```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
 2                       Norfolk Division

 3

 4  - - - - - - - - - - - - - - - - - - -
      MARGARET M. AARON,                 )
 5                                       )
             Plaintiff,                  )
 6                                       )        CIVIL CASE NO.
      v.                                 )          2:10cv00606
 7                                       )
      KROGER LIMITED PARTNERSHIP I,      )
 8                                       )
             Defendant.                  )
 9  - - - - - - - - - - - - - - - - - - -

10

11                   TRANSCRIPT OF PROCEEDINGS
             (Testimony of Vernon E. Harris and D. Dale Heath)
12

13                       Norfolk, Virginia

14                       January 26, 2012

15

16

17  BEFORE:   THE HONORABLE ROBERT G. DOUMAR,
             United States District Judge, and a jury
18

19

20

21  APPEARANCES:

22            WILSON & MCINTYRE, PLLC
              By:  John S. Wilson, Esquire
23                 Counsel for the Plaintiff

24            GUYNN, MEMMER & DILLON, P.C.
              By:  Victor "Dinny" Skaff, Esquire
25                 Counsel for the Defendant
```

Heidi L. Jeffreys, Official Court Reporter

```
1                        I N D E X

2

3    ON BEHALF OF THE DEFENDANT:      Direct   Cross   Red.   Rec.

4    D. E. Heath                         3        16     31     --

5    V. E. Harris                       32        40     --     --

6

7

8

9

10

11                      E X H I B I T S

12   No.                                                    Page

13   Defendant's Exhibits 4 through 10                        12

14   Defendant's Exhibit 11                                   39

15   Defendant's Exhibit 12                                   40

16
     Plaintiff's Exhibit 30                                   50
17

18

19

20

21

22

23

24

25
```

Heidi L. Jeffreys, Official Court Reporter

D. D. Heath - Direct

| | |
|---|---|
| 1 | *****     *****     ***** |
| 2 | MR. SKAFF:  Yes, sir.  We would call Dale Heath at |
| 3 | this time. |
| 4 | (The witness was sworn by the clerk.) |
| 5 | DANIEL DALE HEATH, called as a witness, having been |
| 6 | first duly sworn, testified as follows: |
| 7 | DIRECT EXAMINATION |
| 8 | BY MR. SKAFF: |
| 9 | Q.  Good morning. |
| 10 | A.  Good morning. |
| 11 | Q.  Could I get you to state your full name, please? |
| 12 | A.  Daniel Dale Heath. |
| 13 | Q.  And, Mr. Heath, are you currently employed? |
| 14 | A.  Yes. |
| 15 | Q.  And where are you employed? |
| 16 | A.  Kroger in Charlottesville. |
| 17 | Q.  And how long have you been employed with Kroger, |
| 18 | generally? |
| 19 | A.  It will be 24 years in August. |
| 20 | Q.  And how long have you been in a management position? |
| 21 | A.  Eleven years. |
| 22 | Q.  At which stores?  Various stores, or -- |
| 23 | A.  Yes. |
| 24 | Q.  And were you the manager of the Shore Drive store at any |
| 25 | point? |

4

D. D. Heath - Direct

1   A.   Yes.

2   Q.   Okay.  During what time periods?

3   A.   The end of 2009 through the first part of 2011.

4   Q.   And you say you're now in Charlottesville.  How did you

5   get to Charlottesville?

6   A.   A promotion.

7   Q.   And in your position as a store manager is safety an

8   important aspect?

9   A.   Yes.

10  Q.   Explain a little bit about what Kroger's priorities are

11  as it relates to safety.

12  A.   It's part of our creed, our company, I guess, statement;

13  the safety of associates and customers.

14  Q.   Is it very important to Kroger?

15  A.   Yes.

16  Q.   And what did you do as it relates to store safety,

17  particularly as it relates to the floors, when you were the

18  manager at the Virginia Beach store?

19  A.   Just regular visual inspections of the floor conditions.

20  Q.   And did you have people come in as well?

21  A.   Yes.

22  Q.   And if you found anything that you determined to be

23  dangerous or a hazard what would you do?

24  A.   Well, if it was a spill or trash on the floor, of course,

25  you would take care of the spill or the trash.  If it was

D. D. Heath - Direct

 1  something more serious then we put it on the service hub, and
 2  Facility Engineering would come in and fix it.
 3  Q.  Was that done pretty quickly?
 4  A.  Yes, especially if it's a safety issue.
 5  Q.  Okay.  All right.  Let me direct your attention as it
 6  relates to the cement drain cover at issue in this case.
 7  You're aware that that's an issue in this case.
 8  A.  Right.
 9  Q.  All right.  And you were employed, I think you said, at
10  the Shore Drive store for two and a half years.
11  A.  Correct.
12  Q.  Were you aware of that cement drain cover?
13  A.  I had seen it, yes.
14  Q.  Okay.  And why were you aware of it?
15  A.  Just because that's -- the area that it's in is where we
16  do our seasonal displays, so for the summer we would have
17  watermelons there, for Halloween we would have Halloween
18  candy there.  So it was right there, you know, in a visible
19  place.
20  Q.  And were you ever -- did you ever run your foot over it
21  or touch it or anything?
22  A.  Yes.
23  Q.  And what did you find?
24  A.  That it was level.
25  Q.  Did you ever run your foot over it -- I'm sorry.  Excuse

D. D. Heath - Direct

1   me.

2        Did you ever determine whether it was raised up above

3   the floor in any way?

4   A.   No.  It just looked to me like it was filled in with wax.

5   Q.   But was it raised up above the floor in any way?

6   A.   No.

7   Q.   Okay.  Did you ever have any problem seeing where it was?

8   A.   No.

9   Q.   And on June -- prior to June 3rd of 2010, which is when

10  Mrs. Aaron fell in your store, was it hidden in any way?

11  A.   No.

12  Q.   Was it hidden in any way on June 3, 2010?

13  A.   No.

14  Q.   Let me show you the photograph that we have right in

15  front of you.

16        THE COURT:  Mr. Pierce...

17        MR. SKAFF:  Mr. Pierce, I'm just going to ask him

18  one quick question about it.

19  BY MR. SKAFF:

20  Q.   Does the photograph shown there accurately depict the way

21  the store looked on June 3, 2010?

22  A.   Yes.

23  Q.   Okay.  Let me show you the photograph we have behind you

24  there.

25        THE COURT:  What exhibit number is that?

D. D. Heath - Direct

1          (There was a pause in the proceedings.)

2          THE COURT:  We can put it in now.

3          MR. SKAFF:  It's already into evidence, Your Honor.

4     I'm just not sure what the --

5          THE COURT:  It may be in evidence, but we don't have

6     a mark on it.  I don't know why.

7          THE CLERK:  Demonstrative...

8          THE COURT:  Well, let's put it in evidence, okay?

9          THE CLERK:  It's P 1.

10          THE COURT:  It's P 1?

11          THE CLERK:  Yes, sir.

12          THE COURT:  It's P 1?  Or is it P 2?  Take a look at

13     it and --

14          THE CLERK:  Yes, that's it.  That one on the easel

15     right now is P 2.

16          THE COURT:  Okay.  P 1 is the one that Mr. Pierce

17     has in his hand?

18          THE CLERK:  No.

19          MR. SKAFF:  P 15, Your Honor, I think is the one

20     Mr. Pierce is holding.

21          THE CLERK:  Yes.

22          THE COURT:  P 15?

23          THE CLERK:  P 15 is in.

24          THE COURT:  All right.  That's just a blow-up of

25     P 15?

Heidi L. Jeffreys, Official Court Reporter

8

D. D. Heath - Direct

1          MR. SKAFF:  Yes, sir.

2          THE COURT:  All right.  Mark it P 15.

3          Excuse me.  It's just that if we're going to refer

4    to something I want to make sure it's properly recorded.

5          MR. SKAFF:  And this one, I believe, is P 2, Your

6    Honor.

7          THE COURT:  That's P 2?

8          MR. SKAFF:  Yes.

9          THE COURT:  Mark that P 2.  Otherwise, we get into a

10   real problem.  P 2 will be both the blow-up as well as the

11   small one that's been admitted into evidence, okay?

12         Let's go.

13   BY MR. SKAFF:

14   Q.  And, Mr. Heath, let me show you what's been marked as

15   Exhibit P 2 in the case.

16         Any -- does that accurately depict the way the door

17   looked on the day, June 3, 2010?

18   A.  Yes.

19   Q.  As the store manager, are you out on the sales floor on a

20   regular basis?

21   A.  Yes, constantly.

22   Q.  When you were there as a store manager how many people do

23   you think were in and out of that store on a daily basis?

24   A.  On a daily basis?  2500, 3,000.

25   Q.  Did you ever see anybody have any difficulty walking in

—————————— D. D. Heath - Direct ——————————

1  and around that area?

2  A.  No, sir.

3  Q.  Did you ever have any complaints about anything in or

4  around that area?

5  A.  No.

6  Q.  Was anything changed about that particular area after the

7  fall?

8  A.  No.

9  Q.  It's still in existence today?

10  A.  Yes.

11  Q.  At any time was that cement drain cover ever raised as a

12  safety concern by anyone at Kroger?

13  A.  No.

14  Q.  All right.  Let me direct your attention to June 3, 2010,

15  the date of Ms. Aaron's fall.

16          Were you working that day?

17  A.  Yes.

18  Q.  Okay.  What were you doing?

19  A.  As far, you know --

20  Q.  Well, let me back up.  You didn't see Mrs. Aaron fall,

21  did you?

22  A.  No.

23  Q.  Okay.  How did you first become aware of the fall?

24  A.  I was paged to the front over the intercom.

25  Q.  And what had you been doing?

Heidi L. Jeffreys, Official Court Reporter

D. D. Heath - Direct

1   A.  I was on the back dock receiving a truck.

2   Q.  And when you arrived what did you see?

3   A.  Mrs. Aaron was sitting in a chair, and her shin was

4   bleeding.

5   Q.  Did you speak with her?

6   A.  Yes.

7   Q.  Okay.  And what, if anything, do you recall that she said

8   to you?

9   A.  Just that she didn't know what happened, she didn't see

10  anything in the floor, she didn't know what she tripped over,

11  and she was apologetic.

12  Q.  Did she say anything about how she might have fallen or

13  tripped and fallen?

14  A.  No, just that she didn't know what she fell over.

15  Q.  Did she ever point anything out to you about the drain

16  cover?

17  A.  No.

18  Q.  Did she ever say anything to you about the drain cover?

19  A.  No.

20  Q.  And what did you do next?

21  A.  Called my administrative assistant, Linda Saia, to get

22  the first aid kit to see if we could stop the bleeding on her

23  shin.

24  Q.  Okay.  Did you do anything else?

25  A.  No.

D. D. Heath - Direct

1  Q.  You took care of her and made sure she was okay?

2  A.  Right.

3  Q.  Okay.  And then did you do anything else as it related to

4  the accident?

5  A.  Just the next day I had Vernon -- no.

6  Q.  Okay.  All right.  Now, did you later on complete some

7  reports as it related to this accident?

8  A.  Yes.

9  Q.  All right.  Let me show you a series of documents -- I'd

10  ask that Mr. Pierce hand them to you -- and just get you to

11  take a look through there.

12          (There was a pause in the proceedings.)

13  BY MR. SKAFF:

14  Q.  Do you recognize those documents?

15  A.  Yes.

16  Q.  And what are they?

17  A.  Just the incident report that we sent to Sedgewick.

18  Q.  You sent to Kroger?

19  A.  Yes.

20  Q.  Okay.  Explain to me what these documents are.  What do

21  you do with these documents?

22  A.  Basically, we fill these out as we do our investigation

23  and then fax them to Sedgewick.

24  Q.  Which is a part of Kroger, correct?

25  A.  Right.

Heidi L. Jeffreys, Official Court Reporter

———————— D. D. Heath - Direct ————————

1   Q.   Okay.

2           THE COURT:  Was this done in every case?

3           THE WITNESS:  Yes.

4           THE COURT:  Anytime somebody --

5           THE WITNESS:  Yes, an associate or customer.

6           THE COURT:  Just kept in the regular course of

7   business?

8           THE WITNESS:  Right.

9           THE COURT:  All right.  Let's move along.

10          MR. SKAFF:  Okay.

11  BY MR. SKAFF:

12  Q.   And on the date -- are these your signatures at the

13  bottom of these documents?

14  A.   Yes.

15  Q.   Let me go through these a little bit with you.

16          The first one, which is marked as --

17          MR. SKAFF:  Let me go ahead at this point and just

18  move these into evidence as Defendant's 4 through 10.

19          THE COURT:  Defendant's Exhibits 4 through 10 are

20  admitted into evidence.

21          (The exhibits were admitted into evidence.)

22  BY MR. SKAFF:

23  Q.   Mr. Heath, let me go ahead and direct your attention to

24  Exhibit 4 first.

25          That's the customer incident report?

D. D. Heath - Direct

1   A.   Yes.

2   Q.   Okay.  And, now, this document shows that it wasn't

3   completed until 6-10 of 2010, correct?

4   A.   Correct.

5   Q.   Which was about a week or so after the accident.

6   A.   Correct.

7   Q.   Okay.  Why was that the case?

8   A.   Just the -- the way Mrs. Aaron was acting at the time of

9   the fall, she said it wasn't our fault; that her husband had

10  recently had heart surgery, and, you know, she just really

11  didn't want to be a bother.

12  Q.   Okay.  And, so, what, you didn't complete them at that

13  time?

14  A.   Correct.

15  Q.   Okay.  And what made you complete them later on?

16  A.   A letter from her lawyer.

17  Q.   And, so, you found out that she had retained an attorney

18  within a week of the incident?

19  A.   Yes.

20  Q.   Okay.  And, so, you felt like you had to go ahead and --

21  A.   Right.

22  Q.   Okay.  At any time -- at that point did you realize the

23  cement drain cover was an issue in the case?

24  A.   Not at that time, no.

25  Q.   Now, let me point your attention to Exhibit 7 as part of

Heidi L. Jeffreys, Official Court Reporter

14

———— D. D. Heath - Direct ————

1    that packet.

2        Okay.  Let me -- is that, again, just another --

3    that's a supplemental slip/fall incident report?

4    A.  Yes.

5    Q.  Okay.  And that was prepared -- all of these documents

6    were essentially prepared at the same time?

7    A.  Yes.

8    Q.  Okay.  Let me direct your attention to where it says,

9    "List any comments made by the customer after the fall."

10       Does that refresh your recollection about anything

11   that Mrs. Aaron might have said to you after the incident?

12   A.  Yes.  She said she didn't see anything on the floor, so

13   she must have tripped over her own feet.

14   Q.  Let me direct your attention to what's marked as Exhibit

15   A --

16       THE COURT:  What did she -- let me get back.  I

17   didn't hear the end of that.  What was the end of that?

18       THE WITNESS:  That she didn't see anything on the

19   floor, so she must have tripped over her own feet.

20       THE COURT:  Did she say that to you?

21       THE WITNESS:  Yes.

22   BY MR. SKAFF:

23   Q.  Okay.  Now, let me show you what's marked as Exhibit 8.

24       Is that a diagram that you prepared with regard to

25   the accident?

Heidi L. Jeffreys, Official Court Reporter

——————————— D. D. Heath - Direct ———————————

1  A.  Yes.

2  Q.  Okay.  Now, that diagram shows that the fall happened

3  back where she initially -- where she's testified she picked

4  up her watermelon.  Why did you mark it back there?

5  A.  Just from talking with Ryan Walters, that's where I

6  thought she was standing at the time of the fall, because

7  there was nothing else on the floor that I deemed a slip

8  hazard.

9  Q.  And, based on what she told you at that point, you didn't

10  know what had happened?

11  A.  Exactly.

12  Q.  Okay.  Let me direct your attention to the next document

13  in line, which is Defendant's Exhibit Number 9.

14        What is that document?

15  A.  A floor inspection report.

16  Q.  Okay.  And what is that document for, and what did you do

17  there?

18  A.  Just -- it's asking when the last time the floor was

19  inspected, and it was inspected by me at around 1:00 p.m., on

20  a routine store walk.

21  Q.  And you didn't -- what did you not -- what did you see

22  or not see?

23  A.  It was free of debris, no liquid, no trip hazards.

24  Q.  And Exhibit 10 -- what is that document?

25  A.  Suspicious/questionable incident form.

———— D. D. Heath - Cross ————

1  Q.  And why did you complete that document?

2  A.  Just because they told -- when we go through training

3  they tell us to fill out as much as possible.

4  Q.  And that's just part of the packet?

5  A.  Right.

6  Q.  And that just, again, talks about what you were told with

7  regard to the accident?

8  A.  Yes.

9  Q.  Okay.  Did you at any time tell anyone what to put on any

10  form or anything like that?

11  A.  No.

12       MR. SKAFF:  I think that's all I have, Your Honor.

13                    CROSS-EXAMINATION

14  BY MR. WILSON:

15  Q.  Mr. Heath, good morning.

16       One of your job responsibilities as store manager

17  included promoting safety awareness and safety standards in

18  the store?

19  A.  Yes.

20  Q.  And the store had safety audits on a bimonthly basis?

21  A.  Correct.

22  Q.  And you had to sign off on those, right?

23  A.  Yes.

24  Q.  And those were conducted by Mr. Harris and not by you?

25  A.  Correct.

—— D. D. Heath - Cross ——

1  Q.  And the condition of the floor surfaces was part of those

2  safety audits, right?

3  A.  Yes.

4  Q.  And the audits covered things like the drain covers, any

5  unevenness, anything that could possibly be a trip hazard?

6  A.  Yes.

7  Q.  And you understood that a tripping hazard was anything

8  that could make someone trip, correct?

9  A.  Yes.

10  Q.  You had looked at the cement drain plug before June 3,

11  2010?

12  A.  Yes.

13  Q.  And you rubbed your foot on it?

14  A.  Yes.

15  Q.  And, based on your visual observation, you concluded that

16  it was level, right?

17  A.  Yes.

18  Q.  And, so, do you know in this case whether or not it's

19  been measured to be not level one way or the other?

20  A.  I don't -- I don't.

21  Q.  But someone who was in the store who does those routine

22  inspections that you've described -- and you're all over the

23  floor -- by visual inspection it was level to you, correct?

24  A.  Correct.

25  Q.  Okay.  You never touched the spot with your hand, though,

─────────── D. D. Heath - Cross ───────────

1    did you?

2    A.   Just ran my foot across it.

3    Q.   You never took any measurements or anything like that?

4    A.   No.

5    Q.   You don't have any professional licenses, do you?

6    A.   No.

7    Q.   You mentioned that Kroger has a separate -- I think you

8    said Facilities Engineering Department.

9    A.   Yes.

10   Q.   And that's where?

11   A.   Roanoke.

12   Q.   And that's where you have your engineers?

13   A.   Yes.

14   Q.   From your experience as the store manager, did this

15   cement spot serve any purpose?

16   A.   No.

17   Q.   Was it decorative in any way?

18   A.   No.

19   Q.   And you don't even know why it was there, do you?

20   A.   No, I don't.

21   Q.   Other areas in the store have brass drain covers, right?

22   A.   Yes.

23   Q.   This Shore Drive store had a large senior clientele, did

24   it not?

25   A.   It did.

D. D. Heath - Cross

1  Q.  And, in fact, you offered a 5 percent senior discount on
2  Tuesdays.
3  A.  Yes.
4  Q.  And you posted that prominently on the window.
5  A.  Yes.
6  Q.  What was the purpose of doing that?
7  A.  Just to increase business.
8  Q.  Increase senior business?
9  A.  Yes.
10  Q.  In terms of this watermelon display that we've seen,
11  Kroger decided where to place that watermelon display, right?
12  A.  Basically, it's a decision made in store.
13  Q.  But what I'm saying is it's a decision that that store
14  makes, as opposed to a vendor who comes in and says, "I want
15  to put my watermelons here."
16  A.  Right.
17  Q.  And I think you said that this area normally was used for
18  seasonal or promotional items.
19  A.  Yes.
20  Q.  And on the store plan would you agree that that area is
21  shown clear?
22  A.  Yes.
23  Q.  If you can look at it -- I don't know if you can see it,
24  sir, and I don't -- it's not a good angle for you, but did
25  you understand that there was a yellow sign on the box?

Heidi L. Jeffreys, Official Court Reporter

———— D. D. Heath - Cross ————

1    A.   Yes.

2    Q.   And what did that mean?

3    A.   That's the price of the watermelon.

4    Q.   Was it a sales item?

5    A.   Yes.

6    Q.   And, so, the purpose was to draw people over to that

7    area?

8    A.   Yes.

9    Q.   You have no personal knowledge as to how the fall

10   occurred?

11   A.   I don't.

12   Q.   Looking at one of the exhibits which has previously been

13   marked as Plaintiff's 1, I'd ask you one question.

14        After Mrs. Aaron had fallen do you see the initials

15   "WM" with an X there down at the bottom?

16   A.   Yes.

17   Q.   And was it your understanding that's where the watermelon

18   had landed?

19   A.   Yes.

20   Q.   And after her fall it's my understanding that you went

21   and conducted a very thorough examination of that area all

22   around the watermelon display, right?

23   A.   Right.

24   Q.   And when you did that did you find any debris -- I mean,

25   putting the watermelon aside.

──────── D. D. Heath - Cross ────────

1   A.   No.

2   Q.   Was the watermelon displayed in any -- the watermelon

3   that broke, was that where Mrs. Aaron fell, or did she throw

4   that forward?

5   A.   It looked like she had thrown it forward.

6   Q.   Okay.  And, so, when you looked in the area where you

7   thought she had fallen there was nothing there, as far as you

8   could tell.

9   A.   Right.

10  Q.   But the cement drain plug was there, wasn't it?

11  A.   Yes.

12  Q.   When you first went to Mrs. Aaron she was sitting in a

13  chair?

14  A.   Yes.

15  Q.   Do you know how she got in the chair?

16  A.   From what I was told, I think a customer brought it over.

17  Q.   All right.  Other than that, you don't know -- you don't

18  have any personal knowledge?

19  A.   No.

20  Q.   Were you aware that Mrs. Aaron was hurt?

21  A.   Just -- I -- that her shin was bleeding.

22  Q.   When you say "her shin" was it actually on the outside of

23  her leg?

24  A.   Yeah.  It was her right leg, I believe.

25  Q.   On the outside near the shin?

D. D. Heath - Cross

1  A.  Right.

2  Q.  Okay.  And I think you said that you tended to her.

3  A.  Yes.

4  Q.  And as you tended to her were you able to stop the

5  bleeding?

6  A.  After a while.  It seemed like maybe she was on blood

7  thinners, and it was -- it was hard to get it to stop

8  bleeding.

9  Q.  When you inspected the area after her fall did you see

10  what she had cut her leg on?

11  A.  I did not.

12  Q.  Now, we talked about the incident report that you

13  prepared, and I'd ask you to look at that.

14          THE COURT:  Which number is it?

15          MR. WILSON:  Your Honor, this was Defendant's

16  Exhibits 4 through 10, with the exception of Number 6, which

17  we discussed earlier.

18  BY MR. WILSON:

19  Q.  Do you have a copy of that in front of you, sir?

20  A.  Yes.

21  Q.  Okay.  Now, you prepared that incident report after you

22  had received an attorney letter, correct?

23  A.  Correct.

24  Q.  And at the bottom of it it says, "This report is being

25  prepared in anticipation of litigation under the direction of

————— D. D. Heath - Cross —————

1   legal counsel."

2         Do you see that?

3   A.  Yes.

4   Q.  Okay.  And when you were preparing this you had already

5   been put on notice of a claim, and then you were preparing

6   sort of -- I guess you were filling out the form accordingly.

7   A.  Right.

8   Q.  Now, if you would look, please, at the first page, which

9   is, I guess, marked as Number 4.  Do you have that?

10  A.  Yes.

11  Q.  And do you see that that date is June 10, down at the

12  bottom there, sir, the second page?

13  A.  Yes.

14  Q.  Okay.  And, so, that's the date you filled out that form.

15  A.  Right.

16  Q.  Okay.  Now, Counsel brought your attention to what's been

17  marked as 8, which was the drawing.

18        Do you have that in front of you?

19  A.  Yes.

20  Q.  Okay.  Looking at that drawing, you were asked to place

21  an X where the fall happened, right?

22  A.  Correct.

23  Q.  And you didn't witness the fall.

24  A.  Right.

25  Q.  Ryan Walters did.

———————— D. D. Heath - Cross ————————

1    A.  Yes.

2    Q.  And Ryan Walters -- you never asked him to see if you had

3    actually put the X in the right place, did you?

4    A.  No, I didn't.

5    Q.  And, in fact, where you put that X -- that was behind the

6    watermelon bin, right?

7    A.  Right.

8    Q.  As opposed to just coming around the corner where that

9    cement drain plug was, right?

10    A.  Right.

11    Q.  Okay.  So you had the wrong location.

12    A.  Yes.

13    Q.  Now, if you look, please, again going back to Number 4,

14    if you don't mind, it talks about witnesses on page 2.

15        Do you see that, "Potential Witnesses"?

16    A.  Yes.

17    Q.  And do you see that differentiates between store

18    employees and non-employees?

19    A.  Yes.

20    Q.  When Mrs. Aaron got hurt were there other customers in

21    the store?

22    A.  There was.

23    Q.  And on that date did you try to contact or interview any

24    customers to see what they had seen?

25    A.  I did not.

——————— D. D. Heath - Cross ———————

1    Q.  Did you expect that once the shoppers left that day that

2    you would have difficulty tracking them down?

3    A.  Honestly, it didn't even cross my mind.

4    Q.  Okay.  Then if you would continue down a little bit

5    further it says, "Were witness statements taken?"

6          Do you see that?

7    A.  Yes.

8    Q.  And you indicated "Yes," and you gave two.  And was one

9    of the witness statements that was taken that of Mr. Walters?

10   A.  Yes.

11   Q.  And you'll see that marked as Exhibit 5.

12         THE COURT:  Mr. Wilson, you're treading on thin ice.

13   Approach the bench.

14         (The following was heard at the sidebar out of the

15   hearing of the jury:)

16         THE COURT:  You're opening Pandora's box when you

17   start talking about witness statements that were taken and

18   who was taken and who wasn't taken, and you're going to end

19   up with the lady's statement coming into evidence.

20         MR. WILSON:  This is already in evidence; not the

21   other one.  I'll move on.

22         THE COURT:  Do you understand what I'm saying to

23   you, Mr. Wilson?

24         MR. WILSON:  I do.

25         THE COURT:  I'm trying to warn you.

—— D. D. Heath - Cross ——

1        MR. WILSON:  I've got you.

2        THE COURT:  Have you got the warning?

3        MR. WILSON:  Yes, sir.  I'll leave that one alone.

4        (The proceedings resumed in open court as follows:)

5  BY MR. WILSON:

6  Q.  Mr. Heath, look, please, at what's been marked as

7  Exhibit 7.

8        Do you have that?

9  A.  Yes.

10  Q.  And where it asks about the type of flooring in this area

11  you said, "Slip-Resistant Tile"?

12  A.  Yes.

13  Q.  You never mentioned the cement drain plug that was the

14  anomaly in the slip-resistant tile area, right?

15  A.  Correct.

16  Q.  And then you -- at that time did you make notes that

17  Mrs. Aaron was wearing white Sketchers?

18  A.  Yes, slip-on shoes.

19  Q.  And you said "without a back on them."

20  A.  Yes.

21  Q.  And if I could ask that we perhaps show those shoes to

22  you.

23        (There was a pause in the proceedings.)

24  BY MR. WILSON:

25  Q.  And, sir, those aren't white Sketchers, are they?

D. D. Heath - Cross

1   A.  No, but --

2   Q.  Okay.  And they do have a back on them.

3   A.  Not really.

4   Q.  Okay.  Are those the shoes that you remember?

5   A.  To the best of my recollection, yes.

6   Q.  Okay.  Now, when --

7           THE COURT:  I didn't understand.  Are these the

8   shoes you saw, or are they different shoes that you saw?

9           THE WITNESS:  To the best of my recollection, they

10  are the shoes.

11          THE COURT:  Okay.

12  BY MR. WILSON:

13  Q.  Now, Mr. Heath, I wanted to ask you when you spoke with

14  Mrs. Aaron after the fall you didn't know that she had broken

15  her pelvis at that time, right?

16  A.  No.

17  Q.  And is it fair to say that you didn't realize the

18  seriousness of her condition?

19  A.  Correct.

20  Q.  When you were talking with her -- you don't have any

21  specialized medical training do you?

22  A.  No.

23  Q.  And you wouldn't know if someone were in shock?

24  A.  No.

25  Q.  When you were talking with her did she seem shaken up to

D. D. Heath - Cross

1  you?

2  A.  A little, yeah.  Average, yes.

3  Q.  And was she sort of rambling a bit?

4  A.  A little bit.

5  Q.  When you were with Mrs. Aaron before the paramedics

6  arrived was she embarrassed by the attention?

7  A.  Yes.

8  Q.  And she said she was sorry to be a bother?

9  A.  Yes.

10  Q.  And did she also tell you that she wanted to avoid

11  calling her husband directly?

12  A.  Yes.

13  Q.  And did she say why?

14  A.  Because he had just had heart surgery.

15  Q.  And she didn't want to upset him?

16  A.  Correct.

17  Q.  Now, earlier when Mr. Skaff asked you what you recalled

18  her saying I thought you said that she said, "I didn't know

19  what happened," right?

20  A.  Right.  She said, "I didn't know what I tripped over."

21  Q.  Okay.  And then when he was giving you this document that

22  was prepared in anticipation of litigation --

23  A.  Uh-huh.

24  Q.  -- that refreshed your memory in terms of some other

25  things that you thought about, right?

D. D. Heath - Cross

1    A.  Yes.

2    Q.  You selected what to put in this report, did you not, in

3    terms of statements?

4    A.  Yes.

5    Q.  Because you didn't mention things about her husband with,

6    you know, the heart condition, and whether or not she wanted

7    to call an ambulance, and things like that, correct?

8    A.  Correct.

9    Q.  So you selected what to put in here, correct?

10   A.  Yes.

11   Q.  And when you were doing that did you understand at the

12   time that you might be using this document in court in order

13   to provide some detail to the jury?

14   A.  Yes.

15   Q.  And you did that because you were preparing this in the

16   anticipation of litigation.

17   A.  Yes.

18   Q.  Now, look at what you said on Exhibit 4, and tell me if

19   I'm reading this correctly.

20        "Mrs. Aaron repeatedly told us she fell on her own

21   and didn't trip over anything."  Do you see that?

22   A.  Yes.

23   Q.  And then, if you wouldn't mind, would you please look at

24   Exhibit 7.  And this time you say that she said, "I tripped

25   over my own feet."

D. D. Heath - Cross

1    A.  Yes.

2    Q.  Okay.  So on June 10, when you prepared Exhibit 4, you

3    were told she said, "I didn't trip over anything," and on

4    June 11 you said that she tripped over her own feet.

5    A.  Correct.

6    Q.  All right.  And then --

7            THE COURT:  That's what she said, not what he said.

8    Is that what she said?

9            THE WITNESS:  To the best of my recollection, yes.

10   BY MR. WILSON:

11   Q.  And, sir, then if you would look, please, at Exhibit 10,

12   now -- well, first of all, this is called a Supplemental

13   Questionable/Suspicious Incident Form.

14   A.  Uh-huh.

15   Q.  And do you fill that form out for every fall?

16   A.  Yeah.

17   Q.  So, from Kroger's perspective, every time someone falls

18   it's questionable or suspicious?

19   A.  Or supplemental.

20   Q.  And this Supplemental Questionable --

21           THE COURT:  Asked and answered.  Move along,

22   Mr. Wilson.

23           MR. WILSON:  Okay.

24   BY MR. WILSON:

25   Q.  Mr. Heath --

Heidi L. Jeffreys, Official Court Reporter

──────── D. D. Heath - Redirect ────────

1        THE COURT:  Sometimes you just keep going.

2   BY MR. WILSON:

3   Q.  Mr. --

4        THE COURT:  Let's move along.

5   BY MR. WILSON:

6   Q.  Mr. Heath, when you look at what you describe as what

7   Mrs. Aaron told you in this particular document now it says,

8   "She repeatedly told us she tripped over her own feet and it

9   was not our fault but hers."

10  A.  Correct.

11  Q.  So we sort of get the progression from didn't trip --

12       THE COURT:  Don't make any comments, Mr. -- you can

13  argue your case at the end of the trial, Mr. Wilson.

14       MR. WILSON:  Okay.  That's all, then.  I have no

15  further questions for you.

16       THE COURT:  Any redirect, Mr. Skaff?

17       MR. SKAFF:  Yes, Your Honor, just a couple of

18  things.

19                  REDIRECT EXAMINATION

20  BY MR. SKAFF:

21  Q.  Mr. Heath, I just want to be clear.

22       Did you in any way alter or prepare these reports

23  differently than your recollection of what happened on the

24  day of the accident because there had been some letter from

25  an attorney?

Heidi L. Jeffreys, Official Court Reporter

—————— V. E. Harris - Direct ——————

1   A.  No.

2   Q.  Did you -- were you aware -- did you have any knowledge

3   of any specific customers that had ever seen what happened?

4   A.  No.

5   Q.  Mr. Wilson asked you some questions about why -- you

6   know, about putting slip-resistant tile on the forms as

7   opposed to not -- and also not putting the cement drain plug

8   on there.  Why was that?

9   A.  At that time I didn't realize that the drain plug was an

10  issue.

11  Q.  Did you ever realize that it could be an issue?

12  A.  Not at that time.

13          MR. SKAFF:  Okay.  All right.  That's all I have,

14  Your Honor.

15          THE COURT:  Anything else, Mr. Wilson?

16          MR. WILSON:  No, Your Honor.

17          THE COURT:  You're instructed not to discuss your

18  testimony with anyone until this case is complete, at which

19  time you're free to discuss it with anyone you like.  You may

20  step down.

21          Who is your next witness, Mr. Skaff?

22          MR. SKAFF:  We would call Mr. Vernon Harris, Your

23  Honor.

24          (The witness was sworn by the clerk.)

25          VERNON ELDRIDGE HARRIS, called as a witness, having

—————————— V. E. Harris - Direct ——————————

1    been first duly sworn, testified as follows:

2                         DIRECT EXAMINATION

3    BY MR. SKAFF:

4    Q.  Good morning.

5    A.  Good morning.

6    Q.  Could I get you to state your full name, please.

7    A.  Vernon Eldridge Harris.

8    Q.  Mr. Harris, are you currently employed?

9    A.  Yes, sir.

10   Q.  Where?

11   A.  Kroger's.

12   Q.  And what do you do for Kroger?

13   A.  I'm a loss prevention specialist.

14   Q.  And how long have you been there?

15   A.  Thirteen years.

16   Q.  Are you assigned to a specific store, or --

17   A.  I cover seven stores.

18   Q.  And in your job in loss prevention what do you do as it

19   relates to store safety, focusing particularly on the floors

20   of the stores?

21   A.  Safety inspections, date inspections, check about the

22   dates, safety concerns, you know, fire inspections, make sure

23   fire doors are sealed.

24   Q.  And as part of your safety inspection as it relates to

25   floors do you go around and look at the floors?

V. E. Harris - Direct

1    A.  Yes, sir.

2    Q.  And what are you looking for when you do that?

3    A.  Cracks, any tiles that are peeled up, carpet that's torn,

4    rugs that might be misplaced, out of place.

5    Q.  And if you see anything like that what do you do about

6    it?

7    A.  I have an audit I fill out, and I also tell the store

8    manager and send it through the e-mail to the corporate

9    headquarters.

10   Q.  Does Kroger take care of that pretty quickly?

11   A.  Yes, sir.  They put it on what's called a hub, and

12   Maintenance comes out and takes care of that.

13   Q.  Let me talk to you about this cement drain cover that

14   you're aware of that's pictured just to the right of the

15   watermelon display.

16        You're aware of what I'm speaking of, correct?

17   A.  Yes, sir.

18   Q.  Okay.  In your position had you become aware of this

19   cement drain cover prior to June 3 of 2010?

20   A.  Yes, sir.

21   Q.  And how and why?

22   A.  It's been there since they did a remodel back in 2000 --

23   1999, 2000.

24   Q.  And when they did that remodel was there any kind of

25   inspection or anything done?

—————————— V. E. Harris - Direct ——————————

1    A.   Yeah.   Every time a part of a remodel is done it gets

2    inspected.

3    Q.   By whom?

4    A.   By the city and also by Kroger.

5    Q.   Okay.   And did that pass all those inspections?

6            MR. WILSON:   Your Honor, I would object to the

7    hearsay for part of the inspection and that Kroger --

8            THE COURT:   Objection overruled.   Continue.

9    BY MR. SKAFF:

10   Q.   To your knowledge, did the floor at issue pass those

11   inspections?

12   A.   To the best of my knowledge, it did.

13   Q.   Okay.   Now, have you ever touched that specific spot or

14   anything?

15   A.   Quite often.

16   Q.   Okay.   And what do you notice about it?

17   A.   Really, nothing.   It's -- there's just one little spot

18   that's like a little divot the size of a pencil head.   Other

19   than that, it's pretty -- fairly flat.

20   Q.   Do you ever have any problems seeing it?

21   A.   No, sir.

22   Q.   Prior -- or -- where is your office based out of?

23   A.   It's on the opposite side of the produce entrance.   It's

24   on the far side of the building.

25   Q.   So, while you work out of seven stores, is your office

———— V. E. Harris - Direct ————

1  based out of this particular store?

2  A.  Yes, sir.

3  Q.  Okay.  So have you -- in the times that you've gone in

4  and out of that store did you ever have any problem seeing

5  that spot?

6  A.  No, sir.

7  Q.  Was it ever -- prior to June 3 of 2010, was it hidden in

8  any way?

9  A.  No, sir.

10  Q.  On June 3, 2010, was it hidden in any way?

11  A.  No, sir.

12  Q.  In your store life and in your discussions with Kroger

13  and all that sort of thing has that ever been identified as

14  some sort of safety issue?

15  A.  No, sir.

16  Q.  Are you -- how many people do you believe are in and out

17  of that store on a regular basis?

18          THE COURT:  Unless he knows -- the store manager?  I

19  allowed him to testify to that; not him.

20          Let's move along.

21          MR. SKAFF:  Yes, sir.

22  BY MR. SKAFF:

23  Q.  Is that a fairly busy store?

24  A.  Yes, sir.

25  Q.  And have you ever had any complaints about that

—————————————— V. E. Harris - Direct ——————————————

1   incident -- about that spot?

2   A.   No, sir.

3   Q.   And was anything changed about it after Ms. Aaron's fall?

4   A.   No, sir.

5   Q.   It still exists today?

6   A.   Yes, sir.

7   Q.   In the same form?

8   A.   Yes, sir.

9   Q.   Now, since this incident has occurred have you had the

10  opportunity to go out and inspect it?

11  A.   Yes, sir.

12  Q.   And what -- have you measured it?

13  A.   Yes, sir.

14  Q.   How did you measure it?

15  A.   With a ruler, a stick ruler.

16  Q.   Okay.  And what -- what do you -- what do you -- have you

17  seen in terms of measurements?  What did you find out?

18  A.   It's -- like I said, it's got an eighth-of-an-inch like

19  divot on one edge, about the size of a pencil head.  Other

20  than that, it's fairly flat.

21  Q.   And how far across is it?

22  A.   It's seven inches across.

23  Q.   At no point -- is it raised above the floor at any point?

24  A.   No, sir.

25  Q.   Aside from that one little pencil spot that you

V. E. Harris - Direct

1  mentioned, is that -- is it flush with the floor?

2  A.  Yes, sir.

3  Q.  That you're -- according to your inspections?

4  A.  Yes, sir.

5  Q.  Okay.  Let me ask you a quick question about the floor,

6  if you know.

7        The tiles on the floor, are they a specific

8  measurement?

9  A.  Yeah.  They're a foot by a foot.

10  Q.  Okay.  Let me show you a couple of photographs, if I

11  could, please.  The first one would be what we've marked as

12  Defendant's Exhibit Number 11.

13        Do you recognize that?

14  A.  Yes, sir.

15  Q.  What is that?

16  A.  That's the drain cover.

17  Q.  And were you present when this photograph was taken?

18  A.  Yes, sir.

19  Q.  And it was taken after this incident occurred?

20  A.  Yes, sir.

21  Q.  Does that generally depict the area where the plaintiff

22  allegedly -- or where she fell, minus the watermelon display?

23  A.  Yes, sir.

24  Q.  Okay.

25        MR. SKAFF:  Your Honor, at this time we would move

——————— V. E. Harris - Direct ———————

1    into evidence Defendant's Exhibit 11.

2             THE COURT:  Defense Exhibit 11 is received in

3    evidence.

4             (The exhibit was admitted into evidence.)

5             MR. SKAFF:  I'm sorry, Your Honor?

6             THE COURT:  It was received in evidence.

7             MR. SKAFF:  Thank you.

8    BY MR. SKAFF:

9    Q.  If I could just show you one more photograph, Mr. Harris.

10   This is what we've marked as Defendant's Exhibit Number 12.

11            Can you just -- do you recognize what that is?

12   A.  Yes, sir.

13   Q.  And what is that?

14   A.  That's the drain cover.

15   Q.  Just another angle?

16   A.  Yes, sir.

17   Q.  And were you present when that photograph was taken?

18   A.  Yes, sir.

19   Q.  And, again, that was taken after this incident occurred?

20   A.  Yes, sir.

21   Q.  Does that accurately depict the area in question in this

22   case?

23   A.  Yes, sir.

24            MR. SKAFF:  Your Honor, we would move into evidence

25   Defendant's Exhibit Number 12.

Heidi L. Jeffreys, Official Court Reporter

———————— V. E. Harris - Cross ————————

1          THE COURT:  Number 12 is received in evidence.

2          (The exhibit was admitted into evidence.)

3    BY MR. SKAFF:

4    Q.  One final question -- or a couple final questions.

5    A.  Okay.

6    Q.  The testimony in this case has shown that Mrs. Aaron had

7    a shopping cart with her --

8    A.  Okay.

9    Q.  -- just prior to her fall.

10          Did you have an opportunity to measure generally what

11   the size of those shopping carts are?

12   A.  Yes, sir.

13   Q.  Okay.  How wide is it?

14   A.  It's two feet wide and four feet long.

15   Q.  Okay.

16          MR. SKAFF:  I think that's all I have, Your Honor.

17                    CROSS-EXAMINATION

18   BY MR. WILSON:

19   Q.  Mr. Harris, you described yourself as a loss prevention

20   specialist.

21   A.  Yes, sir.

22   Q.  And is one of your primary roles to execute initiatives

23   to reduce losses at the store?

24   A.  Yes, sir.

25   Q.  And is one of the ways you do that to testify in civil

V. E. Harris - Cross

1    cases?

2    A.  Yes, sir, if I'm called to.

3    Q.  And you have no personal knowledge as to what happened

4    with Mrs. Aaron on June 3rd, do you?

5    A.  No, sir.

6    Q.  You weren't even working that day, were you?

7    A.  No, sir.

8    Q.  Other than being the designated witness, did you have any

9    job responsibilities to perform those safety audits?

10   A.  I'm sorry?

11   Q.  Did you have any job responsibilities to perform those

12   safety audits?

13   A.  Yes, sir.

14   Q.  And my understanding is they were about every eight weeks

15   or so.

16   A.  Yes, sir.

17   Q.  Are you a licensed engineer?

18   A.  No, sir.

19   Q.  Do you have any professional licenses?

20   A.  No, sir.

21   Q.  Do you consider yourself a safety expert?

22   A.  No, sir.

23   Q.  And you don't know what is within industry tolerances in

24   terms of safety points, do you?

25   A.  Oh, no, sir, I don't.

V. E. Harris - Cross

1  Q.  But you've got that Roanoke facility with engineers out
2  there, right, that use different standards?
3  A.  Yes, sir.  I just report -- if I see something that's
4  not -- that I think is not safe, I report it to them.
5  Q.  When you take these safety audits do you have a
6  checklist?
7  A.  Yes, sir.
8  Q.  And it's something printed off the computer?
9  A.  Yes, sir.
10  Q.  And when you're done with those inspections do you keep
11  any records of those, or are they sent off to somebody else?
12  A.  They're sent off.
13  Q.  And, so, the store doesn't keep any records.
14  A.  No, sir.
15  Q.  One of the things that you were to look at as part of
16  those safety audits, to my understanding, are the drain
17  areas, right?
18  A.  Yes, sir.
19  Q.  And in this case most of the drain areas have those brass
20  covers on them?
21  A.  Yes, sir.
22  Q.  And you look to make sure they didn't have loose screws
23  or that they were level?
24  A.  Yes, sir.
25  Q.  And you were familiar with the cemented drain area --

Heidi L. Jeffreys, Official Court Reporter

———— V. E. Harris - Cross ————

 1   we've talked about that -- and that's something you would

 2   check as part of your safety audit, right?

 3   A.  Yes, sir.

 4   Q.  And when you were inspecting that particular spot you

 5   never determined, prior to June 3, 2010, that it wasn't

 6   totally flat, did you?

 7   A.  It's -- every time I checked it, you know, I reported it

 8   to be safe.  So I never had any issues where it looked like

 9   it was a hazard and raised up or any kind of hazard for

10   anybody.

11   Q.  But my question was before June 3rd you believed that the

12   cement drain plug was totally flat with the floor, did you

13   not?

14   A.  Yes, sir.

15   Q.  And you also believed that it was -- or you disagreed

16   that it was either slightly dished or irregular from the rest

17   of the floor surface, right?

18   A.  Yes, sir.

19   Q.  And in your inspections prior to June 3rd, 2010, you had

20   never actually measured it, had you?

21   A.  No, sir.

22   Q.  You never checked the slip resistance of the tile

23   vis-à-vis the cement drain spot, did you?

24   A.  No, sir.

25            THE COURT:  This is cross-examination.  He hasn't

———— V. E. Harris - Cross ————

1   inspected it.  You've shown that.  Let's move along.

2   BY MR. WILSON:

3   Q.  Well, let me ask -- you inspected this thing every eight

4   weeks?

5           THE COURT:  He's inspected it before.  Let's move

6   along, Mr. Wilson.

7           MR. WILSON:  Okay.

8   BY MR. WILSON:

9   Q.  Now, I understand that now, based on your measurements,

10  you now conclude that there is in fact a deviation, after you

11  measured it after this lawsuit.

12  A.  In the little -- in the far corner, the little divot,

13  pencil head size.

14  Q.  Were you surprised to learn that your visual inspection

15  didn't reveal that deviation?

16          THE COURT:  We're talking about a deviation, he

17  said, of a pencil head?

18          MR. WILSON:  That's what he said, and I was

19  asking --

20  BY MR. WILSON:

21  Q.  Did your visual inspection reveal that, and were you

22  surprised that it did not?

23  A.  I'm not sure I understand the question there.

24  Q.  All right.  When you were looking at it you thought it

25  was totally flat, right?

Heidi L. Jeffreys, Official Court Reporter

———— V. E. Harris - Cross ————

1    A.   Right.

2    Q.   When you measured it you found out it wasn't totally

3    flat, right?

4    A.   Correct.

5    Q.   Okay.  And, so, were you surprised that when you actually

6    measured it what you had seen wasn't the way it actually was?

7    A.   Yes.

8    Q.   Okay.  Now, you mentioned something about in the early

9    2000s there was a -- I think you said a reconstruction or a

10   remodel.

11   A.   Yes, sir.

12   Q.   Okay.  And it was my understanding that you had no input

13   or role in the construction or remodeling process.

14   A.   That's correct.

15   Q.   And, so, when you talked about a city inspection you

16   don't know if this area was inspected, do you?

17   A.   I know they had to come in -- that I was told that they

18   come in to do inspections after each section was done, but I

19   had no control over seeing them come in, walking them through

20   it, or anything like that.

21   Q.   Right.  So you don't know if, in fact, anyone ever

22   inspected that spot.

23   A.   That's true.

24   Q.   Okay.  Now, I'm going to ask you that --

25              THE COURT:  Just ask the questions, Mr. Wilson,

Heidi L. Jeffreys, Official Court Reporter

─────────────── V. E. Harris - Cross ───────────────

1    please.

2    BY MR. WILSON:

3    Q.  As part of this remodel did Kroger put new tile in the

4    produce area?

5    A.  Yes, sir.

6    Q.  And was it your understanding that that cement drain plug

7    had been filled prior to Kroger taking over the store?

8           THE COURT:  I don't know what he -- what are we

9    talking about?

10          Did you ever go to the store prior to Kroger taking

11   over the store?

12          THE WITNESS:  Yes, sir.  I worked for Hannaford's,

13   which owned the Kroger store before Kroger bought it.

14          THE COURT:  Oh, good.  Go ahead.

15   BY MR. WILSON:

16   Q.  Did you know that prior to the tile being put down that

17   the cement drain plug had been filled in by somebody other

18   than Kroger?

19   A.  That I don't know.

20   Q.  You do know that Kroger did put down new tile.

21   A.  Yes, sir.

22   Q.  You gave the dimensions of it.  You said it was 12 inches

23   by 12 inches.  How thick was it?

24   A.  That I don't know.

25   Q.  Okay.  You mentioned that some pictures were taken after

———— V. E. Harris - Cross ————

1   the lawsuit, and you said you were present.  Who actually

2   took the pictures?

3   A.  We did.

4   Q.  Who is "we"?

5   A.  I took some and sent them to Mr. Skaff.

6   Q.  Okay.  I don't want to get into that.

7       But was Mr. Skaff with you when you were taking the

8   pictures?

9   A.  Yes.

10  Q.  Okay.  And did he hold the camera at any time?

11  A.  No.

12  Q.  And, so, you took the pictures?

13  A.  I took the pictures.

14  Q.  With him present?

15  A.  Yes, sir.

16  Q.  One of the pictures --

17      THE COURT:  Do you contend that the pictures aren't

18  correct?

19      MR. WILSON:  What's that?

20      THE COURT:  Did you make any contention that the

21  pictures aren't correct, Mr. --

22      MR. WILSON:  No.  I'm going to introduce one.

23      THE COURT:  Well, why are we doing all of this?

24      MR. WILSON:  I'm getting ready to introduce one as

25  an exhibit.

——————— V. E. Harris - Cross ———————

1          THE COURT:  You know, let's get on with it,

2     Mr. Wilson.  Let's get on to the case.

3          MR. WILSON:  I would move to introduce this -- it

4     was originally marked Defendant's 11, but the numbers got

5     changed, so we can call it P 30.

6          So this would be P 30, although it had originally

7     been marked D 11, okay?

8     BY MR. WILSON:

9     Q.  Looking at that picture, does it look like it's taken

10    more from ground level?

11    A.  Yes, sir.

12    Q.  Okay.  And the other pictures that Mr. Skaff had

13    introduced were taken more from sort of a bird's-eye, up-top

14    level?

15    A.  Yes, sir.

16    Q.  And, so, if you look at those -- if you look at the ones

17    from ground level versus the ones from top level, they look

18    real different, don't they?

19    A.  They look a little different.

20    Q.  Okay.  Do you know if that area -- when these pictures

21    were taken had it been cleared out of merchandise that

22    normally is a seasonal promotion?  Had it been moved out so

23    you could take these pictures?

24    A.  Which?

25    Q.  Any of the pictures that you took with your lawyer.

1          THE COURT:  Do you contend that any of these

2     pictures are inaccurate?  Then I'll be glad to hear it.

3     Let's move along, Mr. Wilson.

4          Do you contend that any of these pictures are

5     inaccurate?  Do you?

6          MR. WILSON:  They're inaccurate because they don't

7     show the display on that day, and that's all I was trying to

8     establish.

9          MR. SKAFF:  We've stipulated --

10         THE COURT:  They're not intended to show the

11    display.

12         Let's move along, Mr. Wilson.  We want to get to

13    this trial.

14         MR. WILSON:  Okay.  That was my last question.  I

15    just wanted to make that point.

16         MR. SKAFF:  I have no further questions, Your Honor.

17         THE COURT:  What exhibits have we got that may not

18    be here so I don't have to recall any more witnesses?

19         THE CLERK:  P 30 is actually Defendant's Exhibit 11,

20    but we need to get that in.

21         THE COURT:  And that's it?

22         THE CLERK:  That's the only one you need to admit.

23         THE COURT:  Okay.  That's what I was curious about.

24         You're moving for this exhibit to be admitted into

25    evidence, correct, Mr. Wilson?

```
 1              MR. WILSON:  Yes, Your Honor.  I renumbered it P 30.

 2              THE COURT:  All right.  It's admitted.

 3              MR. WILSON:  Thank you.

 4              (The exhibit was admitted into evidence.)

 5              THE COURT:  Anything else?

 6              MR. SKAFF:  Not of this witness, Your Honor.

 7              THE COURT:  Anything else of this witness,

 8    Mr. Wilson?

 9              MR. WILSON:  No, Your Honor.

10              THE COURT:  All right.  Let's move along.

11              Ladies and gentlemen, just because I'm trying to

12    move this case doesn't mean I have an opinion one way or the

13    other.  I want to make that abundantly clear.  I want to get

14    this case over.

15              Let's go.

16              MR. SKAFF:  That's all I have, Your Honor.  I'd like

17    to take up some issues with Your Honor, but...

18              MR. WILSON:  I'd like to call Mrs. Aaron for one

19    rebuttal question.

20                        *****     *****     *****

21

22

23

24

25
```

Heidi L. Jeffreys, Official Court Reporter

1                         <u>CERTIFICATION</u>

2

3          I certify that the foregoing is a correct transcript

4     from the record of proceedings in the above-entitled matter.

5

6                              s/s

7                         Heidi L. Jeffreys

8

9                         February 10, 2012

10                             Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25