```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
 2                     Norfolk Division

 3

 4   - - - - - - - - - - - - - - - - - -
       MARGARET M. AARON,              )
 5                                     )
             Plaintiff,                )
 6                                     )        CIVIL CASE NO.
       v.                              )         2:10cv00606
 7                                     )
       KROGER LIMITED PARTNERSHIP I,   )
 8                                     )
             Defendant.                )
 9   - - - - - - - - - - - - - - - - - -

10

11                    TRANSCRIPT OF PROCEEDINGS
                       (Jury Trial, Day Three)
12

13                      Norfolk, Virginia

14                     January 26, 2012

15

16

17   BEFORE:   THE HONORABLE ROBERT G. DOUMAR,
               United States District Judge, and a jury
18

19

20

21   APPEARANCES:

22           WILSON & MCINTYRE, PLLC
             By:  John S. Wilson, Esquire
23                Counsel for the Plaintiff

24           GUYNN, MEMMER & DILLON, P.C.
             By:  Victor "Dinny" Skaff, Esquire
25                Counsel for the Defendant
```

1                          I N D E X

2
    ON BEHALF OF THE DEFENDANT:      Direct   Cross   Red.    Rec.
3
    D. Heath                          270     284     299     --
4
    V. Harris                         300     308     --      --
5
    V. Harris (spoilation proffer)    320     327     --      --
6
    D. Heath (spoilation proffer)     328     330     333     --
7

8

9

10                         E X H I B I T S

11  No.                                                      Page

12  Defendant's Exhibits 4 - 10                              280

13  Defendant's Exhibit 11                                   306

14  Defendant's Exhibit 12                                   307

15  Plaintiff's Exhibit 30                                   317

16  Defendant's Exhibits 1 - 3                               320

17

18

19

20

21

22

23

24

25

 1          (Following adjournment on January 25, 2012, the
 2     proceedings reconvened at 9:24 a.m. as follows:)
 3          THE COURT:  In relation to the motion, the Court
 4     finds that the motion for summary judgment should be denied.
 5     It is a very close case, but nonetheless I'm going to deny
 6     the motion for summary judgment and we'll proceed.
 7          Is there anything else that has to be done at this
 8     time?
 9          MR. WILSON:  A very quick housekeeping matter
10     regarding some exhibits of Mr. Skaff's that I just found out
11     he's going to put in.
12          In the exhibits there is reference to a lady named
13     Mrs. Saia, who was a former employee.  And she's given a
14     witness statement, which I object to, of course, as hearsay,
15     and we would pull that out, and then in two places where her
16     name is referenced I have redacted it.  So he has a clean
17     copy, just without those references.
18          THE COURT:  Is this your understanding, Mr. Skaff?
19     I don't know what he's talking about.
20          Have you-all agreed on this?
21          MR. WILSON:  I think he's agreed to part of it; not
22     all of it.
23          THE COURT:  Well, Mr. Wilson, don't tell me
24     somebody's agreed to something if they haven't.  See if you
25     you-all can figure it out right now.

 1          What is it?  Are you making some sort of motion,

 2   Mr. Wilson?

 3          MR. WILSON:  Yes, I'm making a motion in limine that

 4   before he puts in that exhibit in the presence of the jury

 5   that we redact from it references to a person who is not

 6   going to be testifying where she's making statements.

 7          THE COURT:  Why?

 8          MR. WILSON:  It's hearsay.

 9          THE COURT:  Well, let me see whether it's hearsay or

10   not.

11          MR. WILSON:  Okay.

12          THE COURT:  Is he trying to present it for the truth

13   of the matter, or what is it?  So what do you contend?

14          MR. WILSON:  It is a --

15          THE COURT:  You know, you --

16          MR. WILSON:  It's a --

17          THE COURT:  You're denying Mr. Skaff the opportunity

18   to present something, Mr. Wilson, so let me hear from

19   Mr. Skaff.

20          What are you seeking to introduce that Mr. Wilson

21   seems to anticipate at this time that is not -- what do you

22   want to introduce?

23          MR. SKAFF:  Well, Your Honor, as part of the

24   testimony of the store manager who took some incident reports

25   following the accident, there's a series of reports that he

1  took.  One of the reports is a supplemental witness statement
2  prepared by a woman by the name of Linda Saia.  In that
3  report Ms. Saia says, basically, what she saw, heard or
4  witnessed about the accident, and part of it is some
5  statements that were made by Mrs. Aaron about the cause of
6  the fall.
7          And, so --
8          THE COURT:  Why is that admissible?
9          MR. SKAFF:  Well, Your Honor, number one, it's a
10  party admission.  Number two, it's a business record.
11          I mean, I think the evidence will show that this was
12  a document that was prepared in Kroger's regular course of
13  business, it was prepared at or near the time of the fall,
14  and it's been kept in the regular course of business since
15  that time.
16          Ms. Saia -- for the Court's information, Ms. Saia is
17  very ill with cancer.  She's undergoing chemotherapy
18  treatments.
19          THE COURT:  I'm not worried about what she's doing.
20  You had an ample opportunity to take her deposition.  If you
21  didn't, Mr. Skaff, I can't help that.
22          My problem is that you're now saying you're going to
23  introduce business records.  Now, generally business records
24  are admissible; however, I don't know whether this is a
25  business record or not.  In the course of business you can

1    admit that.

2            All right, Mr. Wilson, what do you say about it?

3            MR. WILSON:  The bottom of the very document states,

4    "This report is being prepared in anticipation of litigation

5    under the direction of legal counsel.  It is confidential and

6    is not to be released."

7            THE COURT:  Thank you.  Thank you, Mr. Wilson.

8    You're quite correct.  In that case, it's not an ordinary

9    business record.

10           MR. WILSON:  It was prepared for litigation.  She's

11   not here.  If she wants to testify --

12           THE COURT:  I heard, you Mr. Wilson.

13           MR. SKAFF:  Your Honor, this -- I mean, this is an

14   interesting issue, and it's an interesting point he makes,

15   because I think if this were a discovery dispute the argument

16   would be quite the opposite because he would be saying, "They

17   do this in every case where there's an incident, and,

18   therefore, it's really not prepared in anticipation of

19   litigation, and, therefore, I should get a copy."  That's why

20   we turn it over.

21           So I don't think that has anything to do with --

22           THE COURT:  Well, who put that mess on the bottom?

23           MR. SKAFF:  Excuse me?

24           THE COURT:  Who put that mess on the bottom?

25           MR. SKAFF:  I guess Kroger Corporate does, Your

1  Honor.

2          THE COURT:  Oh, they did?

3          MR. SKAFF:  I guess so.  I don't know.

4          THE COURT:  Well, I think Mr. Wilson's position is

5  well taken.  I'm sorry, Mr. Skaff.

6          MR. SKAFF:  Yes, sir, no -- just please note our

7  objection for the record.

8          THE COURT:  All right.  Your objection is noted.

9          However, I'm assuming that Mr. Wilson will agree in

10  relation to that so we don't have to go into the evidence;

11  that is, that that record, according to Kroger's testimony or

12  the man's testimony, would have been that they keep that in

13  the regular course of business.

14          Do you agree to that, Mr. Wilson?

15          MR. WILSON:  I --

16          THE COURT:  Otherwise, I'll have them put it on and

17  then you can --

18          MR. WILSON:  He's going to put the exhibit --

19          THE COURT:  -- you can make your objection then.

20          MR. WILSON:  I'm not objecting.  That's the whole

21  point.  I'm not objecting.  He can put the exhibit in.  I

22  just want to have one page taken out, and he can put the rest

23  of it in, and I don't object.  If he wants to say it's a

24  business record, that will be their testimony.  I have no

25  reason to disbelieve that that would be their testimony.

1           THE COURT:  That's what I'm saying.  Otherwise, I'm
2   going to let him make his offer of proof, and then you have
3   to object just like you should.  You're doing it very wisely
4   now, and the only reason I'm allowing you to do that is
5   because you agree that they would have shown that it was a
6   business record, that it's done in every case where somebody
7   falls, and they keep a record of what happens.
8           MR. WILSON:  I have no reason to dispute that
9   statement, and, therefore, I agree with it.
10          THE COURT:  I'm not asking you to dispute the
11  statement.  I'm not asking that, Mr. Wilson.
12          Do you agree that the testimony would show that they
13  keep these records in every single case in which an incident
14  occurs, whether there's a lawsuit or not?
15          MR. WILSON:  I agree that that's what they would
16  testify.
17          THE COURT:  That the manager would so testify.  Is
18  that correct?
19          MR. WILSON:  Yes.
20          THE COURT:  Okay.
21          MR. SKAFF:  Your Honor, one other issue.  And, so,
22  we will not put in that document, and we will redact her name
23  out of the other -- out of the other documents.
24          THE COURT:  What is the -- what is the other
25  document?

Heidi L. Jeffreys, Official Court Reporter

1        MR. SKAFF:  Well, there's a series --

2        THE COURT:  I'm not ruling -- I'm only ruling on her

3   statement.

4        MR. SKAFF:  I understand, Your Honor, and I just

5   wanted to make clear -- and Mr. Wilson and I talked about

6   it -- if she was not -- if that -- if that document was not

7   allowed to come into evidence that her name would be redacted

8   out of the other documents that will come in.

9        THE COURT:  Why -- okay.  They'll come out, then.

10        MR. SKAFF:  Okay.  Your Honor, one other issue from

11   a housekeeping standpoint that we wanted to alert the Court

12   to.

13        At some point today we would like the opportunity to

14   proffer evidence as it relates to the spoilation issue.

15        THE COURT:  Oh, certainly.

16        MR. SKAFF:  Okay.

17        THE COURT:  I'll allow you to do that.

18        MR. WILSON:  Thank you, Judge.  And we can do it in

19   any way you'd like, if that would be out of your presence or

20   however you'd like us --

21        THE COURT:  No, nothing is done out of my presence,

22   Mr. Skaff.  I want you to proffer it while I'm here so I know

23   what you're proffering, because I want you to do it before we

24   rest this case, okay?

25        MR. SKAFF:  Yes, sir.

1          THE COURT:  I don't want to get blindsided.  So you
2  can do it this morning, if you like, right now.
3          MR. SKAFF:  Well, if the Court -- if it pleases the
4  Court, I would prefer, probably, to do it after.  These
5  witnesses I have -- I have two witnesses that aren't going to
6  take very long --
7          THE COURT:  All right.  Let's go.
8          MR. SKAFF:  -- and then we can do that.
9          THE COURT:  Okay.  Is the jury here?
10         THE CSO:  Yes, sir.
11         THE COURT:  All right.  Bring them in.
12         (The jury entered the courtroom.)
13         THE COURT:  You may be seated.
14         Good morning, ladies and gentlemen.
15         Let the record reflect the entire jury has returned.
16         All right.  You're going to proceed with your case,
17  Mr. Skaff?
18         MR. SKAFF:  Yes, sir.  We would call Dale Heath at
19  this time.
20         (The witness was sworn by the clerk.)
21         DANIEL DALE HEATH, called as a witness, having been
22  first duly sworn, testified as follows:
23                      DIRECT EXAMINATION
24  BY MR. SKAFF:
25  Q.  Good morning.

1   A.   Good morning.

2   Q.   Could I get you to state your full name, please?

3   A.   Daniel Dale Heath.

4   Q.   And, Mr. Heath, are you currently employed?

5   A.   Yes.

6   Q.   And where are you employed?

7   A.   Kroger in Charlottesville.

8   Q.   And how long have you been employed with Kroger,

9 generally?

10   A.   It will be 24 years in August.

11   Q.   And how long have you been in a management position?

12   A.   Eleven years.

13   Q.   At which stores?  Various stores, or --

14   A.   Yes.

15   Q.   And were you the manager of the Shore Drive store at any

16 point?

17   A.   Yes.

18   Q.   Okay.  During what time periods?

19   A.   The end of 2009 through the first part of 2011.

20   Q.   And you say you're now in Charlottesville.  How did you

21 get to Charlottesville?

22   A.   A promotion.

23   Q.   And in your position as a store manager is safety an

24 important aspect?

25   A.   Yes.

1  Q.  Explain a little bit about what Kroger's priorities are
2  as it relates to safety.
3  A.  It's part of our creed, our company, I guess, statement,
4  the safety of associates and customers.
5  Q.  Is it very important to Kroger?
6  A.  Yes.
7  Q.  And what did you do as it relates to store safety,
8  particularly as it relates to the floors, when you were the
9  manager at the Virginia Beach store?
10  A.  Just regular visual inspections of the floor conditions.
11  Q.  And did you have people come in as well?
12  A.  Yes.
13  Q.  And if you found anything that you determined to be
14  dangerous or a hazard what would you do?
15  A.  Well, if it was a spill or trash on the floor, of course,
16  you would take care of the spill or the trash.  If it was
17  something more serious then we put it on the service hub, and
18  Facility Engineering would come in and fix it.
19  Q.  Was that done pretty quickly?
20  A.  Yes, especially if it's a safety issue.
21  Q.  Okay.  All right.  Let me direct your attention as it
22  relates to the cement drain cover at issue in this case.
23  You're aware that that's an issue in this case.
24  A.  Right.
25  Q.  All right.  And you were employed, I think you said, at

1    the Shore Drive store for two and a half years.
2    A.  Correct.
3    Q.  Were you aware of that cement drain cover?
4    A.  I had seen it, yes.
5    Q.  Okay.  And why were you aware of it?
6    A.  Just because that's -- the area that it's in is where we
7    do our seasonal displays, so for the summer we would have
8    watermelons there, for Halloween we would have Halloween
9    candy there.  So it was right there, you know, in a visible
10   place.
11   Q.  And were you ever -- did you ever run your foot over it
12   or touch it or anything?
13   A.  Yes.
14   Q.  And what did you find?
15   A.  That it was level.
16   Q.  Did you ever run your foot over it -- I'm sorry.  Excuse
17   me.
18          Did you ever determine whether it was raised up above
19   the floor in any way?
20   A.  No.  It just looked to me like it was filled in with wax.
21   Q.  But was it raised up above the floor in any way?
22   A.  No.
23   Q.  Okay.  Did you ever have any problem seeing where it was?
24   A.  No.
25   Q.  And on June -- prior to June 3rd of 2010, which is when

1  Mrs. Aaron fell in your store, was it hidden in any way?

2  A.  No.

3  Q.  Was it hidden in any way on June 3, 2010?

4  A.  No.

5  Q.  Let me show you the photograph that we have right in

6  front of you.

7          THE COURT:  Mr. Pierce...

8          MR. SKAFF:  Mr. Pierce, I'm just going to ask him

9  one quick question about it.

10  BY MR. SKAFF:

11  Q.  Does the photograph shown there accurately depict the way

12  the store looked on June 3, 2010?

13  A.  Yes.

14  Q.  Okay.  Let me show you the photograph we have behind you

15  there.

16          THE COURT:  What exhibit number is that?

17          (There was a pause in the proceedings.)

18          THE COURT:  We can put it in now.

19          MR. SKAFF:  It's already into evidence, Your Honor.

20  I'm just not sure what the --

21          THE COURT:  It may be in evidence, but we don't have

22  a mark on it.  I don't know why.

23          THE CLERK:  Demonstrative...

24          THE COURT:  Well, let's put it in evidence, okay?

25          THE CLERK:  It's P 1.

```
 1                THE COURT:  It's P 1?

 2                THE CLERK:  Yes, sir.

 3                THE COURT:  It's P 1?  Or is it P 2?  Take a look at

 4      it and --

 5                THE CLERK:  Yes, that's it.  That one on the easel

 6      right now is P 2.

 7                THE COURT:  Okay.  P 1 is the one that Mr. Pierce

 8      has in his hand?

 9                THE CLERK:  No.

10                MR. SKAFF:  P 15, Your Honor, I think is the one

11      Mr. Pierce is holding.

12                THE CLERK:  Yes.

13                THE COURT:  P 15?

14                THE CLERK:  P 15 is in.

15                THE COURT:  All right.  That's just a blowup of

16      P 15?

17                MR. SKAFF:  Yes, sir.

18                THE COURT:  All right.  Mark it P 15.

19                Excuse me.  It's just that if we're going to refer

20      to something I want to make sure it's properly recorded.

21                MR. SKAFF:  And this one, I believe, is P 2, Your

22      Honor.

23                THE COURT:  That's P 2?

24                MR. SKAFF:  Yes.

25                THE COURT:  Mark that P 2.  Otherwise, we get into a
```

1    real problem.  P 2 will be both the blow-up as well as the
2    small one that's been admitted into evidence.
3           Okay?  Let's go.
4    BY MR. SKAFF:
5    Q.  And, Mr. Heath, let me show you what's been marked as
6    Exhibit P 2 in the case.
7           Any -- does that accurately depict the way the door
8    looked on the day, June 3, 2010?
9    A.  Yes.
10   Q.  As the store manager, are you out on the sales floor on a
11   regular basis?
12   A.  Yes, constantly.
13   Q.  When you were there as a store manager how many people do
14   you think were in and out of that store on a daily basis?
15   A.  On a daily basis?  2500, 3,000.
16   Q.  Did you ever see anybody have any difficulty walking in
17   and around that area?
18   A.  No, sir.
19   Q.  Did you ever have any complaints about anything in or
20   around that area?
21   A.  No.
22   Q.  Was anything changed about that particular area after the
23   fall?
24   A.  No.
25   Q.  It's still in existence today?

1    A.   Yes.

2    Q.   At any time was that cement drain cover ever raised as a

3    safety concern by anyone at Kroger?

4    A.   No.

5    Q.   All right.  Let me direct your attention to June 3, 2010,

6    the date of Ms. Aaron's fall.

7            Were you working that day?

8    A.   Yes.

9    Q.   Okay.  What were you doing?

10   A.   As far -- you know --

11   Q.   Well, let me back up.  You didn't see Mrs. Aaron fall,

12   did you?

13   A.   No.

14   Q.   Okay.  How did you first become aware of the fall?

15   A.   I was paged to the front over the intercom.

16   Q.   And what had you been doing?

17   A.   I was on the back dock receiving a truck.

18   Q.   And when you arrived what did you see?

19   A.   Mrs. Aaron was sitting in a chair, and her shin was

20   bleeding.

21   Q.   Did you speak with her?

22   A.   Yes.

23   Q.   Okay.  And what, if anything, do you recall that she said

24   to you?

25   A.   Just that she didn't know what happened, she didn't see

anything in the floor, she didn't know what she tripped over,

and she was apologetic.

Q. Did she say anything about how she might have fallen or

tripped and fallen?

A. No, just that she didn't know what she fell over.

Q. Did she ever point anything out to you about the drain

cover?

A. No.

Q. Did she ever say anything to you about the drain cover?

A. No.

Q. And what did you do next?

A. Called my administrative assistant, Linda Saia, to get

the first aid kit to see if we could stop the bleeding on her

shin.

Q. Okay. Did you do anything else?

A. No.

Q. You took care of her and made sure she was okay?

A. Right.

Q. Okay. And then did you do anything else as it related to

the accident?

A. Just the next day I had Vernon -- no.

Q. Okay. All right. Now, did you later on complete some

reports as it related to this accident?

A. Yes.

Q. All right. Let me show you a series of documents -- I'd

```
 1    ask that Mr. Pierce had them to you -- and just get you to
 2    take a look through there.
 3              (There was a pause in the proceedings.)
 4    BY MR. SKAFF:
 5    Q.  Do you recognize those documents?
 6    A.  Yes.
 7    Q.  And what are they?
 8    A.  Just the incident report that we sent to Sedgewick.
 9    Q.  You sent to Kroger?
10    A.  Yes.
11    Q.  Okay.  Explain to me what these documents are.  What do
12    you do with these documents?
13    A.  Basically, we fill these out as we do our investigation
14    and then fax them to Sedgewick.
15    Q.  Which is a part of Kroger, correct?
16    A.  Right.
17    Q.  Okay.
18              THE COURT:  Was this done in every case?
19              THE WITNESS:  Yes.
20              THE COURT:  Anytime somebody --
21              THE WITNESS:  Yes, an associate or customer.
22              THE COURT:  Just kept in the regular course of
23    business?
24              THE WITNESS:  Right.
25              THE COURT:  All right.  Let's move along.
```

```
 1              MR. SKAFF:  Okay.
 2     BY MR. SKAFF:
 3     Q.  And on the date -- are these your signatures at the
 4     bottom of these documents?
 5     A.  Yes.
 6     Q.  Let me go through these a little bit with you.
 7              The first one, which is marked as --
 8              MR. SKAFF:  Let me go ahead at this point and just
 9     move these into evidence as Defendant's 4 through 10.
10              THE COURT:  Defendant's Exhibits 4 through 10 are
11     admitted into evidence.
12              (The exhibits were admitted into evidence.)
13     BY MR. SKAFF:
14     Q.  Mr. Heath, let me go ahead and direct your attention to
15     Exhibit 4 first.
16              That's the customer incident report?
17     A.  Yes.
18     Q.  Okay.  And, now, this document shows that it wasn't
19     completed until 6-10 of 2010, correct?
20     A.  Correct.
21     Q.  Which was about a week or so after the accident.
22     A.  Correct.
23     Q.  Okay.  Why was that the case?
24     A.  Just the -- the way Mrs. Aaron was acting at the time of
25     the fall, she said it wasn't our fault; that her husband had
```

1  recently had heart surgery, and, you know, she just really

2  didn't want to be a bother.

3  Q.  Okay.  And, so, what, you didn't complete them at that

4  time?

5  A.  Correct.

6  Q.  Okay.  And what made you complete them later on?

7  A.  A letter from her lawyer.

8  Q.  And, so, you found out that she had retained an attorney

9  within a week of the incident?

10 A.  Yes.

11 Q.  Okay.  And, so, you felt like you had to go ahead and --

12 A.  Right.

13 Q.  Okay.  At any time -- at that point did you realize the

14 cement drain cover was an issue in the case?

15 A.  Not at that time, no.

16 Q.  Now, let me point your attention to Exhibit 7 as part of

17 that packet.

18        Okay.  Let me -- is that, again, just another --

19 that's a supplemental slip/fall incident report?

20 A.  Yes.

21 Q.  Okay.  And that was prepared -- all of these documents

22 were essentially prepared at the same time?

23 A.  Yes.

24 Q.  Okay.  Let me direct your attention to where it says,

25 "List any comments made by the customer after the fall."

1          Does that refresh your recollection about anything
2    that Mrs. Aaron might have said to you after the incident?
3    A.  Yes.  She said she didn't see anything on the floor, so
4    she must have tripped over her own feet.
5    Q.  Let me direct your attention to what's marked as Exhibit
6    A --
7          THE COURT:  What did she -- let me get back.  I
8    didn't hear the end of that.  What was the end of that?
9          THE WITNESS:  That she didn't see anything on the
10   floor, so she must have tripped over her own feet.
11         THE COURT:  Did she say that to you?
12         THE WITNESS:  Yes.
13   BY MR. SKAFF:
14   Q.  Okay.  Now, let me show you what's marked as Exhibit 8.
15         Is that a diagram that you prepared with regard to
16   the accident?
17   A.  Yes.
18   Q.  Okay.  Now, that diagram shows that the fall happened
19   back where she initially -- where she's testified she picked
20   up her watermelon.  Why did you mark it back there?
21   A.  Just from talking with Ryan Walters, that's where I
22   thought she was standing at the time of the fall, because
23   there was nothing else on the floor that I deemed a slip
24   hazard.
25   Q.  And, based on what she told you at that point, you didn't

1   know what had happened?

2   A.   Exactly.

3   Q.   Okay.  Let me direct your attention to the next document

4   in line, which is Defendant's Exhibit Number 9.

5        What is that document?

6   A.   A floor inspection report.

7   Q.   Okay.  And what is that document for, and what did you do

8   there?

9   A.   Just -- it's asking when the last time the floor was

10  inspected, and it was inspected by me at around 1:00 p.m., on

11  a routine store walk.

12  Q.   And you didn't -- what did you not -- what did you see

13  or not see?

14  A.   It was free of debris, no liquid, no trip hazards.

15  Q.   And Exhibit 10 -- what is that document?

16  A.   Suspicious/questionable incident form.

17  Q.   And why did you complete that document?

18  A.   Just because they told -- when we go through training

19  they tell us to fill out as much as possible.

20  Q.   And that's just part of the packet?

21  A.   Right.

22  Q.   And that just, again, talks about what you were told with

23  regard to the accident?

24  A.   Yes.

25  Q.   Okay.  Did you at any time tell anyone what to put on any

1  form or anything like that?

2  A.  No.

3       MR. SKAFF:  I think that's all I have, Your Honor.

4                  CROSS-EXAMINATION

5  BY MR. WILSON:

6  Q.  Mr. Heath, good morning.

7       One of your job responsibilities as store manager

8  included promoting safety awareness and safety standards in

9  the store?

10  A.  Yes.

11  Q.  And the store had safety audits on a bimonthly basis?

12  A.  Correct.

13  Q.  And you had to sign off on those, right?

14  A.  Yes.

15  Q.  And those were conducted by Mr. Harris and not by you?

16  A.  Correct.

17  Q.  And the condition of the floor surfaces was part of those

18  safety audits, right?

19  A.  Yes.

20  Q.  And the audits covered things like the drain covers, any

21  unevenness, anything that could possibly be a trip hazard?

22  A.  Yes.

23  Q.  And you understood that a tripping hazard was anything

24  that could make someone trip, correct?

25  A.  Yes.

1  Q.  You had looked at the cement drain plug before June 3,
2  2010?
3  A.  Yes.
4  Q.  And you rubbed your foot on it?
5  A.  Yes.
6  Q.  And, based on your visual observation, you concluded that
7  it was level, right?
8  A.  Yes.
9  Q.  And, so, do you know in this case whether or not it's
10 been measured to be not level one way or the other?
11 A.  I don't -- I don't.
12 Q.  But someone who was in the store who does those routine
13 inspections that you've described -- and you're all over the
14 floor -- by visual inspection it was level to you, correct?
15 A.  Correct.
16 Q.  Okay.  You never touched the spot with your hand, though,
17 did you?
18 A.  Just ran my foot across it.
19 Q.  You never took any measurements or anything like that?
20 A.  No.
21 Q.  You don't have any professional licenses, do you?
22 A.  No.
23 Q.  You mentioned that Kroger has a separate -- I think you
24 said Facilities Engineering Department.
25 A.  Yes.

1   Q.  And that's where?

2   A.  Roanoke.

3   Q.  And that's where you have your engineers?

4   A.  Yes.

5   Q.  From your experience as the store manager, did this

6   cement spot serve any purpose?

7   A.  No.

8   Q.  Was it decorative in any way?

9   A.  No.

10  Q.  And you don't even know why it was there, do you?

11  A.  No, I don't.

12  Q.  Other areas in the store have brass drain covers, right?

13  A.  Yes.

14  Q.  This Shore Drive store had a large senior clientele, did

15  it not?

16  A.  It did.

17  Q.  And, in fact, you offered a 5 percent senior discount on

18  Tuesdays?

19  A.  Yes.

20  Q.  And you posted that prominently on the window?

21  A.  Yes.

22  Q.  What was the purpose of doing that?

23  A.  Just to increase business.

24  Q.  Increase senior business?

25  A.  Yes.

1    Q.  In terms of this watermelon display that we've seen,

2    Kroger decided where to place that watermelon display, right?

3    A.  Basically, it's a decision made in store.

4    Q.  But I'm saying is it's a decision that that store makes,

5    as opposed to a vendor who comes in and says, "I want to put

6    my watermelons here."

7    A.  Right.

8    Q.  And I think you said that this area normally was used for

9    seasonal or promotional items.

10   A.  Yes.

11   Q.  And on the store plan would you agree that that area is

12   shown clear?

13   A.  Yes.

14   Q.  If you can look at it -- I don't know if you can see it,

15   sir, and I don't -- it's not a good angle for you, but did

16   you understand that there was a yellow sign on the box?

17   A.  Yes.

18   Q.  And what did that mean?

19   A.  That's the price of the watermelon.

20   Q.  Was it a sales item?

21   A.  Yes.

22   Q.  And, so, the purpose was to draw people over to that

23   area?

24   A.  Yes.

25   Q.  You have no personal knowledge as to how the fall

1  occurred?

2  A.  I don't.

3  Q.  Looking at one of the exhibits which has previously been

4  marked as Plaintiff's 1, I'd ask you one question.

5       After Mrs. Aaron had fallen do you see the initials

6  "WM" with an X there, down at the bottom?

7  A.  Yes.

8  Q.  And was it your understanding that's where the watermelon

9  had landed?

10 A.  Yes.

11 Q.  And after her fall it's my understanding that you went

12 and conducted a very thorough examination of that area all

13 around the watermelon display, right?

14 A.  Right.

15 Q.  And when you did that did you find any debris -- I mean,

16 putting the watermelon aside.

17 A.  No.

18 Q.  Was the watermelon displayed in any -- the watermelon

19 that broke, was that where Mrs. Aaron fell, or did she throw

20 that forward?

21 A.  It looked like she had thrown it forward.

22 Q.  Okay.  And, so, when you looked in the area where you

23 thought she had fallen there was nothing there, as far as you

24 could tell.

25 A.  Right.

1  Q.  But the cement drain plug was there, wasn't it?

2  A.  Yes.

3  Q.  When you first went to Mrs. Aaron she was sitting in a

4  chair?

5  A.  Yes.

6  Q.  Do you know how she got in the chair?

7  A.  From what I was told, I think a customer brought it over.

8  Q.  All right.  Other than that, you don't know -- you don't

9  have any personal knowledge?

10  A.  No.

11  Q.  Were you aware that Mrs. Aaron was hurt?

12  A.  Just -- I -- that her shin was bleeding.

13  Q.  When you say "her shin" was it actually on the outside of

14  her leg?

15  A.  Yeah.  It was her right leg, I believe.

16  Q.  On the outside near the shin?

17  A.  Right.

18  Q.  Okay.  And I think you said that you tended to her.

19  A.  Yes.

20  Q.  And as you tended to her were you able to stop the

21  bleeding?

22  A.  After a while.  It seemed like maybe she was on blood

23  thinners, and it was -- it was hard to get it to stop

24  bleeding.

25  Q.  When you inspected the area after her fall did you see

1 what she had cut her leg on?

2 A.  I did not.

3 Q.  Now, we talked about the incident report that you

4 prepared, and I'd ask you to look at that.

5         THE COURT:  Which number is it?

6         MR. WILSON:  Your Honor, this was Defendant's

7 Exhibits 4 through 10, with the exception of Number 6, which

8 we discussed earlier.

9 BY MR. WILSON:

10 Q.  Do you have a copy of that in front of you, sir?

11 A.  Yes.

12 Q.  Okay.  Now, you prepared that incident report after you

13 had received an attorney letter, correct?

14 A.  Correct.

15 Q.  And at the bottom of it it says, "This report is being

16 prepared in anticipation of litigation under the direction of

17 legal counsel."

18         Do you see that?

19 A.  Yes.

20 Q.  Okay.  And when you were preparing this you had already

21 been put on notice of a claim, and then you were preparing

22 sort of -- I guess you were filling out the form accordingly.

23 A.  Right.

24 Q.  Now, if you would look, please, at the first page, which

25 is, I guess, marked as Number 4.  Do you have that?

1   A.  Yes.

2   Q.  And do you see that that date is June 10, down at the

3   bottom there, sir, the second page?

4   A.  Yes.

5   Q.  Okay.  And, so, that's the date you filled out that form.

6   A.  Right.

7   Q.  Okay.  Now, Counsel brought your attention to what's been

8   marked as 8, which was the drawing.

9        Do you have that in front of you?

10   A.  Yes.

11   Q.  Okay.  Looking at that drawing, you were asked to place

12   an X where the fall happened, right?

13   A.  Correct.

14   Q.  And you didn't witness the fall.

15   A.  Right.

16   Q.  Ryan Walters did.

17   A.  Yes.

18   Q.  And Ryan Walters -- you never asked him to see if you had

19   actually put the X in the right place, did you?

20   A.  No, I didn't.

21   Q.  And, in fact, where you put that X -- that was behind the

22   watermelon bin, right?

23   A.  Right.

24   Q.  As opposed to just coming around the corner where that

25   cement drain plug was, right?

1    A.   Right.

2    Q.   Okay.  So you had the wrong location.

3    A.   Yes.

4    Q.   Now, if you look, please, again going back to Number 4,

5    if you don't mind, it talks about witnesses on page 2.

6         Do you see that, "Potential Witnesses"?

7    A.   Yes he.

8    Q.   And do you see that differentiates between store

9    employees and nonemployees?

10   A.   Yes.

11   Q.   When Mrs. Aaron got hurt were there other customers in

12   the store?

13   A.   There was.

14   Q.   And on that date did you try to contact or interview any

15   customers to see what they had seen?

16   A.   I did not.

17   Q.   Did you expect that once the shoppers left that day that

18   you would have difficulty tracking them down?

19   A.   Honestly, it didn't even cross my mind.

20   Q.   Okay.  Then if you would continue down a little bit

21   further it says, "Were witness statements taken?"

22        Do you see that?

23   A.   Yes.

24   Q.   And you indicated "Yes," and you gave two.  And was one

25   of the witness statements that was taken that of Mr. Walters?

1  A.  Yes.

2  Q.  And you'll see that marked as Exhibit 5.

3          THE COURT:  Mr. Wilson, you're treading on thin ice.

4  Approach the bench.

5          (The following was heard at the sidebar out the

6  hearing of the jury:)

7          THE COURT:  You're opening Pandora's box when you

8  start talking about witness statements that were taken and

9  who was taken and who wasn't taken, and you're going to end

10 up with the lady's statement coming into evidence.

11         MR. WILSON:  This is already in evidence; not the

12 other one.  I'll move on.

13         THE COURT:  Do you understand what I'm saying to

14 you, Mr. Wilson?

15         MR. WILSON:  I do.

16         THE COURT:  I'm trying to warn you.

17         MR. WILSON:  I've got you.

18         THE COURT:  Have you got the warning?

19         MR. WILSON:  Yes, sir.  I'll leave that one alone.

20         (The proceedings resumed in open court as follows:)

21 BY MR. WILSON:

22 Q.  Mr. Heath, look, please, at what's been marked as

23 Exhibit 7.

24         Do you have that?

25 A.  Yes.

1  Q.  And where it asks about the type of flooring in this area

2  you said, "slip-resistant tile"?

3  A.  Yes.

4  Q.  You never mentioned the cement drain plug that was the

5  anomaly in the slip-resistant tile area, right?

6  A.  Correct.

7  Q.  And then you -- at that time did you make notes that

8  Mrs. Aaron was wearing white Sketchers?

9  A.  Yes, slip-on shoes.

10  Q.  And you said "without a back on them."

11  A.  Yes.

12  Q.  And if I could ask that we perhaps show those shoes to

13  you.

14         (There was a pause in the proceedings.)

15  BY MR. WILSON:

16  Q.  And, sir, those aren't white Sketchers, are they?

17  A.  No, but --

18  Q.  Okay.  And they do have a back on them.

19  A.  Not really.

20  Q.  Okay.  Are those the shoes that you remember?

21  A.  To the best of my recollection, yes.

22  Q.  Okay.  Now, when --

23         THE COURT:  I didn't understand.  Are these the

24  shoes you saw, or are they different shoes that you saw.

25         THE WITNESS:  To the best of my recollection, they

1  are the shoes.
2        THE COURT:  Okay.
3  BY MR. WILSON:
4  Q.  Now, Mr. Heath, I wanted to ask you when you spoke with
5  Mrs. Aaron after the fall you didn't know that she had broken
6  her pelvis at that time, right?
7  A.  No.
8  Q.  And is it fair to say that you didn't realize the
9  seriousness of her condition?
10  A.  Correct.
11  Q.  When you were talking with her -- you don't have any
12  specialized medical training do you?
13  A.  No.
14  Q.  And you wouldn't know if someone were in shock?
15  A.  No.
16  Q.  When you were talking with her did she seem shaken up to
17  you?
18  A.  A little, yeah.  Average, yes.
19  Q.  And was she sort of rambling a bit?
20  A.  A little bit.
21  Q.  When you were with Mrs. Aaron before the paramedics
22  arrived was she embarrassed by the attention?
23  A.  Yes.
24  Q.  And she said she was sorry to be a bother?
25  A.  Yes.

1  Q.  And did she also tell you that she wanted to avoid
2  calling her husband directly?
3  A.  Yes.
4  Q.  And did she say why?
5  A.  Because he had just had heart surgery.
6  Q.  And she didn't want to upset him?
7  A.  Correct.
8  Q.  Now, earlier when Mr. Skaff asked you what you recalled
9  her saying I thought you said that she said, "I didn't know
10  what happened," right?
11  A.  Right.  She said, "I didn't know what I tripped over."
12  Q.  Okay.  And then when he was giving you this document that
13  was prepared in anticipation of litigation --
14  A.  Uh-huh.
15  Q.  -- that refreshed your memory in terms of some other
16  things that you thought about, right?
17  A.  Yes.
18  Q.  You selected what to put in this report, did you not, in
19  terms of statements?
20  A.  Yes.
21  Q.  Because you didn't mention things about her husband with,
22  you know, the heart condition, and whether or not she wanted
23  to call an ambulance and things like that, correct?
24  A.  Correct.
25  Q.  So you selected what to put in here, correct?

1  A.  Yes.

2  Q.  And when you were doing that did you understand at the

3  time that you might be using this document in court in order

4  to provide some detail to the jury?

5  A.  Yes.

6  Q.  And you did that because you were preparing this in the

7  anticipation of litigation.

8  A.  Yes.

9  Q.  Now, look at what you said on Exhibit 4, and tell me if

10  I'm reading this correctly.

11      "Mrs. Aaron repeatedly told us she fell on her own

12  and didn't trip over anything."  Do you see that?

13  A.  Yes.

14  Q.  And then, if you wouldn't mind, would you please look at

15  Exhibit 7.  And this time you say that she said, "I tripped

16  over my own feet."

17  A.  Yes.

18  Q.  Okay.  So on June 10, when you prepared Exhibit 4, you

19  were told she said, "I didn't trip over anything," and on

20  June 11 you said that she tripped over her own feet.

21  A.  Correct.

22  Q.  All right.  And then --

23      THE COURT:  That's what she said, not what he said.

24  Is that what she said?

25      THE WITNESS:  To the best of my recollection, yes.

——— D. D. Heath - Cross ———

1   BY MR. WILSON:

2   Q.  And, sir, then if you would look, please, at Exhibit 10,

3   now -- well, first of all, this is called a supplemental

4   questionable/suspicious incident form.

5   A.  Uh-huh.

6   Q.  And do you fill that form out for every fall?

7   A.  Yeah.

8   Q.  So, from Kroger's perspective, every time someone falls

9   it's questionable or suspicious?

10  A.  Or supplemental.

11  Q.  And this supplemental questionable --

12          THE COURT:  Asked and answered.  Move along,

13  Mr. Wilson.

14          MR. WILSON:  Okay.

15  BY MR. WILSON:

16  Q.  Mr. Heath --

17          THE COURT:  Sometimes you just keep going.

18  BY MR. WILSON:

19  Q.  Mr. --

20          THE COURT:  Let's move along.

21  BY MR. WILSON:

22  Q.  Mr. Heath, when you look at what you describe what

23  Mrs. Aaron told you in this particular document, now it says,

24  "She repeatedly told us she tripped over her own feet and it

25  was not our fault but hers."

1   A.  Correct.

2   Q.  So we sort of get the progression from didn't trip --

3          THE COURT:  Don't make any comments, Mr. -- you can

4   argue your case at the end of the trial, Mr. Wilson.

5          MR. WILSON:  Okay.  That's all, then.  I have no

6   further questions for you.

7          THE COURT:  Any redirect, Mr. Skaff?

8          MR. SKAFF:  Yes, Your Honor, just a couple of

9   things.

10                     REDIRECT EXAMINATION

11  BY MR. SKAFF:

12  Q.  Mr. Heath, I just want to be clear.

13         Did you in any way alter or prepare these reports

14  differently than your recollection of what happened on the

15  day of the accident because there had been some letter from

16  an attorney?

17  A.  No.

18  Q.  Did you -- were you aware -- did you have any knowledge

19  of any specific customers that had ever seen what happened?

20  A.  No.

21  Q.  Mr. Wilson asked you some questions about why -- you

22  know, about putting slip-resistant tile on the forms as

23  opposed to not -- and also not putting the cement drain plug

24  on there.  Why was that?

25  A.  At that time I didn't realize that the drain plug was an

1  issue.

2  Q.  Did you ever realize that it could be an issue?

3  A.  Not at that time.

4       MR. SKAFF:  Okay.  All right.  That's all I have,

5  Your Honor.

6       THE COURT:  Anything else, Mr. Wilson?

7       MR. WILSON:  No, Your Honor.

8       THE COURT:  You're instructed not to discuss your

9  testimony with anyone until this case is complete, at which

10  time you're free to discuss it with anyone you like.  You may

11  step down.

12       Who is your next witness, Mr. Skaff?

13       MR. SKAFF:  We would call Mr. Vernon Harris, Your

14  Honor.

15       (The witness was sworn by the clerk.)

16       VERNON ELDRIDGE HARRIS, called as a witness, having

17  been first duly sworn, testified as follows:

18                  DIRECT EXAMINATION

19  BY MR. SKAFF:

20  Q.  Good morning.

21  A.  Good morning.

22  Q.  Could I get you to state your full name, please.

23  A.  Vernon Eldridge Harris.

24  Q.  Mr. Harris, are you currently employed?

25  A.  Yes, sir.

1    Q.   Where?

2    A.   Kroger's.

3    Q.   And what do you do for Kroger?

4    A.   I'm a loss prevention specialist.

5    Q.   And how long have you been there?

6    A.   Thirteen years.

7    Q.   Are you assigned to a specific store, or --

8    A.   I cover seven stores.

9    Q.   And in your job in loss prevention what do you do as it

10   relates to store safety, focusing particularly on the floors

11   of the stores?

12   A.   Safety inspections, date inspections, check about the

13   dates, safety concerns, you know, fire inspections, make sure

14   fire doors are sealed.

15   Q.   And as part of your safety inspection as it relates to

16   floors do you go around and look at the floors?

17   A.   Yes, sir.

18   Q.   And what are you looking for when you do that?

19   A.   Cracks, any tiles that are peeled up, carpet that's torn,

20   rugs that might be misplaced, out of place.

21   Q.   And if you see anything like that what do you do about

22   it?

23   A.   I have an audit I fill out, and I also tell the store

24   manager and send it through the e-mail to the corporate

25   headquarters.

1  Q.  Does Kroger take care of that pretty quickly?
2  A.  Yes, sir.  They put it on what's called a hub, and
3  Maintenance comes out and takes care of that.
4  Q.  Let me talk to you about this cement drain cover that
5  you're aware of, that's pictured just to the right of the
6  watermelon display.
7        You're aware of what I'm speaking of, correct?
8  A.  Yes, sir.
9  Q.  Okay.  In your position, had you become aware of this
10  cement drain cover prior to June 3 of 2010?
11  A.  Yes, sir.
12  Q.  And how and why?
13  A.  It's been there since they did a remodel back in 2000 --
14  1999, 2000.
15  Q.  And when they did that remodel was there any kind of
16  inspection or anything done?
17  A.  Yeah.  Every time a part of a remodel is done it gets
18  inspected.
19  Q.  By whom?
20  A.  By the city and also by Kroger.
21  Q.  Okay.  And did that pass all those inspections?
22        MR. WILSON:  Your Honor, I would object to the
23  hearsay for part of the inspection and that Kroger --
24        THE COURT:  Objection overruled.  Continue.
25  BY MR. SKAFF:

1    Q.  To your knowledge, did the floor at issue pass those
2    inspections?
3    A.  To the best of my knowledge, it did.
4    Q.  Okay.  Now, have you ever touched that specific spot or
5    anything?
6    A.  Quite often.
7    Q.  Okay.  And what do you notice about it?
8    A.  Really, nothing.  It's -- there's just one little spot
9    that's like a little divot the size of a pencil head.  Other
10   than that, it's pretty -- fairly flat.
11   Q.  Do you ever have any problems seeing it?
12   A.  No, sir.
13   Q.  Prior -- or -- where is your office based out of?
14   A.  It's on the opposite side of the produce entrance.  It's
15   on the far side of the building.
16   Q.  So while you work out of seven stores, is your office
17   based out of this particular store?
18   A.  Yes, sir.
19   Q.  Okay.  So have you -- in the times that you've gone in
20   and out that store did you ever have any problem seeing that
21   spot?
22   A.  No, sir.
23   Q.  Was it ever -- prior to June 3 of 2010, was it hidden in
24   any way?
25   A.  No, sir.

1  Q.  On June 3, 2010, was it hidden in any way?

2  A.  No, sir.

3  Q.  In your store life and in your discussions with Kroger

4  and all that sort of thing has that ever been identified as

5  some sort of safety issue?

6  A.  No, sir.

7  Q.  Are you -- how many people do you believe are in and out

8  of that store on a regular basis?

9         THE COURT:  Unless he knows -- the store manager?  I

10  allowed him to testify to that; not him.

11         Let's move along.

12         MR. SKAFF:  Yes, sir.

13  BY MR. SKAFF:

14  Q.  Is that a fairly busy store?

15  A.  Yes, sir.

16  Q.  And have you ever had any complaints about that

17  incident -- about that spot?

18  A.  No, sir.

19  Q.  And was anything changed about it after Ms. Aaron's fall?

20  A.  No, sir.

21  Q.  It still exists today?

22  A.  Yes, sir.

23  Q.  In the same form?

24  A.  Yes, sir.

25  Q.  Now, since this incident has occurred have you had the

1  opportunity to go out and inspect it?

2  A.  Yes, sir.

3  Q.  And what -- have you measured it?

4  A.  Yes, sir.

5  Q.  How did you measure it?

6  A.  With a ruler, a stick ruler.

7  Q.  Okay.  And what -- what do you -- what do you -- have you

8  seen in terms of measurements?  What did you find out?

9  A.  It's -- like I said, it's got an eighth-of-an-inch like

10  divot on one edge, about the size of a pencil head.  Other

11  than that, it's fairly flat.

12  Q.  And how far across is it?

13  A.  It's seven inches across.

14  Q.  At no point -- is it raised above the floor at any point?

15  A.  No, sir.

16  Q.  Aside from that one little pencil spot that you

17  mentioned, is that -- is it flush with the floor?

18  A.  Yes, sir.

19  Q.  That you're -- according to your inspections?

20  A.  Yes, sir.

21  Q.  Okay.  Let me ask you a quick question about the floor,

22  if you know.

23        The tiles on the floor, are they a specific

24  measurement?

25  A.  Yeah, they're a foot by a foot.

1  Q.  Okay.  Let me show you a couple of photographs, if I

2  could, please.  The first one would be what we've marked as

3  Defendant's Exhibit Number 11.

4          Do you recognize that?

5  A.  Yes, sir.

6  Q.  What is that?

7  A.  That's the drain cover.

8  Q.  And were you present when this photograph was taken?

9  A.  Yes, sir.

10 Q.  And it was taken after this incident occurred.

11 A.  Yes, sir.

12 Q.  Does that generally depict the area where the plaintiff

13 allegedly -- or where she fell, minus the watermelon display?

14 A.  Yes, sir.

15 Q.  Okay.

16          MR. SKAFF:  Your Honor, at this time we would move

17 into evidence Defendant's Exhibit 11.

18          THE COURT:  Defense Exhibit 11 is received in

19 evidence.

20          (The exhibit was admitted into evidence.)

21          MR. SKAFF:  I'm sorry, Your Honor?

22          THE COURT:  It was received in evidence.

23          MR. SKAFF:  Thank you.

24 BY MR. SKAFF:

25 Q.  If I could just show you one more photograph, Mr. Harris.

1    This is what we've marked as Defendant's Exhibit Number 12.

2         Can you just -- do you recognize what that is?

3    A.  Yes, sir.

4    Q.  And what is that?

5    A.  That's the drain cover.

6    Q.  Just another angle?

7    A.  Yes, sir.

8    Q.  And were you present when that photograph was taken?

9    A.  Yes, sir.

10   Q.  And, again, that was taken after this incident occurred?

11   A.  Yes, sir.

12   Q.  Does that accurately depict the area in question in this

13   case?

14   A.  Yes, sir.

15        MR. SKAFF:  Your Honor, we would move into evidence

16   Defendant's Exhibit Number 12.

17        THE COURT:  Number 12 is received in evidence.

18        (The exhibit was admitted into evidence.)

19   BY MR. SKAFF:

20   Q.  One final question -- or a couple final questions.

21   A.  Okay.

22   Q.  The testimony in this case has shown that Mrs. Aaron had

23   had a shopping cart with her --

24   A.  Okay.

25   Q.  -- just prior to her fall.

1           Did you have an opportunity to measure generally what

2    the size of those shopping carts are?

3    A.  Yes, sir.

4    Q.  Okay.  How wide is it?

5    A.  It's two feet wide and four feet long.

6    Q.  Okay.

7           MR. SKAFF:  I think that's all I have, Your Honor.

8                      CROSS-EXAMINATION

9    BY MR. WILSON:

10   Q.  Mr. Harris, you described yourself as a loss prevention

11   specialist.

12   A.  Yes, sir.

13   Q.  And is one of your primary roles to execute initiatives

14   to reduce losses at the store?

15   A.  Yes, sir.

16   Q.  And is one of the ways you do that to testify in civil

17   cases?

18   A.  Yes, sir, if I'm called to.

19   Q.  And you have no personal knowledge as to what happened

20   with Mrs. Aaron on June 3rd, do you?

21   A.  No, sir.

22   Q.  You weren't even working that day, were you?

23   A.  No, sir.

24   Q.  Other than being the designated witness, did you have any

25   job responsibilities to perform those safety audits?

1    A.  I'm sorry?

2    Q.  Did you have any job responsibilities to perform those

3    safety audits?

4    A.  Yes, sir.

5    Q.  And my understanding is they were about every eight weeks

6    or so.

7    A.  Yes, sir.

8    Q.  Are you a licensed engineer?

9    A.  No, sir.

10   Q.  Do you have any professional licenses?

11   A.  No, sir.

12   Q.  Do you consider yourself a safety expert?

13   A.  No, sir.

14   Q.  And you don't know what is within industry tolerances in

15   terms of safety points, do you?

16   A.  Oh, no, sir, I don't.

17   Q.  But you've got that Roanoke facility with engineers out

18   there, right, that use different standards?

19   A.  Yes, sir.  I just report -- if I see something that's

20   not -- that I think is not safe, I report it to them.

21   Q.  When you take these safety audits do you have a

22   checklist?

23   A.  Yes, sir.

24   Q.  And it's something printed off the computer?

25   A.  Yes, sir.

1  Q.  And when you're done with those inspections do you keep

2  any records of those, or are they sent off to somebody else?

3  A.  They're sent off.

4  Q.  And, so, the store doesn't keep any records.

5  A.  No, sir.

6  Q.  One of the things that you were to look at as part of

7  those safety audits, to my understanding, are the drain

8  areas, right?

9  A.  Yes, sir.

10 Q.  And in this case most of the drain areas have those brass

11 covers on them?

12 A.  Yes, sir.

13 Q.  And you look to make sure they didn't have loose screws

14 or that they were level?

15 A.  Yes, sir.

16 Q.  And you were familiar with the cemented drain area --

17 we've talked about that -- and that's something you would

18 check as part of your safety audit, right?

19 A.  Yes, sir.

20 Q.  And when you were inspecting that particular spot you

21 never determined, prior to June 3, 2010, that it wasn't

22 totally flat, did you?

23 A.   It's -- every time I checked it, you know, I reported it

24 to be safe.  So I never had any issues where it looked like

25 it was a hazard and raised up or any kind of hazard for

1  anybody.

2  Q.  But my question was before June 3rd you believed that the

3  cement drain plug was totally flat with the floor, did you

4  not?

5  A.  Yes, sir.

6  Q.  And you also believed that it was -- or you disagreed

7  that it was either slightly dished or irregular from the rest

8  of the floor surface, right?

9  A.  Yes, sir.

10  Q.  And in your inspections prior to June 3rd, 2010, you had

11  never actually measured it, had you?

12  A.  No, sir.

13  Q.  You never checked the slip resistance of the tile

14  vis-à-vis the cement drain spot, did you?

15  A.  No, sir.

16        THE COURT:  This is cross-examination.  He hasn't

17  inspected it; you've shown that.  Let's move along.

18  BY MR. WILSON:

19  Q.  Well, let me ask -- you inspected this thing every eight

20  weeks?

21        THE COURT:  He's inspected it before.  Let's move

22  along, Mr. Wilson.

23        MR. WILSON:  Okay.

24  BY MR. WILSON:

25  Q.  Now, I understand that now, based on your measurements,

1  you now conclude that there is in fact a deviation, after you

2  measured it after this lawsuit.

3  A.  In the little -- in the far corner, the little divot,

4  pencil head size.

5  Q.  Were you surprised to learn that your visual inspection

6  didn't reveal that deviation?

7          THE COURT:  We're talking about a deviation, he

8  said, of a pencil head?

9          MR. WILSON:  That's what he said, and I was

10  asking --

11  BY MR. WILSON:

12  Q.  Did your visual inspection reveal that, and were you

13  surprised that it did not?

14  A.  I'm not sure I understand the question there.

15  Q.  All right.  When you were looking at it you thought it

16  was totally flat, right?

17  A.  Right.

18  Q.  When you measured it you found out it wasn't totally

19  flat, right?

20  A.  Correct.

21  Q.  Okay.  And, so, were you surprised that when you actually

22  measured it what you had seen wasn't the way it actually was?

23  A.  Yes.

24  Q.  Okay.  Now, you mentioned something about in the early

25  2000s there was a -- I think you said a reconstruction or a

1  remodel.

2  A.  Yes, sir.

3  Q.  Okay.  And it was my understanding that you had no input

4  or role in the construction or remodeling process.

5  A.  That's correct.

6  Q.  And, so, when you talked about a city inspection you

7  don't know if this area was inspected, do you?

8  A.  I know they had to come in -- that I was told that they

9  come in to do inspections after each section was done, but I

10  had no control over seeing them come in, walking them through

11  it, or anything like that.

12  Q.  Right.  So you don't know if, in fact, anyone ever

13  inspected that spot.

14  A.  That's true.

15  Q.  Okay.  Now, I'm going to ask you that --

16          THE COURT:  Just ask the questions, Mr. Wilson,

17  please.

18  BY MR. WILSON:

19  Q.  As part of this remodel did Kroger put new tile in the

20  produce area?

21  A.  Yes, sir.

22  Q.  And was it your understanding that that cement drain plug

23  had been filled prior to Kroger taking over the store?

24          THE COURT:  I don't know what he -- what are we

25  talking about?

1    Did you ever go to the store prior to Kroger taking

2  over the store?

3    THE WITNESS:  Yes, sir.  I worked for Hannaford's,

4  which owned the Kroger store before Kroger bought it.

5    THE COURT:  Oh, good.  Go ahead.

6  BY MR. WILSON:

7  Q.  Did you know that prior to the tile being put down that

8  the cement drain plug had been filled in by somebody other

9  than Kroger?

10 A.  That I don't know.

11 Q.  You do know that Kroger did put down new tile.

12 A.  Yes, sir.

13 Q.  You gave the dimensions of it.  You said it was 12 inches

14 by 12 inches.  How thick was it?

15 A.  That I don't know.

16 Q.  Okay.  You mentioned that some pictures were taken after

17 the lawsuit, and you said you were present.  Who actually

18 took the pictures?

19 A.  We did.

20 Q.  Who is "we"?

21 A.  I took some and sent them to Mr. Skaff.

22 Q.  Okay.  I don't want to get into that.

23    But was Mr. Skaff with you when you were taking the

24 pictures?

25 A.  Yes.

———— V. E. Harris - Cross ————

1   Q.  Okay.  And did he hold the camera at any time?

2   A.  No.

3   Q.  And so you took the pictures?

4   A.  I took the pictures.

5   Q.  With him present?

6   A.  Yes, sir.

7   Q.  One of the pictures --

8           THE COURT:  Do you contend that the pictures aren't

9   correct?

10          MR. WILSON:  What's that?

11          THE COURT:  Did you make any contention that the

12  pictures aren't correct, Mr. --

13          MR. WILSON:  No, I'm going to introduce one.

14          THE COURT:  Well, why are we doing all of this?

15          MR. WILSON:  I'm getting ready to introduce one as

16  an exhibit.

17          THE COURT:  You know, let's get on with it,

18  Mr. Wilson.  Let's get on to the case.

19          MR. WILSON:  I would move to introduce this -- it

20  was originally marked Defendant's 11, but the numbers got

21  changed, so we can call it P 30.

22          So this would be P 30, although it had originally

23  been marked D 11, okay?

24  BY MR. WILSON:

25  Q.  Looking at that picture, does it look like it's taken

Heidi L. Jeffreys, Official Court Reporter

1    more from ground level?

2    A.  Yes, sir.

3    Q.  Okay.  And the other pictures that Mr. Skaff had

4    introduced were taken more from sort of a bird's-eye, up-top

5    level?

6    A.  Yes, sir.

7    Q.  And, so, if you look at those -- if you look at the ones

8    from ground level versus the ones from top level, they look

9    real different, don't they?

10   A.  They look a little different.

11   Q.  Okay.  Do you know if that area -- when these pictures

12   were taken had it been cleared out of merchandise that

13   normally is a seasonal promotion?  Had it been moved out so

14   you could take these pictures?

15   A.  Which?

16   Q.  Any of the pictures that you took with your lawyer.

17             THE COURT:  Do you contend that any of these

18   pictures are inaccurate?  Then I'll be glad to hear it.

19             Let's move along, Mr. Wilson.

20             Do you contend that any of these pictures are

21   inaccurate?  Do you?

22             MR. WILSON:  They're inaccurate because they don't

23   show the display on that day, and that's all I was trying to

24   establish.

25             MR. SKAFF:  We've stipulated --

1          THE COURT:  They're not intended to show the

2    display.

3          Let's move along, Mr. Wilson.  We want to get to

4    this trial.

5          MR. WILSON:  Okay.  That was my last question.  I

6    just wanted to make that point.

7          MR. SKAFF:  I have no further questions, Your Honor.

8          THE COURT:  What exhibits have we got that may not

9    be here so I don't have to recall any more witnesses?

10          THE CLERK:  P 30 is actually Defendant's Exhibit 11,

11    but we need to get that in.

12          THE COURT:  And that's it?

13          THE CLERK:  That's the only one you need to admit.

14          THE COURT:  Okay.  That's what I was curious about.

15          You're moving for this exhibit to be admitted into

16    evidence, correct, Mr. Wilson?

17          MR. WILSON:  Yes, Your Honor.  I renumbered it P 30.

18          THE COURT:  All right.  It's admitted.

19          MR. WILSON:  Thank you.

20          (The exhibit was admitted into evidence.)

21          THE COURT:  Anything else?

22          MR. SKAFF:  Not of this witness, Your Honor.

23          THE COURT:  Anything else of this witness,

24    Mr. Wilson?

25          MR. WILSON:  No, Your Honor.

1          THE COURT:  All right.  Let's move along.

2          Ladies and gentlemen, just because I'm trying to

3     move this case doesn't mean I have an opinion one way or the

4     other.  I want to make that abundantly clear.  I want to get

5     this case over.

6          Let's go.

7          MR. SKAFF:  That's all I have, Your Honor.  I'd like

8     to take up some issues with Your Honor, but --

9          MR. WILSON:  I'd like to call Mrs. Aaron for one

10    rebuttal question.

11         THE COURT:  No, you're not going to call Mrs. Aaron

12    for any rebuttal question unless it rebuts something that's

13    said that you did not bring out in your original case.

14         MR. WILSON:  It does.

15         THE COURT:  Okay?

16         MR. WILSON:  Mrs. Aaron, take the witness stand.

17         THE COURT:  First let me see.  Approach the bench,

18    Mr. Wilson.  We're not starting your case over.

19         MR. WILSON:  No, it will only be two questions.

20         (The following was heard at the sidebar out the

21    hearing of the jury:)

22         MR. WILSON:  Did you tell Mr. Heath that you tripped

23    over your own feet?  Did you tell Mr. Heath that --

24         THE COURT:  No, I'm not allowing that.

25         MR. SKAFF:  She testified yesterday she didn't know

1    what she said.

2            THE COURT:  That's exactly right.  I'm not allowing

3    it.

4            MR. WILSON:  Okay.

5            (The proceedings resumed in open court as follows:)

6            THE COURT:  We're not going to start this case over,

7    Mr. Wilson, okay?

8            All right.  Ladies and gentlemen, we'll be

9    probably -- I estimate this will take about -- I'd estimate

10   at least 45 minutes to go over instructions and whatnot with

11   counsel.  I have to go over each one of them with counsel and

12   then we'll have to discuss it, and we'll do that.

13           Everyone please rise while the jury retires.

14           (The jury withdrew from the courtroom.)

15           THE COURT:  All right.  Do you have a motion,

16   Mr. Skaff?

17           MR. SKAFF:  Your Honor, just from a housekeeping

18   standpoint I would make sure that we've moved into evidence

19   Exhibits D 1 through D 12, which were in our notebook

20   submitted prior to the incident, minus the document that

21   we've already talked about.

22           THE CLERK:  So it would be D 1 through 3.  4 through

23   10 is already in.

24           THE COURT:  All right.

25           MR. SKAFF:  And, Your Honor, 1 through 3, I think,

1   was already into evidence, but to make sure --

2          THE COURT:  We'll put them in.

3          MR. SKAFF:  Thank you.

4          (The exhibits were admitted into evidence.)

5          THE COURT:  It was agreed to.  Let's go.  They're in

6   evidence.

7          MR. SKAFF:  Judge, again, I have the proffer of the

8   spoliation evidence.  I don't know when you want to deal with

9   that.

10         THE COURT:  Deal with it right now, Mr. Skaff.

11         MR. SKAFF:  Yes, sir.  Would it be all right if I

12  walk out to get the witnesses?  Can they both come in?

13         THE COURT:  Yes, they can both come in.  This

14  doesn't have anything to do with the trial.

15         You're reminded you're still under oath, sir.  You

16  can take the witness stand.

17         THE WITNESS:  Yes, sir.

18         VERNON E. HARRIS, recalled as a witness for proffer

19  of the spoliation evidence, having previously been sworn,

20  testified further as follows:

21                    DIRECT EXAMINATION

22  BY MR. SKAFF:

23  Q.  Mr. Harris, you've already testified that you're employed

24  with Kroger in a loss prevention capacity, correct?

25  A.  Yes, sir.

1  Q.  Okay.  In that capacity did part of your duties deal with
2  the surveillance cameras and the video?
3  A.  Yes, sir.
4  Q.  Describe what your role is in that.
5  A.  If we have a shoplifter I need video, internal theft, I
6  need video and just keep track of the store, watch for safety
7  conditions and so forth.
8  Q.  Okay.  And is it part of your role to retrieve video if
9  there's any incident, theft or accident?
10  A.  Yes, sir.
11  Q.  Okay.  Can you just describe a little bit about the
12  surveillance camera system at the Shore Drive store?
13  A.  Yes, sir.  It's -- I have three monitors, two DVRs, and
14  it's 32 cameras in the whole store.
15  Q.  Now, when you walk into a Kroger store there's a lot of
16  bubbles up on the ceiling.
17  A.  Yes, sir.
18  Q.  Do all of those bubbles have cameras in them?
19  A.  Yes, sir.
20  Q.  Okay.  Do all of those have active cameras in them?
21  A.  Most of the time.  Sometimes, you know, they're out, you
22  know, and we have to get them fixed or replaced.
23  Q.  And what is the main purpose as it relates to
24  surveillance?
25  A.  Mainly, it's to deter theft.

1  Q.  And do you recall dealing with certain theft issues back
2  in June of 2010?
3  A.  Yes, sir.
4  Q.  And, as a result, were certain cameras pointed certain
5  ways?
6  A.  Yes, sir.
7  Q.  Can you describe that for the Court?
8  A.  Yes, sir.  We had an issue with DVDs being stolen, and
9  our DVD section was kind of across the front of the store, so
10 all of our movable cameras -- to try to catch who was doing
11 it, we turned all those to face that area.
12 Q.  Were you at the store when this incident occurred?
13 A.  No, sir, I was not.
14 Q.  Okay.  How did you get involved?
15 A.  I got a call or a text -- I can't remember which one --
16 from Dale Heath.
17 Q.  The store manager?
18 A.  Yes, sir.
19 Q.  And what were you asked to do?
20 A.  I was asked to come in the next day to look at video
21 because there was an accident in the store.
22 Q.  And what did you do in response to that?
23 A.  I either called him or texted him back -- I don't
24 remember which one -- that I would be there the next morning.
25 And I went there the next morning and talked to him, got the

1  exact time or close to the exact time, the area, and I

2  proceeded to investigate.  I walked over there personally

3  myself to get an idea of what we were talking about, and then

4  I went back and tried to find it on video.

5  Q.  And, so, what was your understanding at that point of

6  what had happened and where it was?

7  A.  My understanding was there was a lady that slipped and

8  fell over by the produce section.

9  Q.  And, so, what did you do?  Did you start to look for

10 video?

11 A.  Yes, sir.  I went into my office, and I went to that

12 date, and I went to that time, and I played back video to see

13 if I had it on video.  And the cameras that cover that area

14 were not pointing in that direction, and one of them was out.

15 Q.  Okay.  Let's talk about that for a second.

16        Which cameras -- how many cameras did you look at?

17 A.  I looked at, I believe, six.

18 Q.  So you looked at the video from six --

19 A.  Different cameras, yes, sir.

20 Q.  The remaining 26 -- did you look at those?

21 A.  No, I did not.

22 Q.  Why not?

23 A.  Because they're in the back of the store, across the

24 other side of the store, you know, not even in the area.

25 Q.  Of the produce section?

Heidi L. Jeffreys, Official Court Reporter

1   A.  Of the produce section.

2   Q.  All right.  When you looked at those six cameras, the

3   video from those six cameras, what did you see?

4   A.  I saw what they were covering, which was where I turned

5   them to, but I didn't see any accident.

6   Q.  Was there any of those cameras pointed towards the

7   produce section?

8   A.  No.

9   Q.  Were there any cameras remotely pointed towards the

10  produce section?

11  A.  There was one that was covering the prep room door.

12  Q.  Which is where in relation --

13  A.  Which is -- in relation to the picture, it's -- it's this

14  wall (indicating) farther down.

15  Q.  Did you see any video as it relates to the fall involving

16  Mrs. Aaron?

17  A.  No, sir.

18  Q.  Did you see any video at all as it related to the area

19  where the watermelon display was?

20  A.  No, sir.

21  Q.  And was there any?

22  A.  No, sir.

23  Q.  Because --

24  A.  Because they were -- I had the PTZs, which are our

25  movable cameras, turned to where I was losing videos to cover

1    all of that area.

2    Q.  As a result did you -- well, let's talk about the videos.

3        So what happens?  The cameras take the video, right?

4    A.  The camera records the video.

5    Q.  Okay.  And, so, what happens?

6    A.  It stays into the system for 30 days unless I save it to

7    the desktop or to a disk.

8    Q.  As a result of what you had done -- well, let me back up

9    again.  You went to look for the video?

10   A.  Correct.

11   Q.  Did anybody else do that with you?

12   A.  No, I did that by myself.

13   Q.  Okay.  As a result of what you didn't see did you keep

14   anything?

15   A.  No, sir.

16   Q.  Did you destroy anything?

17   A.  No, sir.

18   Q.  What happened to the tape?

19   A.  After 30 days it records over itself.

20   Q.  If the tapes would have been -- let's say we had six --

21   let's say we had 32 cameras.  Had 32 cameras, all the video,

22   been saved what would we have seen?

23   A.  You would have seen customers shopping, you would have

24   seen employees working, and pretty much that's about it.

25   Q.  Okay.  Is there any -- you said that -- you said there

1    was a camera that wasn't working.

2    A.   Right.  And that was the foyer cameras, which is inside

3    the foyer, people coming in and going out.

4    Q.   The foyer where?

5    A.   In the produce side on the produce -- the produce side of

6    the store.

7    Q.   And that camera was not working?

8    A.   That camera wasn't working.

9    Q.   Were you ever aware of any type of letter or

10   correspondence that was sent to the store asking to save

11   video?

12   A.   No, sir.

13   Q.   Okay.

14        MR. SKAFF:  That's all I have, Your Honor.

15        THE COURT:  Nobody told you about a letter being

16   sent to the store?

17        THE WITNESS:  No, sir.  I didn't know anything about

18   the letter until I was shown at deposition.

19        THE COURT:  All right.  Do you have some questions,

20   Mr. Wilson?

21        MR. WILSON:  I -- I mean, I wasn't planning to

22   examine him.  I thought he was just doing a proffer of what

23   he thought he would say.  I mean, we've briefed it --

24        THE COURT:  Do you have any questions, Mr. Wilson?

25   Just answer my question.

1    CROSS-EXAMINATION

2  BY MR. WILSON:

3  Q.  Did you know what Mrs. Aaron looked like when you were

4  looking at the video?

5  A.  I got a brief kind of description, but, no, I wouldn't

6  have, you know --

7  Q.  So you wouldn't have known if you saw her or not.

8  A.  No.

9  Q.  And you've moved the cameras around at different times.

10 They're not even the same today as they were on the date of

11 the incident, are they?

12 A.  That's correct.

13 Q.  And, so, you tried to reconstruct how you thought they

14 were based on memory, right?  On the day of the incident you

15 tried to reconstruct how you thought the cameras were

16 positioned based on memory.  Is that correct?

17 A.  No.  What I did is I looked -- I was asked to look for an

18 accident, and I pulled up video, and the cameras were pointed

19 in a different area.

20        THE COURT:  Did they show any accident on any of the

21 film.

22        THE WITNESS:  No, sir.

23        THE COURT:  All right.  Let's move along,

24 Mr. Wilson.

25        MR. WILSON:  It's covered in the submissions we've

1   already given.

2            MR. SKAFF:  Yes, Your Honor, that's all I have of

3   Mr. Harris.

4            THE COURT:  Do you have any --

5            MR. SKAFF:  I have Mr. Heath, to ask him about three

6   or four questions.

7            THE COURT:  Who?

8            MR. SKAFF:  Mr. Heath, who already testified.

9            THE COURT:  Yeah, he's got to testify.  I want to

10  find out about the letter.

11           MR. SKAFF:  Yes, sir.

12           THE COURT:  Let's go.  Do you have a copy of the

13  letter, Mr. Wilson?

14           MR. WILSON:  I may not, Judge.  I may not,

15  because --

16           THE COURT:  I just asked if you had a copy.  All you

17  have to do is say, "I don't have one."

18           I think it's attached to your exhibit, so we'll look

19  in a minute.  My clerk will get one.  Thank you, Mr. Wilson.

20           DANIEL D. HEATH, recalled as a witness for proffer

21  of the spoliation evidence, having previously been sworn,

22  testified further as follows:

23                         DIRECT EXAMINATION

24  BY MR. SKAFF:

25  Q.  Mr. Heath, you've already testified.  You're still under

1   oath.

2          You were the store manager at the time of this

3   accident?

4   A.  Yes.

5   Q.  Okay.  You started to tell the jury a little bit about

6   this, but let me ask you now.

7          After the fall occurred what did you do as it related

8   to Mr. Vernon Harris?

9   A.  The next day I had him look at video footage to see if --

10  what he could find.

11  Q.  And Mr. Harris is the loss prevention person for the

12  store?

13  A.  Yes.

14  Q.  Okay.  And is it your understanding that he went to view

15  those tapes?

16  A.  Yes.

17  Q.  And what is your understanding of what was on those

18  tapes?

19  A.  Nothing.  There was nothing on video.

20  Q.  Okay.  At some point after the accident you've already

21  testified about that you received a letter from an attorney

22  about this incident.

23  A.  Yes.

24  Q.  Okay.  As a result of that letter I would -- I'll -- you

25  would agree that that letter asked you to save any videotape

1    relating to the incident.

2    A.   Yes.

3    Q.   Okay.  Did you save anything?

4    A.   No.

5    Q.   Why is that?

6    A.   Because there was nothing to save.

7    Q.   And that's what had been related to you by Mr. Harris?

8    A.   Yes.

9         MR. SKAFF:  Okay.  That's all I have on that.

10        THE COURT:  Do you have any questions?

11                    CROSS-EXAMINATION

12   BY MR. WILSON:

13   Q.   Did you ever show the letter to Mr. Harris?

14   A.   Not -- not that I recall.

15        MR. SKAFF:  That's all.

16        THE COURT:  I'm going to look at the letter again in

17   relation to this testimony.

18        MR. SKAFF:  Yes, sir.  That's all I have, Your

19   Honor.

20        THE COURT:  My clerk is going to see -- it was one

21   attached to one of the exhibits.

22        MR. SKAFF:  I think I have a copy, Your Honor.

23        (There was a pause in the proceedings.)

24        THE COURT:  Oh, you have it there.

25        MR. SKAFF:  Yes, sir.

1          THE COURT:  Thank you.  Let me look at it.  My

2    recollection...

3          (There was a pause in the proceedings.)

4          THE COURT:  Well, it's scratched out.  What was

5    scratched out?

6          MR. SKAFF:  It might have had something to do with

7    the insurance company, Your Honor.  I...

8          (There was a pause in the proceedings.)

9          MR. SKAFF:  I'm pretty sure that's what it was.

10          (There was a pause in the proceedings.)

11          THE COURT:  The letter does say, "...any

12   photographs, incident reports or any other documentary

13   evidence which may be relevant to the incident."

14          How about that, Mr. Wilson?

15          MR. WILSON:  Well, that's it.  And I don't have the

16   letter in front of me, so I --

17          THE COURT:  All right.  We'll...

18          (There was a pause in the proceedings.)

19          MR. WILSON:  What I said was, "...place a litigation

20   hold on all relevant documents and other tangible things

21   related to the incident, including, without limitation, any

22   video recordings from store monitoring equipment, copies of

23   payor information and/or checks..." and whatnot, and the --

24          THE COURT:  But you said "...which may be relevant

25   to the incident".

 1          MR. WILSON:  Not up top.  I said, "...hold all" --
 2    "...on all relevant documents and other tangible" -- "related
 3    to" -- yeah, which may be relevant, right.
 4          THE COURT:  Right.  It had to be relevant for them
 5    to keep it.
 6          MR. WILSON:  Right.
 7          THE COURT:  I didn't pay much attention to that,
 8    because I thought -- I'm sorry.
 9          MR. WILSON:  In your prior decision I think you said
10    there was relevance because it could show things other than
11    the fall, because there's a lot of case law that says what
12    relevance is is much broader than showing just the fall.  It
13    could show some of these witnesses.  You already defined what
14    "relevance" meant in your opinions.
15          And when we say "a litigation hold" -- I mean, I
16    don't know what more I can do as a lawyer.  I said, "...on
17    all" --
18          THE COURT:  When did you get this letter, Mr. Heath?
19          THE WITNESS:  The Wednesday following -- actually,
20    it was delivered to my comanager.  I was off that day.
21          THE COURT:  Did you ever call Mr. Wilson and say,
22    "We don't have any such tape"?
23          THE WITNESS:  I did not.
24          THE COURT:  Did you do anything with Mr. Wilson?
25          THE WITNESS:  No.

Heidi L. Jeffreys, Official Court Reporter

1          MR. WILSON:  And, Your Honor, I don't know if it's

2    attached to what you have, but a few days later I sent

3    something to -- and we can say it now -- Sedgewick, the exact

4    same thing, to the insurer.

5          THE COURT:  What is it?

6          MR. WILSON:  And I say -- I reiterate the evidence

7    preservation issues.

8          THE COURT:  I think I -- let me see this.

9          (There was a pause in the proceedings.)

10         THE COURT:  The part that's missing from the Exhibit

11   P 9 is the fact it says, "If you've not done so already,

12   please place your insurance carrier on notice of this

13   incident."

14         All right.  I understand.  I don't have any

15   questions of Mr. Heath.

16         Do you have any more questions?

17         MR. SKAFF:  Just one more question, Your Honor.

18                    REDIRECT EXAMINATION

19   BY MR. SKAFF:

20   Q.  In response to the letter, Mr. Heath, the photographs

21   that were taken and the incident reports all were kept.

22   A.  Correct.

23         MR. SKAFF:  Okay.  That's all I have, Your Honor.

24         THE COURT:  All right.  Let's go into your motion,

25   Mr. Skaff.  You can step down, Mr. Heath.  Thank you.  You're

1  instructed not to discuss your testimony with any other

2  witness.

3          All right, Mr. Skaff.

4          MR. SKAFF:  Yes, sir.  Judge, we would just at this

5  time -- at the close of the evidence we would just renew our

6  motion to strike on the same basis.

7          THE COURT:  I have some real problems, Mr. Skaff.

8          What is it that's wrong with this thing, Mr. Wilson?

9  Tell me what you have shown that is wrong with it.  Your

10  expert testified that it was not level -- okay? -- that it

11  had a concave portion in it.  The only concave portion I've

12  gotten so far is one -- and he didn't say anything protruded

13  upward, he said that there was an eighth- to a

14  quarter-of-an-inch dip.  He didn't measure the dip, but he

15  says it was an eighth- to a quarter-of-an-inch dip in it.

16  What did that do?  You say she may have caught her toe in it.

17  Now, I don't know what it is.

18          MR. WILSON:  Well, he described two things.  He

19  described that the texture was different, and he described

20  that it was uneven, okay?  The jury has seen it.  They are

21  the --

22          THE COURT:  So it's uneven.  But what has that got

23  to do with anything?

24          MR. WILSON:  Well, the testimony from both -- from

25  Mr. Heath was anything that's uneven he considers a tripping

1    hazard.

2           THE COURT:  Yeah, but how does that cause the

3    accident?

4           MR. WILSON:  Because she testified that she came

5    around, she felt something that was uneven and a different

6    texture, which caused her foot to jam and to fall.  Proximate

7    cause is a jury question, I would submit.

8           THE COURT:  Oh, it is -- well, there's got to be

9    some evidence of it.  The problem is that the only thing

10   uneven that's been shown so far is this one-quarter or

11   one-eighth-inch dip.

12          MR. WILSON:  The testimony --

13          THE COURT:  Is there any other dip been shown?

14          MR. WILSON:  His testimony was the whole --

15          THE COURT:  It's uneven.  I understand.

16          MR. WILSON:  The whole surface was uneven, and that

17   it was as much as a quarter --

18          THE COURT:  It is uneven if you've got a

19   quarter-of-an-inch dip in it.

20          MR. WILSON:  Right, but --

21          THE COURT:  So he could testify to that.  He's just

22   a paid person, Mr. Wilson.

23          So what is it that caused this fall?

24          MR. WILSON:  What it is -- the cement drain plug --

25   when she turned the corner her foot jammed in it --

1          THE COURT:  There's no evidence that her foot jammed
2    in this drain.

3          MR. WILSON:  She said it.

4          THE COURT:  There is no evidence that this foot
5    jammed in this drain or that the drain itself was negligent.
6    What is the negligence?

7          MR. WILSON:  The negligence is it's an unsafe
8    condition and was --

9          THE COURT:  No, it was never any unsafe condition.
10   It said it was unsafe because it had a pin head one-eighth of
11   an inch deep?

12         MR. WILSON:  Well, one expert said a quarter of an
13   inch deep, which violated engineering standards, and --

14         THE COURT:  There was never any engineering
15   standards put in evidence.  There was nothing scientific
16   done, period.  It was all -- it was uneven, and it is uneven.
17   I -- I will say there's no evidence saying that it was even,
18   because there's a quarter- or an eighth-of-an-inch dip in it.

19         I may let it go to the jury, but I have real
20   misgivings about it.  I can't figure out any proximate cause.
21   I just can't figure it out.

22         MR. WILSON:  I have case law that I think says that
23   we've --

24         THE COURT:  I've read all your cases, Mr. Wilson.
25   You rely on the old *Taylor* case, but that was a question of

1    water on the floor, and the water was coming from a drip of

2    ice that had come out of the thing and was spilling on the

3    floor in the *Taylor* case.

4              MR. WILSON:  Uh-huh.

5              THE COURT:  This is really a very distinguishable

6    case.  I've read the *Taylor* case.  I am concerned about it,

7    because now I'm really trying to figure out what it is that

8    the jury can figure out.

9              MR. WILSON:  Well, I think what they'll figure out

10   is --

11             THE COURT:  And what you're saying is that if a

12   fellow says that it's uneven you don't have to show anything

13   else, correct?

14             MR. WILSON:  No.  What I'm saying is, especially in

15   a case -- the case law says this:

16             Unsafe condition is a jury question, and when the

17   jury goes out and looks at it they can --

18             THE COURT:  So what -- doesn't there have to be some

19   testimony that would make it?

20             MR. WILSON:  Well, there was testimony that would

21   make it unsafe.  There was an expert who said it.  And you

22   may discount his testimony, but he said it.

23             THE COURT:  An expert in -- there isn't any

24   question.

25             MR. WILSON:  And so he has said it, and whether the

1   jury discounts or believes him, that's the jury's

2   prerogative.

3           THE COURT:  We have a guy who's got a Ph.D. from an

4   institution that was on the Internet that nobody can find.

5           MR. WILSON:  He said it went out of business after

6   about ten years, and I understand that.

7           THE COURT:  He's testified to it, and it's been

8   uncontradicted.  It's an Internet institution.

9           MR. WILSON:  And he also has a -- he's a

10  professional licensed engineer.

11          THE COURT:  He's an engineer, but it wasn't an

12  engineer's question.  It was not a question of engineering,

13  it was a question of whether that was safe in relation to

14  what is normally safe.

15          I'll probably let it go to the jury, but I have

16  tremendous misgivings, Mr. Wilson, tremendous misgivings.

17  But I'll let it go to the jury.

18          MR. WILSON:  I just think the facts are what they

19  are, and I think it's a jury question.  That's all I can say.

20  I mean, they can certainly reach a verdict based on what they

21  have heard, what they have seen, and --

22          THE COURT:  They've been out there and looked at it,

23  so --

24          MR. WILSON:  Huh?

25          THE COURT:  -- if they find that it's -- they've

1  looked at it, so we'll see.

2          MR. WILSON:  Well, that's it.  I mean, that's really

3  my point.  Once they've looked at it it took it out of my

4  hands, because I wasn't there to see what they were looking

5  at.

6          THE COURT:  Well, I certainly wouldn't have let you

7  go out there.  You probably still would have been talking if

8  you went out there, Mr. Wilson, so --

9          MR. WILSON:  I know you're displeased with me, but

10 I'm trying to keep it quick.

11         THE COURT:  -- we'll let it go to the jury.

12         Have we got the instructions?

13         THE LAW CLERK:  No, sir.  I --

14         THE COURT:  Would you get them for me, please?

15         THE CLERK:  Do exhibits, based on the motion in

16 limine, need to be redacted?

17         THE COURT:  You-all can check the exhibits right now

18 to see if we've got them all.

19         THE CLERK:  Didn't the motion in limine say that any

20 references had to be redacted?

21         MR. SKAFF:  I think they were.

22         THE CLERK:  So Exhibit 6 is out, but that has to be

23 redacted.

24         (There was a pause in the proceedings.)

25         THE COURT:  So the negligence in this case is the

1   fact that the drain is uneven.  Is that correct, Mr. Wilson?

2          MR. WILSON:  The negligence is that it was an unsafe

3   condition posed by the two characteristics of being uneven

4   and a different texture.  The expert even used the words

5   "grabbed her foot."  It was those two, those two in

6   combination.

7          THE COURT:  Nothing was shown that the different

8   texture would do anything.  That's the problem.

9          MR. WILSON:  There was testimony on it.

10         THE COURT:  There was testimony that it was a

11  different texture, but it didn't say what the result of any

12  different texture was.

13         MR. WILSON:  He said it grabbed her foot.

14         THE COURT:  He said what?

15         MR. WILSON:  It grabbed her foot.

16         THE COURT:  How could he say it grabbed her foot

17  when she doesn't even know what caused her to fall?

18         MR. WILSON:  She knows what caused her to fall.  She

19  went back afterwards to confirm --

20         THE COURT:  Listen.

21         MR. WILSON:  The moment she fell she didn't know --

22         THE COURT:  You know something, Mr. Wilson?  Here

23  she is -- she's testifying to the name of the person who

24  helped her, how many times he came up, what he said, how he

25  talked to her.  The only thing she can't remember is what it

was that she -- was there.  She had a vivid memory of the
person who helped her, got her up off the floor, everything
about him.  She had an absolute, total recall.  Now she
doesn't have a total recall about making statements.  That
might hurt her.

          MR. WILSON:  It may, but it's a jury question.

          THE COURT:  You know, so --

          MR. WILSON:  Your Honor, what she testified to --

          THE COURT:  I'm going to let this case go to the
jury, but I've got terrible misgivings, not to say what
happened.

          Have we got all the exhibits straight now?

          THE CLERK:  Yes, sir.

          THE COURT:  Just as soon as she brings back the
instructions we'll go over those.  It's a very simple case.

          THE CLERK:  We need the demonstrative P 1 and P 2 --

          THE COURT:  They've been marked.  Let them go into
evidence.

          THE CLERK:  Are you going to use them in your
closing?

          MR. WILSON:  I may.  Let's just see.

          THE CLERK:  All right.

          THE COURT:  They were marked P 1 and P 2.

          MR. WILSON:  P 1.

          THE CLERK:  This one is P 2.  That's my handwriting

1   there.  And this one is P 15.

2             MR. WILSON:  And I have P 1.

3             THE CLERK:  Uh-huh.

4             THE COURT:  After this case is tried the big

5   exhibits will be removed unless they're -- by counsel.

6             MR. WILSON:  Yes, sir.  And I would also make a

7   motion to substitute the shoes at the appropriate time with a

8   picture.

9             THE COURT:  Make a motion to do what?

10            THE CLERK:  To substitute a photo for the shoes.

11            THE COURT:  You can have a photograph of the shoes.

12  It will have to be kept, though, if it's an appeal.

13            MR. WILSON:  We hope there won't be an appeal.

14            THE COURT:  Why don't we take a five-minute break,

15  and then I'll get the instructions back down, gentlemen.

16  Everybody can use the facilities.  Because we'll be a little

17  while on the instructions.

18            (A recess was taken.)

19            THE COURT:  You may be seated.

20            (There was a pause in the proceedings.)

21            THE COURT:  I don't see any reason to have the

22  technology instruction in here -- we're going to try to make

23  this as simple as possible -- unless you-all insist on it.

24            Let's go down them, okay?  Are you ready?

25            The first instruction is a canned instruction.

1          The second instruction is canned.

2          All right.  Let's go to preponderance of the

3 evidence.

4          (There was a pause in the proceedings.)

5          THE COURT:  So we go to the preponderance of the

6 evidence.  Any problems?

7          Okay.  Next is the negligence issue and allocation

8 of burdens of proof.

9          "The issue in this case is was Kroger negligent.  If

10 Kroger was negligent, was its negligence a proximate cause of

11 the accident?  On this issue the plaintiff has the burden of

12 proof.

13          "3.  Was the plaintiff negligent?  If so, was her

14 negligence a proximate cause of the accident?  On these

15 issues the defendant has the burden of proof.

16          "And, lastly, if the plaintiff is entitled to

17 recover, what is the amount of her damages?  On this issue

18 the plaintiff has the burden of proof."

19          Any problems?  Hearing none...

20          "Both the plaintiff and the defendant have a

21 duty" -- uh-oh.  "...have a duty to exercise reasonable

22 care."  The E is off.  I'm just going to print it.  I'm not

23 going to -- "...have a duty to exercise reasonable care in

24 performing the duties defined in these instructions."

25          "Reasonable care is that care that a reasonable

1  person would exercise under the same or similar

2  circumstances."

3       "Verdict:  You shall find your verdict for the

4  plaintiff if she has proved by the greater weight of the

5  evidence that, one, the defendant was negligent and that the

6  defendant's negligence was a proximate cause of the

7  plaintiff's accident and damages.  You shall find your

8  verdict for the defendant if the plaintiff failed to prove

9  either or both of those two elements above or if you find by

10 the greater weight of the evidence that the plaintiff was

11 contributorily negligent and that her contributory negligence

12 was a proximate cause of the accident.

13      "The defendant's duty to an invitee in general:  An

14 occupant of premises such as the Kroger Company does not

15 guarantee an invitee's safety; rather, it has the duty, one,

16 to use ordinary care to have the premises in a reasonably

17 safe condition for an invitee's use, consistent with the

18 invitation, unless the invitee knows or should have known of

19 an unsafe condition, and to use ordinary care to warn an

20 invitee of any unsafe condition about which the occupant

21 knows or by the use of ordinary care should know, unless the

22 unsafe condition is open and obvious to a person using

23 ordinary care for her own safety.  If an occupant fails to

24 perform either or both of these duties then it is negligent."

25      "Definition of proximate cause:  The word

1    'proximate' as used in these instructions in defining

2    'proximate cause' is a legal term.  It does not mean

3    approximate.  It is a cause of an accident, injury or

4    damage" -- "is a cause" has been repeated here; I don't know

5    why -- "which in the natural and continuous sequence" -- take

6    out the other "cause," a typographical matter -- "which in

7    natural and continuous sequence produces the accident, injury

8    or damage.  It is a cause without which the accident, injury

9    or damage would not have occurred.  There may be more than

10   one proximate cause of an injury or damage.  The fact that

11   there was an accident and the plaintiff was injured does not

12   of itself entitle the plaintiff to recover."

13            "Contributory negligence is the failure to act as a

14   reasonable person would have acted for her own safety under

15   the circumstances of the case.  When the defendant Kroger

16   Company claims contributory negligence as a defense the

17   Kroger Company has the burden of proving by a preponderance

18   of the evidence that the plaintiff was negligent and that

19   this negligence was a proximate cause of the plaintiff's

20   injuries."

21            "If you find from the greater weight of the evidence

22   that both the plaintiff and defendant were negligent and that

23   their negligence proximately contributed to the accident, you

24   may not compare the negligence of the parties.  Any

25   negligence of the plaintiff which was the proximate cause of

1  an accident will bar the plaintiff from recovery."

2      "If you are permitted" -- "You are permitted" -- I'm

3  putting the spoliation instruction in next.

4      "You are permitted but not required to infer that

5  the store's June 3rd, 2010, surveillance videotapes would

6  have been unfavorable to Kroger's theory of the case based on

7  Kroger's intentional destruction of the videotapes after the

8  store manager had received an evidence preservation letter."

9      (There was a pause in the proceedings.)

10      THE COURT:  "If you do draw an adverse inference

11  against Kroger from its conduct, then you may consider that

12  inference with the other evidence to decide the question of

13  negligence."

14      Personal injury damages are next.

15      "If you find your verdict for the plaintiff, then in

16  determining the damages to which she is entitled you shall

17  consider any of the following which you believe by a

18  preponderance of the evidence was caused by the negligence of

19  the defendant, the Kroger Company, by and through its

20  employees."  And this is just a canned instruction.

21      Any problems with any of them so far?

22      MR. SKAFF:  Yes, sir.

23      MR. WILSON:  Go ahead.

24      THE COURT:  All right.

25      MR. SKAFF:  I had --

```
 1          THE COURT:  And then there's "Deliberation," which
 2   is another canned instruction.
 3          All right.  Which one do you have a problem with,
 4   Mr. Skaff, other than the spoliation instruction, which I
 5   know that you object to strongly?
 6          MR. SKAFF:  Yes, sir.
 7          THE COURT:  Your objection is noted.  What else?
 8          MR. SKAFF:  The -- on the proximate cause
 9   instruction, Your Honor, in the last -- the last -- second
10   paragraph, the statement, "The fact that there was an
11   accident and the plaintiff was injured does not in and of
12   itself entitle the plaintiff to recover" -- I'm just asking
13   the question about whether or not that should just be a
14   separate instruction or whether that was intended to be
15   there.  I know from the Virginia Model Instructions that that
16   is a separate instruction.
17          THE COURT:  It is generally a separate instruction.
18   Do you want it separate?
19          MR. SKAFF:  I think I would, Your Honor.
20          And, again, from --
21          THE COURT:  Okay.
22          MR. SKAFF:  In terms of the spoliation instruction,
23   we would object that it be given generally, but in terms of
24   this particular instruction I think the evidence is clear
25   that there was not intentional destruction of these
```

1  videotapes, and I think that's even harsh on the spoliation
2  issue.
3          THE COURT:  I'll take out the word "intentional" and
4  just say "destruction."
5          MR. WILSON:  Your Honor, I thought that your order
6  twice said that it was intentional in the sense that it was
7  allowed to happen willfully.  And that is actually --
8  because, I mean, if it's -- I can read it, and it was
9  correct.  And I'm not just pandering.  I mean, it was a
10 correct statement of the law because it has to be.  I mean,
11 that's really sort of --
12         THE COURT:  I'm taking out "intentional."
13         MR. WILSON:  Okay.  All right.  I do have --
14         THE COURT:  The question is that -- there's no
15 question that they intended to destroy the tapes, and there's
16 no question that it was after they had gotten a letter, but
17 it wasn't because it was unfavorable.  They destroy the tapes
18 every 30 days.  Unfortunately, after the testimony I can't
19 find that, but I'm going to do the other.
20         Okay, Mr. -- okay.  We'll retype these two, then.
21 Okay.
22         MR. WILSON:  I have one that I might suggest to add.
23         THE COURT:  All right.  What else do you have,
24 Mr. Wilson?
25         MR. WILSON:  This is a Model Jury Instruction that

1   particularly applies to premises cases, and it is the one
2   that talks about -- number one, we don't have a definition of
3   "invitee."  It's been stipulated, but I just want to make
4   sure that that's not going to get lost in the shuffle.
5   There's typically a definition that I put in my version --
6          THE COURT:  Well, just what do you want?
7          MR. WILSON:  A definition of what "invitee" is or
8   that we've stipulated to it.
9          THE COURT:  Just wait.  Just stop.
10          MR. WILSON:  I put in an instruction --
11          THE COURT:  What do you want?  Just give me the
12   instruction you want.  Don't give me a whole lot of, you
13   know, who-struck-John.
14          MR. WILSON:  My Number P 21.
15          THE COURT:  Okay.  Let's see it.
16          MR. WILSON:  P 21, and that is the Model Jury
17   Instruction.
18          THE COURT:  How many instructions do you want to
19   give, now?
20          All right.  What is this?  Definition...
21          (There was a pause in the proceedings.)
22          THE COURT:  Oh, goodness.  I'm just saying, "An
23   invitee is one who visits the premises lawfully at the
24   express or implied invitation of the occupant."
25          MR. WILSON:  We've stipulated to it.

```
 1              THE COURT:  I don't mind that, okay?

 2              MR. WILSON:  Okay.  Thank you.

 3              THE COURT:  But I'm not going to give all this -- an

 4   express invitation?  Nobody is going to word it like that.

 5              MR. WILSON:  Don't need it.

 6              THE COURT:  "An invitee is one who visits the

 7   premises lawfully at the express or implied invitation of the

 8   occupant.  He or she is one who visits."

 9              I'm sure you want to say "she," don't you?

10              MR. WILSON:  I have no problem with that.

11              THE COURT:  Oh.  If you have no problem with it,

12   I'll eliminate it.

13              MR. WILSON:  No --

14              THE COURT:  You don't want it?  Do you want it or

15   not?

16              MR. WILSON:  Yes.

17              THE COURT:  Don't give me that who-struck-John,

18   Mr. Wilson.

19              MR. WILSON:  Yes, I do.  Thank you.

20              THE COURT:  Okay.  That's it.  Okay.  "He or she."

21   The rest of it is just surplusage.

22              And I'm not going to give you the second

23   instruction.

24              MR. WILSON:  Just so the record is clear, the second

25   instruction that I've proffered that's been rejected is the
```

1   one that discusses the Model Virginia Jury Instruction that

2   says --

3           THE COURT:  Maybe I'd better give it.  I'll give it.

4   "An invitee has a right to assume the premises were

5   reasonably safe."

6           MR. WILSON:  "Until she knows otherwise."

7           THE COURT:  I'll add that to the invitee.  Wait a

8   minute.

9           (There was a pause in the proceedings.)

10          THE COURT:  I'll take out, "He or she is one who

11  visits other than for a social purpose," because she had gone

12  there for her own convenience.  She said she went there to

13  shop.  That could cause confusion.

14          MR. WILSON:  I think that's a very wise --

15          THE COURT:  Yes, I think -- Mr. Wilson, it doesn't

16  hurt you.  It certainly helps you.  "An invitee..."

17          (There was a pause in the proceedings.)

18          THE COURT:  How is this?  Let me ask Mr. Skaff.

19          "An invitee is one who visits premises lawfully at

20  the express or implied invitation of the occupant.  He or she

21  is one who visits other than for a social purpose.  An

22  invitee has a right to assume that the premises are

23  reasonably safe to utilize."

24          Any problem with that, Mr. Skaff?

25          MR. SKAFF:  I think that that's probably a proper

1  statement of the law.  I would just object to the second
2  portion of that just because that's not included in the Model
3  Jury Instruction that I have, but --
4          THE COURT:  What is the second portion?
5          MR. SKAFF:  It doesn't have that.  It just says, "An
6  invitee is one" -- it just has that first paragraph that you
7  mentioned.
8          THE COURT:  "An invitee has a right to assume the
9  premises are reasonably safe to utilize."
10         MR. SKAFF:  I think that's a proper statement of the
11  law, Your Honor.
12         THE COURT:  All right.  Okay.
13         MR. SKAFF:  And, Judge, I had a few additional that
14  I would offer, if that's appropriate at this time.
15         THE COURT:  What?
16         MR. SKAFF:  I have a few additionals that I would
17  offer --
18         THE COURT:  All right.  Tell me what you want to
19  offer.
20         MR. SKAFF:  Yes, sir.  In the ones that we submitted
21  to the Court, Instruction D 9, "You must not base your
22  verdict in any way upon sympathy, bias, guesswork or
23  speculation.  Your verdict must be solely on the evidence and
24  instructions of the Court."
25         THE COURT:  "In deciding the facts of this case you

1    must not be swayed by sympathy for any party, nor bias or

2    prejudice or favors to any party.  Our system of law does not

3    permit jurors to be governed by prejudice, sympathy, bias,

4    guesswork or speculation and, therefore, only by proof."

5    I'll just add that.

6              MR. SKAFF:  Yes, sir.

7              (There was a pause in the proceedings.)

8              THE COURT:  Okay.

9              MR. SKAFF:  I would offer Instruction D 8, which is

10   again a Model Jury Instruction, which says, "The amount sued

11   for or sought is not evidence in this case.  You should not

12   consider it" --

13             THE COURT:  I don't allow anybody to mention the

14   amount sued for in federal court.

15             MR. WILSON:  I think that's a state court rule.  I

16   tried to do it and got --

17             THE COURT:  That's a state court thing.  We don't

18   allow people to discuss it.  The ruling is clear that what an

19   attorney may think is the value of the case doesn't

20   necessarily mean anything.

21             MR. SKAFF:  Judge, the remaining ones that I would

22   tender to the Court basically deal with, obviously, it's our

23   theory of the case that this was an open and obvious

24   condition and, therefore, the plaintiff was contributorily

25   negligent in not seeing it.

```
1              The Court is going --
2              THE COURT:  I'm not even sure that it was an unsafe
3    condition, Mr. Skaff.
4              MR. SKAFF:  I understand.
5              THE COURT:  And how would the plaintiff have known
6    that?  You know, I'm just not going to give it.
7              MR. SKAFF:  Your Honor, just for the record, we
8    would offer Exhibits -- Instructions D 25 --
9              THE COURT:  What is D 25?
10             MR. SKAFF:  All of these are -- I mean, I can go
11   through each of these, if you like, Judge, but all of these
12   deal with --
13             THE COURT:  Go through whatever you want to --
14             MR. SKAFF:  Okay.
15             THE COURT:  -- because otherwise -- and what I'll
16   do -- when the instructions are given I'll give you an
17   opportunity to object.  What I suggest you do, because the
18   Federal Rules are different than the state rules, is just say
19   you adopt the objections you made when the instructions were
20   discussed with the Court.  That way you're fully protected, I
21   think, okay?
22             MR. SKAFF:  And, along those lines, just let me go
23   ahead and state this for the Court --
24             THE COURT:  All right.
25             MR. SKAFF:  -- that we would just note our objection
```

1    to the jury being instructed in any way, because we think

2    this is a case that should have been dismissed before the

3    instruction phase.

4            THE COURT:  You say there's not sufficient evidence

5    to go to the jury.

6            MR. SKAFF:  Yes, sir.

7            THE COURT:  I understand that, Mr. Skaff.

8            MR. SKAFF:  Okay.  Judge, we would offer Instruction

9    D 25, which says, "The defendant has no duty to warn of

10   conditions that are open and obvious to a person using

11   ordinary care for her own safety."

12           D 26:  "The plaintiff was contributorily negligent

13   if she had" --

14           THE COURT:  Wait a minute.  Let me see what we've

15   got on that.

16           MR. SKAFF:  I don't think there's any -- I don't

17   think there were any instructions related to anything open

18   and obvious.

19           THE COURT:  Let me see.

20           (There was a pause in the proceedings.)

21           THE COURT:  All right.  You're probably right about

22   that, Mr. Skaff, okay?

23           MR. SKAFF:  Yes, sir.

24           We would offer --

25           THE COURT:  Wait a minute.

1          MR. SKAFF:  I'm sorry.

2          (There was a pause in the proceedings.)

3          THE COURT:  Okay.

4          MR. SKAFF:  We would offer Instruction D 28, which

5    says, "The plaintiff" --

6          THE COURT:  Stop a minute.

7          The instruction you want to offer -- I don't have

8    your proffered instructions in front of me right now.

9          THE LAW CLERK:  They should be there.

10         THE COURT:  Are they up here?

11         THE LAW CLERK:  They should be in here.

12         (There was a pause in the proceedings.)

13         THE COURT:  All right.  So the instruction you want

14   is number what, now?

15         MR. SKAFF:  D 25 is the one that we just discussed,

16   Your Honor.

17         THE COURT:  Okay.  I'll allow that.  I don't see any

18   problem with it; it's canned.

19         MR. WILSON:  And I'll just note an objection.

20         THE COURT:  Why?

21         MR. WILSON:  Because I think the definition of "open

22   and obvious," as stated by the Fourth Circuit, is in a case

23   called *Freeman v. Case Corporation*.

24         MR. SKAFF:  Well, at this time I don't think there's

25   been any -- there was -- the instruction as it relates to

```
 1   what is open and obvious was not tendered.  Maybe we could
 2   discuss that, but --
 3           MR. WILSON:  I guess we need to figure out, but --
 4           THE COURT:  You've got me confused, now.  Stop.
 5           Mr. Skaff, are you asking me to add D 25?
 6           MR. SKAFF:  Yes, sir.
 7           THE COURT:  All right.  And you're objecting to
 8   D 25.  Is that correct, Mr. Wilson?
 9           MR. WILSON:  Without any instruction further.  I'm
10   objecting to it standing alone.
11           THE COURT:  Stop a minute.  Let me ask you a
12   question.
13           Why didn't you object to it when it was originally
14   offered and sent in?
15           MR. WILSON:  Because I didn't know -- when we
16   originally offered and sent them in?  Because I didn't know
17   that we were --
18           THE COURT:  Well, they were supposed to be sent in
19   five days before the trial.  You never objected.
20           MR. WILSON:  I didn't -- I didn't see anything in
21   the rules that said we had to object to anything.
22           THE COURT:  But I'll allow you to object --
23           MR. WILSON:  Thank you.
24           THE COURT:  -- Mr. Wilson.  I'll allow it.  I --
25           MR. WILSON:  I don't -- the only thing is my
```

1    definition -- it will work in tandem with this.

2         THE COURT:  I'm not about to -- I'm going to give

3    the instruction.

4         What else have you got, Mr. Skaff?

5         MR. SKAFF:  Well, to jump to this point, Your Honor,

6    we would offer D 32, which --

7         THE COURT:  Stop.  D 25?

8         MR. SKAFF:  Yes, sir.

9         THE COURT:  Now you're offering, again, D --

10        MR. SKAFF:  32.

11        THE COURT:  There's nothing on that in here.  32?

12   What is D 32?

13        MR. SKAFF:  It says, "An open and obvious condition

14   is one that could have been seen by the plaintiff, had she

15   been looking."

16        THE COURT:  I'm not going to give it.

17        MR. SKAFF:  Yes, sir.

18        THE COURT:  I think "open and obvious" -- they'll

19   know what "open and obvious" is, okay?

20        MR. SKAFF:  We would just note our objection to

21   that.

22        THE COURT:  Unless Mr. Wilson wants it.

23        MR. WILSON:  I do not.  I'm objecting to all of his

24   on "open and obvious" until I get my chance to give you my

25   portion.

```
 1            THE COURT:  I didn't hear you, Mr. Wilson.
 2            MR. WILSON:  I'm sorry, sir.  I'm objecting to all
 3    of his "open and obvious" instructions, and I don't object to
 4    25 conditioned on me giving my one that we haven't talked
 5    about yet.
 6            THE COURT:  Okay.  Anything else?
 7            MR. SKAFF:  Yes, sir, I have a few others.
 8            Instruction D 28:  "The plaintiff is charged with
 9    seeing what she could have seen had she looked where she was
10    going."
11            THE COURT:  What do you say about that, Mr. Wilson?
12            MR. WILSON:  These aren't Model Jury Instructions,
13    he's citing cases.  He's writing his brief.
14            THE COURT:  I know -- do you object?
15            MR. WILSON:  I object, yes.
16            THE COURT:  All right.  Say that.  Objection
17    sustained.
18            What is next?
19            MR. SKAFF:  Instruction D 29, Your Honor:  "If you
20    find that the condition was an open and obvious condition and
21    thus should have been avoided by the plaintiff exercising
22    reasonable care for her own safety, then the plaintiff is
23    guilty of contributory negligence."
24            THE COURT:  What's your position?
25            MR. WILSON:  Same objection to his --
```

```
 1          THE COURT:  I don't -- there isn't any same
 2    objections, Mr. Wilson.  Tell me, what is your objection to
 3    this instruction?
 4          MR. WILSON:  It is duplicative of D 25, and it is
 5    citing from case law to basically make an argument, as
 6    opposed to a statement of law.  It's duplicative of D 25.
 7          THE COURT:  D 25.  It does look like...
 8          (There was a pause in the proceedings.)
 9          THE COURT:  Well, you can have either D 25 or D 29.
10    Which one do you want, Mr. Skaff?
11          MR. SKAFF:  Well, Judge, I think they're different.
12    D --
13          THE COURT:  I'm sure they are.  You can have one or
14    the other.
15          MR. SKAFF:  I would like D 29, Your Honor.
16          THE COURT:  Okay.  D 25 is out.
17          Okay.  What else is it?
18          MR. SKAFF:  Judge, I have a couple more.
19          D 31:  "When a condition is so slight or ordinary
20    that no careful or prudent person would reasonably anticipate
21    any danger from its existence, then as a matter of law there
22    is no actionable negligence."
23          That is a -- it is not a Model Jury Instruction,
24    Your Honor, but it is an accurate statement of Virginia law,
25    coming from a Supreme Court case.
```

1          THE COURT:  You're saying that's from the *Hill v.*
2     *City of Richmond*.  Isn't that correct?
3          MR. SKAFF:  Yes, sir.
4          THE COURT:  All right.  What have you got to say
5     about that, Mr. Wilson?  That's a pretty important
6     instruction that he's asking for.
7          MR. WILSON:  I think, number one, it's a sidewalk
8     case that he's citing to.  *Hill v. City of Richmond* is a
9     sidewalk case, and we've already gone down that path.
10         The way the Model Jury Instruction is set up, it
11    simply says they must provide a reasonably safe shopping
12    environment.  And you've already given that instruction, and
13    it's up to the jury to determine what is reasonably safe.
14    That's the Model Jury Instruction.  He's asking for a
15    directed verdict with that.
16         (There was a pause in the proceedings.)
17         THE COURT:  Okay.  Here's what I'm going to give:
18         "If you find by a preponderance of the evidence that
19    the condition is so slight or ordinary that no careful or
20    prudent person would reasonably anticipate any danger from
21    its existence, then as a matter of law there's no actionable
22    negligence."  Okay?
23         What's next?
24         MR. SKAFF:  Yes, sir.
25         THE COURT:  Got any more, Mr. Skaff?

          1           MR. SKAFF:  No, sir.  I think that's all we have.

          2           THE COURT:  Okay.  I understand you object to any

          3    and all instructions.

          4           All right.  What about you, Mr. Wilson?  What do you

          5    have?

          6           MR. WILSON:  I'm objecting to all of the ones you

          7    just admitted.  I only have two more.

          8           THE COURT:  No, you always have to state what your

          9    objections are.  He's objecting to all the instructions on

         10    the ground you haven't proved your case.  You're saying

         11    you've proved your case as a matter of law, correct?

         12           MR. WILSON:  What I'm saying is the instruction that

         13    you just read -- I didn't make note of the number -- where

         14    you say that if it's so slight -- I'm objecting to that

         15    because it is --

         16           THE COURT:  I haven't said it was so slight.  I

         17    said, "If you find by a preponderance of the evidence that

         18    the condition is so slight or ordinary that no careful or

         19    prudent person would reasonably anticipate any danger from

         20    its existence, then as a matter of law there's no actionable

         21    negligence."

         22           MR. WILSON:  Well, I object to it because I think

         23    the duty to an invitee, which is a Model Jury Instruction,

         24    addresses that where it says, "...to use ordinary care to

         25    have the premises in a reasonably safe condition for an

```
 1    invitee's use, consistent with the invitation."
 2             THE COURT:  So what you're saying is you don't
 3    dispute this is the law.
 4             MR. WILSON:  I do dispute that's the law.
 5             THE COURT:  You do?
 6             MR. WILSON:  Yeah.  I don't think --
 7             THE COURT:  So you don't like the case of Hill v.
 8    City of Richmond.
 9             MR. WILSON:  Absolutely not.  Hill v. City of
10    Richmond has been rejected in a premises liability context --
11             THE COURT:  Okay.
12             MR. WILSON:  -- because it's --
13             THE COURT:  Anything else?
14             MR. WILSON:  Yeah, I have two additional.
15             We need one on circumstantial evidence, the standard
16    circumstantial evidence.  I didn't see it in there.  I read
17    through, and I don't remember seeing circumstantial evidence,
18    just the standard instruction.
19             THE COURT:  All right.  Circumstantial evidence
20    instruction -- which one do you want to give?
21             MR. WILSON:  It's my P 5.  It's a Model Virginia
22    Jury Instruction.
23             THE COURT:  Let me look at it.  P 5.
24             You don't have to give it to me.  I think I've got
25    your instructions here.  Wait a minute.
```

```
1              (There was a pause in the proceedings.)
2              THE COURT:  Okay.  P 5.  All right.  Don't give it
3    to me.
4              MR. WILSON:  And, lastly --
5              THE COURT:  Let me discuss P 5, will you?
6              (There was a pause in the proceedings.)
7              THE COURT:  Do you have any problem with P 5,
8    Mr. Skaff?
9              MR. SKAFF:  No, sir.  I think that's an accurate
10   statement.
11             THE COURT:  Okay, P 5.
12             What else do you want?
13             MR. WILSON:  P 24.
14             THE COURT:  Who?
15             MR. WILSON:  P 24.
16             THE COURT:  24.
17             (There was a pause in the proceedings.)
18             THE COURT:  No, I won't give P 24.  It assumes that
19   the hazard presented by the defect was -- it was a hazard.  I
20   can't do it.
21             Okay.  What else have you got?
22             MR. WILSON:  That's -- maybe I need to reword it,
23   but under the --
24             THE COURT:  You don't have to reword anything.  I'm
25   objecting to it.  We've got to end this case some day,
```

```
 1   Mr. Wilson.
 2           MR. WILSON:  Okay.  Well, I -- I note my objection
 3   to --
 4           THE COURT:  You note your objection to my denial.
 5   My denial of it is it assumes there's a hazard.  I'm not
 6   going to do that.
 7           What's next?  We can't start all over.  I'm not
 8   going to do it.
 9           MR. WILSON:  I'm done.
10           THE COURT:  You're done?  All right.
11           Anything else, Mr. Skaff?
12           MR. SKAFF:  No, sir.
13           THE COURT:  Let me see if I can't embody these, and
14   then we'll be back, okay?
15           MR. SKAFF:  Yes, sir.
16           (A recess was taken.)
17           THE COURT:  Somehow or another we left out some
18   instructions.
19           You may be seated.
20           We left out some instructions.  We left out
21   credibility of the witnesses before, and I've reinstated
22   that.
23           We left out -- well, I discussed them with you
24   before.  We left out expert witness.  "In considering the
25   weight to be given to the testimony of an expert witness, you
```

1    should consider the basis for his opinion and the manner by

2    which he arrived at it and the underlying facts and data upon

3    which he relied.  An expert witness is to be judged by the

4    same standard as any other witness."

5            Then we've got circumstantial evidence in there,

6    preponderance of the evidence.  Then we come to negligence

7    issues, the definition of an invitee, the duty to exercise

8    rights of an invitee, the defendant's duty to an invitee in

9    general.  That also says if you -- the part here, "If it's so

10   slight or ordinary that no careful or prudent person would

11   reasonably anticipate any danger, then as a matter of law

12   there's no actionable negligence."

13           "'Proximate cause' is a legal term that does not

14   mean 'approximate' with an A in front.  It is the cause of an

15   accident, injury or damage and one which, in the natural and

16   continuous sequence, produces the accident, injury or damage.

17   It is a cause without which the accident, injury or damage

18   would not have occurred."

19           "Contributory negligence" -- what is the alleged

20   contributory negligence in this case?  Why am I giving this

21   instruction?  I know there's no objection to it, but...

22           MR. SKAFF:  Yes, sir.  I mean, obviously, it would

23   be our contention this is an open and obvious condition and

24   that if she fails to see an open and obvious condition and

25   trips over it then she's contributorily negligent.

            1          THE COURT:  Isn't that sort of the antithesis of
            2   what you say?
            3          Now, don't you come up with any objection at this
            4   stage, Wilson.  I will hit you over the head if you do.
            5          MR. WILSON:  I know you would, so I'm not going up
            6   to the podium so I don't get too close.  I was standing for
            7   my back.
            8          THE COURT:  Oh, okay.  I'm just going to tell you
            9   I'm not going to start all over.
           10          I have misgivings about it, though.  What you're
           11   saying is it's so obvious -- it doesn't seem to be
           12   consistent.  It doesn't seem to me to be consistent.
           13          Okay.  Other than that, I don't think there's
           14   anything there.  We'll -- my guess is that the -- let's get
           15   the jury back in, then, in that case, and we'll go ahead from
           16   there.
           17          Anything else you want to take up while the jury is
           18   out?
           19          MR. WILSON:  Just in terms of your procedure, are
           20   you going to give us the numbers to write on them as we go
           21   through?
           22          THE COURT:  I don't care if you write any number you
           23   want.  I don't write numbers on my instructions.
           24          MR. WILSON:  Okay.  All right.  It says, "Jury
           25   Instruction No." -- I've got it.

1          THE COURT:  I try to keep -- I don't want them to
2    know how many instructions there are, and sometimes you
3    change the numbers and you pull things and you put things --
4    yes, sir.
5          MR. SKAFF:  Judge, just for the record, we would
6    just renew our objections that we stated earlier during the
7    course of discussing the objections with regard to
8    the instructions that were rejected.
9          But in particular we would again renew the objection
10   to the spoliation instruction, and we would again renew our
11   objection to the jury being instructed in any way, because we
12   don't think the plaintiff has proven the case.
13         THE COURT:  Well, the problem with the spoliation
14   instruction is the only way we could determine that the tapes
15   were there were -- was the person who looked at them.  Once
16   he was on notice that they were there, the cases seem to hold
17   that unless there's somebody else that could look to see what
18   that evidence was or was not we've got a problem.  And that's
19   where we really are, Mr. Skaff.
20         MR. SKAFF:  Yes, sir.
21         THE COURT:  And I think I iterated that before in my
22   opinion.  However, I did not have the testimony of the -- at
23   the time I did that I didn't have the testimony of the safety
24   man, who indicated that all the cameras were pointed to where
25   there were more expensive products because they were designed

1  for thievery, not for safety.  They were designed to capture

2  thieves.

3          So if there's nothing else, would you tell

4  Mr. Pierce to bring in the jury, please.

5          How long do you want, Mr. Wilson?

6          MR. WILSON:  I don't -- I will do my very, very best

7  to be somewhere between 20 and 25 minutes, and then rebuttal.

8          THE COURT:  All right.  You have 25 minutes.  If you

9  won't do your best you won't exceed it, okay?  You have

10  25 minutes.

11          Is that sufficient for you, Mr. Skaff?

12          MR. SKAFF:  Yes, sir.  I won't be very long.

13          THE COURT:  All right.  That's opening and rebuttal,

14  Mr. Wilson.

15          MR. WILSON:  Okay.

16          THE COURT:  25 minutes.

17          (The jury entered the courtroom.)

18          THE COURT:  Ladies and gentlemen, I'm sorry we took

19  so long, but framing the instructions is an opportunity for

20  everybody to make their objections they desire to make and to

21  formulate what they believe are appropriate instructions.

22          At this time we will first hear from Mr. Wilson, who

23  will argue his position.  And then we'll hear from Mr. Skaff,

24  and he'll argue his position.  And then Mr. Wilson can come

25  back.  However, they won't argue more than 25 minutes each.

1   So I'll tell you that.

2          We may have to take a break.  I do know that you've

3   been ordered lunch, and it will get in here sometime, I hope,

4   soon.  It takes approximately an hour from the time it's

5   ordered to get it here.

6          All right, Mr. Wilson, we'll hear from you first.

7          MR. WILSON:  Thank you, Your Honor.

8          Let me first thank each of you for the time and

9   attention that you've paid to this case.  On behalf of Mrs.

10  Aaron, that is very important, and we appreciate it.

11         As the Judge said, in a short while you're going to

12  begin your deliberations.  And the Judge will explain to you

13  in the instructions that what your task is is to apply the

14  law as he's going to instruct you and to resolve any factual

15  disputes in the case based on the evidence that you have

16  heard.

17         And, certainly, the role of the jury in that process

18  is a cornerstone of the judicial system.  And, as the Judge

19  has said, for over 300 years juries have been sitting such as

20  yourselves; good people who come in and set standards for

21  safety and for other types of protections that affect all of

22  us.

23         Now, in the oath that you took as jurors you

24  promised to follow the law as charged.  The Judge will

25  instruct you on certain aspects of the law.  One of the

1    instructions that he will give you will relate to the duty

2    that a store owes to what's called an invitee.  And if you

3    remember when we read one of the stipulations, an invitee is

4    somebody who comes on the premises because they're there to

5    shop or whatever because the business is extending that

6    invitation.

7            Now, the issues in the case are whether -- and these

8    are based on the instructions from the Court.  Your verdict

9    will be based on the facts as you find them and on the law

10   contained in all of these instructions.  The issues in the

11   case are, one, was Kroger negligent, and, two, if Kroger was

12   negligent was its negligence a proximate cause of       Ms.

13   Aaron's injuries.  On those issues Mrs. Aaron has the burden

14   of proof, and I'll explain that in a moment.

15           If the plaintiff is entitled to recover, the next

16   question is what is the amount of the damages to which she's

17   entitled based on the evidence that you've heard and based on

18   the instructions that the Judge is going to give you.  On

19   this issue the plaintiff again has the burden of proof.

20           Now, when you get the instructions you're going to

21   see what the burden of proof is in a case such as this.  The

22   burden of proof is described as the preponderance of the

23   evidence.  And a preponderance-of-the-evidence

24   standard basically, if you're looking at the scales of

25   justice, is 51 percent versus 49 percent.  It is not the

1    higher burden you hear in some of the criminal cases, and

2    that will be included in what the Judge will instruct you

3    when we get to that point.

4            Now, when this case started out Mr. Skaff, on behalf

5    of Kroger, said that it's an issue of responsibility, and I

6    agree.  We just see it differently.

7            In this case what you have heard is that there has

8    been a condition in the floor that you all have seen.  We

9    didn't go with you, so we really don't know what you did and

10   what you looked at and whatnot, but there's a condition there

11   that Kroger does not have a explanation as to why it is

12   there, okay?  And, so, we have brought into this courtroom an

13   expert to offer his opinion, and his opinion, based on his

14   experience based on over a thousand fall investigations, said

15   this is unsafe.

16           And his opinion was essentially there are two

17   characteristics.  One, it's a slight deviation.  We're not

18   suggesting that it's like falling down a manhole shaft,

19   because then perhaps she would have been on a duty to have

20   seen it in advance.  Second, the texture of it is different,

21   and what he described was it grabs your foot.  And those

22   two -- the combination of those two characteristics are what

23   the evidence has shown happened to Mrs. Aaron.

24           Now, Mrs. Aaron described what she felt as she fell.

25   Now, Kroger said to her, "You didn't look down at the moment

that you fell, so you can't say that was what you actually
stepped on." Well, nobody is going to look down when they're
carrying a watermelon and they turn the corner and their foot
jams. They're not going to do that. When she was on the
ground she said, "That's what it was, because I remember what
I felt."

She went back to the store in September, 2010,
and -- after she was out of therapy -- and she went back and
she rubbed her foot again to confirm in her own mind, "Was
that in fact what I felt?" Now, the evidence in the case is
that the condition was the same, so fortunately we're not in
a situation where she was going back, you know, a couple
months later and everything had changed. The evidence was
that it was in the same condition.

Kroger, I anticipate, is going to say, "Well, she
doesn't know what she fell on because the moment she was
falling she couldn't say it was that." Well, folks, I'm
going to show you what you've already seen in evidence.

This first is from the Kroger eye witness. What
does he say? He says he sees her falling right there where
that line is. Right there is the cement drain plug, and
right there is her watermelon, okay?

Now, she came around -- by her own testimony, she
came around that corner, jammed her foot there, smacked her
leg on the border, and flew over here, okay? Now, those two

1  stories line up.  There is no dispute between where she fell.

2          Now, keep in mind that the manager, who you heard

3  this morning, went there and said, "I looked around

4  everywhere very thoroughly; nothing else there."  And, so,

5  it's not a circumstance where it might have been, you know,

6  she slipped on a grape or she might have slipped in water.

7  The thing, the one thing everybody agrees, is that in the

8  area where she fell there was one thing and one thing only,

9  that spot.

10          When we're talking about responsibility and when

11  you're deciding the issue of negligence, one of the things

12  that I would ask you to pay very close attention to when the

13  Judge gives you instructions -- because one of the

14  instructions is going to tell you that the store videotapes

15  were destroyed after we sent a letter asking them to be kept,

16  and so the Judge will tell you that on June 3rd, 2010, the

17  videotape from this store was destroyed after I sent the

18  letter.  So, two things happened when I sent that letter.

19  One, a videotape is born.  Two, they then created their

20  incident report.  The incident report at the very bottom

21  makes it as clear as day -- if it wasn't already intuitive

22  based on your common sense -- they're responding to a claim.

23          Mr. Ryan -- Ryan Walters said all he remembered

24  Mrs. Aaron say was that she didn't know what had happened and

25  she was confused.  Well, she had just broken her pelvis.

1    It's a very sudden event.  And that's what he recalled.

2         If you recall what Mr. Heath said, Mr. Heath said,

3    "All I remember her saying was she didn't know what

4    happened."  Then they take out the incident report, prepared

5    for litigation, and give it to him, and now he starts

6    remembering these statements.

7         You know, let's look at the first statement.  She

8    doesn't know what she tripped -- she doesn't -- she fell on

9    her own, and she didn't trip.  That's one.  Then later,

10   "tripped over her own feet."  And then you get to the one,

11   "She tripped over her own feet and said it was all her fault

12   and not ours."  Who writes that?  I mean, I've been accused

13   by the Judge -- that's how I write.  I'm a lawyer.  Those are

14   the things that I say; those aren't the things that someone

15   like Mrs. Aaron ever would have said.

16        Now, the details of the fall are important because

17   they explain in much detail what happened as you reconstruct

18   it.  One of the instructions you're going to get is called

19   "Circumstantial Evidence," okay?  Mrs. Aaron told you,

20   uncontradicted, what she felt.  They also -- uncontradicted,

21   she said she felt the same thing when she went back.  There's

22   nothing else in that spot that can or did cause her to fall.

23   You use your common sense in making those determinations.

24        Now, another piece of proof that's very important is

25   the location where the watermelon lands, okay?  Now, just

1    imagine somebody's foot jams and they're going to throw the
2    watermelon forward.  And that's what everybody said happened.
3    And there was some confusion about whether or not it fell in
4    this area and whether or not that would have obscured -- you
5    know, whether it was wet before or after.  But the witnesses
6    said it fell way down here (indicating).
7            Importantly, her wristwatch, one of those bracelet
8    wristwatches, went off her arm.  That was the suddenness of
9    this mechanism.  And what you've got to consider is the two
10   characteristics that made this unsafe that the only expert
11   has testified concerning in this case, and that is you've got
12   a situation that's a slight deviation.  And you all have seen
13   it.  It's a slight deviation, different material, which
14   catches her foot; therefore, she's sent forward.
15           She doesn't land on her stomach because then she
16   hits the border.  Everybody has explained on her right leg
17   where that injury was, and she explained -- probably more
18   than you-all wanted to hear -- about a blackened big toe.
19   But the blackened big toe is significant because it explains
20   exactly what she's saying; how that foot jammed and how she
21   fell forward.
22           When you heard Dr. Harrison testify he told you that
23   he had gone there, he had performed certain things based upon
24   his experience, and he reached the conclusion that this was a
25   safety defect that, in fact, Kroger caused because the plug

1    was in there ahead of time.  When they took it over they put

2    the tile around it, and Dr. Harrison told you all they had to

3    do was put a piece of tile over it.

4            Mr. Heath this morning told us it serves no purpose.

5    It's not decorative.  It's just a blemish in the floor that

6    they can't account for, and it should never have stayed.

7    Now, the two witnesses who looked at it, Mr. Harris from

8    Kroger -- he told you he's not a safety expert.  Mr. Heath

9    said he's not a safety expert or a professional.  What these

10   people are -- they're store managers, okay?  They do have a

11   facilities -- engineering facilities in Roanoke.  Where were

12   they?

13           THE COURT:  This is not a scientific case, ladies

14   and gentlemen.  There's no scientific evidence whatsoever

15   that's been admitted.  What we're dealing with is a question

16   of an expert who is an expert in safety, allegedly, and he

17   has indicated that there was a defect on this floor.  It has

18   nothing -- there were no scientific things done at all.  It

19   didn't have anything to do with civil engineering.

20           Let's move along.

21           MR. WILSON:  Right.  And, so, you did not hear a

22   counter-expert, but you did hear that they do have this

23   department within Kroger.  Remember you were told that they

24   have 2500 stores in 31 states, and they have this department,

25   and nobody apparently thought to consult them in this case.

 1          Now, when you get to the point of deciding liability
 2   what you will be able to consider are, based on the Court's
 3   instructions, the circumstantial evidence, have you heard a
 4   plausible counter-explanation, do you believe the credibility
 5   of the witnesses, okay?
 6          Now, we were told that for Mr. Heath this was
 7   immediately a suspicious and questionable incident, which is
 8   the way he characterized it, but that's, of course, the
 9   perspective he was writing his report from, and it also
10   explains some of the things that he put in it, such as he
11   didn't have the right location of the fall to put it away
12   from where that cement drain plug was.  It was all the
13   slip-resistant tile.  He never mentioned the cement drain
14   plug.  He had some of the other facts just wrong.
15          And you have the opportunity to say what was the
16   impact of that letter.  The impact of that letter was, one,
17   let's get rid of the videotape, and, two, let's put words in
18   Margaret Aaron's mouth.  She's an 85-year-old woman, and they
19   perhaps didn't expect her to come here today.  And that's
20   what we're here for.
21          Now, you will also have the opportunity when
22   deciding the issue of negligence to infer -- you're not
23   required to, but infer or assume that the reason the tapes
24   were destroyed is because they would have been unfavorable to
25   Kroger's case.

1          Now, certainly, your common sense tells you if the

2     evidence would have been helpful why would it have been

3     destroyed.  The evidence -- if she had tripped over her own

4     feet, as they've alleged, why not keep the tape?  It would

5     prove their theory of the case.  Why, when you have been put

6     on notice of a potential claim, would a party destroy the

7     video evidence?

8          And what we have now is Mr. Skaff is going to get up

9     and say, "Oh, she can't tell that's exactly where she fell"

10    and whatnot, even though the store employee, one of the

11    witnesses we were able to summons, says that's where it was.

12    But you're allowed to infer that the videotapes that are no

13    longer here, even though they were specifically requested so

14    we could show what happened and we weren't going through all

15    of, "Did she actually fall here or there" -- we no longer

16    have that opportunity.

17         Now, you're going to get to the point, I hope and I

18    assume, that you're going to think about the damages and the

19    injuries that Mrs. Aaron suffered as a result of her fall.

20    The Court will provide you a standard instruction which

21    discusses which elements you are to consider.

22         Now, we are not saying that Mrs. Aaron is completely

23    disabled.  She's sitting here.  She's a tough lady.

24    Getting -- you know, old is not for the timid, okay?  But

25    what we are saying is that she now has limitations in her

1    life that she didn't have before.

2         You heard from her doctor, Dr. Davis, who explained

3    that she will no longer regain her functionality.  He called

4    it, "This is her new baseline," and he said, "This is where

5    she is."  And my point is, well, she should be where she was.

6         She talks about things such as needing a cane,

7    something -- an assistive device.  You heard the doctor from

8    Harvard Medical School, Massachusetts General.  She just

9    happened to see him for his examination prior to this.  And

10   what did he describe?  He described somebody -- "A great exam

11   for somebody who is 85; strong arms and legs, walks well."

12   All of those things he observed not knowing, as no one would,

13   that that was going to be used in this courtroom to define,

14   very helpfully, exactly what she lost.  Because those are the

15   things she lost.  She no longer walks well.  She requires the

16   use of a cane.  She no longer has strong arms and legs

17   because she has exercise limitations now.  She told you she

18   used to walk on the beach.  She used to go swimming.  She

19   used to do a lot of things that she no longer can do, and you

20   heard her doctor explain much of that.

21        What I would suggest to you is when you heard

22   Kroger's questioning on that doctor, Dr. Davis, by videotape,

23   the line of questioning was essentially, "Doctor," you know,

24   "did she show any manifestations of her injuries in these

25   subsequent visits?"  And he would ask each time, "Other than

the fact that she's using a walker?  Other than the fact that she's using a cane?"  And Kroger's response was, essentially, "Well, yeah, other than those things."  And I would say that's the equivalent of saying, "But other than that, Mrs. Lincoln, how was the play?"

        The fact that she now needs that cane is much more significant than Kroger is at least admitting to itself and admitting to you.  Mrs. Aaron has explained it to you.  I don't use a cane, but I understand, from what the testimony she gave is, she's afraid to go even on the beach.  Simply putting it down on any soft areas now are things that concern her.  Her husband explained they don't go to movies because she's concerned about walking down the dark aisle.  They don't want to have to climb over people.  And everything, as he said, is now a process.

        And she has described how she has some sleep problems now.  She no longer cooks.  She said she felt like one of her grandchildren caught her doing brownie mixes or something from a box, as opposed to a from-scratch type desert, and that hurt her because that wasn't who she was.

        THE COURT:  You have five minutes left.

        MR. WILSON:  Yep, and I'm finishing.

        And you will see the jury instructions.  When you see the jury instruction what will you be entitled to?  To fully and fairly compensate her.  That is what the

1    instruction will say, and it will list things that you are to

2    consider that are proven by the evidence.  And when you fully

3    and fairly compensate her remember who she is individually

4    and what she has lost.

5         You know the easiest category is the stipulated

6    medical bills.  I had the opportunity to read each one of

7    them to you.  There was the actual injuries itself, 30 days

8    in either a hospital or a rehabilitation center.  But that

9    was just the beginning of the inconvenience.  When she gets

10   home now all these other things she is living with.

11        She has now permanent limitations going forward, and

12   there was no contrary medical evidence.  That is what was

13   said, and that is what she has described, and her husband has

14   described the same thing.  There is no contrary evidence.

15        It's very difficult for jurors, for anybody, to put

16   a dollar value on what is basically pain and suffering,

17   inconvenience, limitations going forward, and those types of

18   categories which really don't express themselves well in

19   finite terms, but that is why we have jurors.  You all draw

20   upon your experience.  There are no limitations on what you

21   consider so long as it's supported by the evidence.

22        And when you're looking through the evidence keep

23   one thing in mind:  This is a lady who was physically strong,

24   fortunately, and blessed to be a self-sufficient 85-year-old,

25   and she's no longer that person.  And she's no longer that

1  person because there's absolutely no question what she fell

2  over, okay?

3            And, so, I may get a chance to talk to you, as long

4  as I still have a few more minutes left, but until then I

5  thank you, and I look forward to speaking to you very quickly

6  later.

7            THE COURT:  You have 25 minutes.

8            MR. SKAFF:  Yes, sir.

9            May it please the Court, first off, on behalf of

10 Kroger just let me say thank you for your time and attention

11 during the course of the trial as well.  You've been a very

12 attentive group, and we do appreciate your help in coming

13 here and resolving this case for us today.

14           Secondly, let me just say right off the bat

15 Mrs. Aaron is a very nice woman.  She has a very nice family.

16 They came in here and did exactly what you would expect; they

17 testified favorably for their mother and their wife.

18           And, as you've heard, it's undisputed that on

19 June the 3rd, 2010, she fell in the Kroger store on Shore

20 Drive, and she suffered significant injuries as a result.  As

21 you have seen, we didn't waste your time by bringing another

22 doctor in here or the Court's time to put on any evidence on

23 that issue, because we submit that she was injured as a

24 result of her fall.  And we hope that you don't get to the

25 issue of damages in the case, but if you do we would ask that

1  you look to, really, the only nonbiased, objective testimony
2  on the issue of damages, and that would be Dr. Davis's
3  testimony.
4          And Dr. Davis's testimony is that he sees her on a
5  regular basis and that he (sic) wasn't making any complaints
6  to  her (sic) for neurological issues or anxiety and
7  depression and that she wasn't making any complaints of
8  fatigue and that sort of thing.  Really, he said that he
9  believed that she was slowing down.  And, by all accounts,
10 she was a very active 85-year-old woman, and we don't dispute
11 that.  But I would submit to you that as we get older all of
12 us, including me, slow down a little bit.
13         What is disputed and what is highly contested by
14 Kroger is the fact that Kroger is responsible for these
15 injuries.  And from our viewpoint, at least, this is a case
16 about liability and who is really responsible for what
17 happened on June the 3rd of 2010.  And, again, keep in mind
18 that you have seen and heard all of the evidence that you
19 need to decide in this case.
20         The Court made a ruling with regard to some
21 videotapes and is going to give you an instruction that I
22 really can't say a whole lot about, even though I wish I
23 could.  But you've got to trust me that that instruction is
24 not evidence in this case, and it doesn't prove anything.
25         All you could have and you would need -- all that

1    you could have had and all that you need to decide this

2    case -- you've been out to the site, you've seen the site.

3    It hasn't changed one bit since the accident.  You've seen

4    all the photos, you've seen all the documents, you've seen

5    the testimony that was put before you in the courtroom.  In

6    addition, you already have the other things you need to

7    decide this case -- your common sense, your life

8    experiences -- and we would ask that you consider those when

9    you're deliberating.

10           Now, Judge Doumar will instruct you that from a

11   liability perspective there's three issues that you've got to

12   decide:  One, was Kroger negligent; two, was Kroger's

13   negligence the cause of her fall; and was the plaintiff

14   contributorily negligent.  And I'd like to go through those,

15   each of those, with you for a moment.

16           On the issue of negligence it's important to

17   understand -- and the Judge will instruct you on this

18   point -- the fact that there was an accident and that the

19   plaintiff was injured does not in and of itself entitle the

20   plaintiff to recover.  And, as you might imagine, that means,

21   simply, that just because Mrs. Aaron fell in Kroger doesn't

22   mean Kroger is responsible.  It is her burden to prove to you

23   by a preponderance of the evidence or the greater weight of

24   the evidence, as Mr. Wilson said -- he used the scale

25   analogy.  I'll use the analogy of the 50-yard line on the

1   football field; you've got to get the ball over the 50 -- and
2   did Kroger fail to use ordinary care.

3           And in cases such as this, as you're going to hear
4   from the Judge, Kroger does not guarantee the safety of those
5   who come into the store but is required to have the store in
6   a reasonably safe condition and warn of any conditions
7   that -- any dangerous conditions that it knew about or should
8   have known about unless the condition is open and obvious to
9   a person using ordinary care for their own safety.

10          So, the issue for you to decide -- and we would
11  submit to you that this is the issue in this case:  Is this
12  cement drain cover a dangerous condition?  And we would
13  submit to you that it's not.  You all got a chance to take a
14  look at it firsthand, and I think you would agree with me
15  it's not perfect, it's not particularly pretty to look at,
16  and we don't really have a good explanation why it still
17  exists.

18          But a dangerous condition or a trip hazard?  I don't
19  think so.  You've heard and seen that it's about seven inches
20  across, maybe a quarter inch deep at one very small -- I
21  think the only testimony is one small pencil point on the
22  edge.  But we come across these major -- we come across minor
23  imperfections in floors and sidewalks every day, if not every
24  hour.  Our world is not flat.  Christopher Columbus taught us
25  that.  I must have encountered at least -- at  least -- a

1    dozen things more significant than this on my walk over to

2    the courthouse today, and I would bet you did, too.

3              The cement drain spot has concrete right next to

4    tile.  It's a slight change in texture, but, again, we deal

5    with that every day.  Just because it's not perfect doesn't

6    make it dangerous.  We don't live in a perfect world.  Again,

7    I think we could all agree on that.

8              Think about where we're headed with our businesses

9    and our homes if under Virginia law that's a dangerous

10   condition.  For example, look in this courtroom.  Right down

11   here we have carpet.  On top of the carpet we have a wire.

12   On top of the wire we have black electrical tape.  A slight

13   condition?  Yeah.  A change in texture?  Yes.  But if I trip

14   over that should I be able to come here and ask you to award

15   me damages against the federal government?  I would submit to

16   you no.

17             Now, Dr. Harrison came in here -- a hired gun, I'll

18   call him, if you will -- and basically told you everything

19   you already knew and everything you could have done when you

20   were at your site visit.  You heard his testimony.  All he

21   did was go out to the site, do a visual inspection, he did a

22   few measurements, he drew something on a picture, and then he

23   simply offered the opinion it wasn't safe because it was

24   imperfect and he would have done it a different way.  But, as

25   I've already discussed with you, Virginia law does not

1    require that.  Virginia law does not require perfection.

2          And, anyway, we didn't -- and that's why we didn't

3    hire someone.  We didn't hire someone to come in here and

4    tell you what we would submit that you yourselves, since you

5    don't have a bias in this case of at least $400 an hour --

6    after your site visit that you are better suited to make a

7    determination about whether or not this is a dangerous

8    condition under Virginia law.

9          And, again, I anticipate that the Judge is going to

10   instruct you in a few moments on this particular point.  If

11   you find by a preponderance of the evidence that the

12   condition in question was so slight or ordinary that no

13   careful or prudent person would reasonably anticipate any

14   danger from its existence, then as a matter of law there's no

15   actionable negligence.

16         And you heard the Kroger witnesses come in here and

17   tell you that they knew that was there.  They've known since

18   2000, but they didn't see anything dangerous with it.  They

19   had never been given any citations for it; it passed

20   inspections, it passed inspections internally.  They rubbed

21   their foot across it, just as you may have done when you were

22   out there.  Don't you think that Kroger -- if that was

23   dangerous that they would have done something to correct it?

24         And, as I said, basically, we submit to you that

25   that's the main issue in this case.  That's what this case is

1    really all about, something that hasn't changed since 2000,

2    really.  It's still in existence, and you got to see it.

3         But there are other issues that we believe are in

4    Kroger's favor, and the second one is causation.  Mrs. Aaron

5    has to prove to you -- she has the burden to show that that

6    cement drain cover is what caused her to fall, and I would

7    submit to you that since we don't know she's failed to meet

8    that burden.  There were no real eyewitnesses to the fall or

9    at least the cause of the fall, so the only thing we really

10   have is the plaintiff's own testimony, and she herself said

11   she really doesn't know.

12        She said she reached in, got a watermelon, she

13   walked around the display, she comes back and she trips and

14   falls, saying that her left foot got jammed on something but

15   she doesn't know what.  She blames it on the cement drain,

16   but she never saw it before, she never saw it during the

17   course of her fall.  The first time that she saw it was after

18   her fall.  And, in her own words -- and I don't blame her for

19   this, but in her own words began looking for reasons that --

20   as to "What happened to me."  And again using her own words,

21   she assumed that it had to have been that drain because there

22   was nothing else there.  I mean, again, I don't fault her for

23   that, but I think that may be human nature.

24        I guess really -- you know, I've tried to think

25   about that.  I guess the best evidence is the testimony that

1    she had a black toe after a fall, and it's argued that she
2    jammed her foot in there and that's what caused the black
3    toe.  We don't know that.  We don't have any evidence of
4    that.  It's a lot of speculation, again, that that's why it
5    happened, and I would submit to you that in tennis shoes such
6    as the ones that she was wearing, on non-slip tile, that her
7    foot could just as easily have jammed into the floor.  I
8    would submit to you that, given her medications and her age,
9    she could just as easily have bruised her toe in the fall
10   itself and had nothing to do with the drain.

11          I would submit to you that perhaps she reached up
12   when she reached in -- she's a smaller person.  When she
13   reached into the bin to get the watermelon and she raised up
14   and she turned the corner that she became light-headed and
15   simply lost her balance.

16          And maybe she hit her shin on the right -- on the
17   border as she came across there.  I mean, maybe that explains
18   the cut to her right shin.  Remember, Ryan Walters said --
19   and he's really the only one that saw this after -- he didn't
20   see what caused it, he saw her after she started to fall, and
21   he didn't see her hit the black border at any point.

22          And keep in mind that -- and with regard to
23   Mr. Walters' testimony, you know, the evidence in the case
24   was that these little black squares are a foot -- you know, a
25   foot square, and she's at least four feet tall; that, you

know, she would have been in the same area had she started to
fall back in here somewhere (indicating).

        And keep in mind that according to Dale Heath and
Ryan Walters she really didn't know what happened after the
fall and said that she may have even tripped over her own two
feet.  As such -- you know, at that point they didn't think
there was a whole lot -- you know, Mr. Heath said he didn't
think there was a whole lot that he had to do with regard to
the incident because he -- you know, he didn't know that
anybody was blaming Kroger as a result of it.  And with
regard to these reports and Mr. Wilson's statement with
regard to the attorney -- you know, "This is prepared in
anticipation of litigation" and all that stuff -- I mean,
keep in mind that that's just stuff -- Mr. Heath testified
that that -- he prints off those documents and fills them
out.  That's not something that he did.  I mean, he didn't
put that there.  Does he seem -- he didn't strike me at all
as the kind of guy who would just make up stuff.  And, in
fact, he testified that he didn't.  He tried to recall, he
said, the best he could as to writing down what was said
after the fact of the accident to make a record of it.

        Because in the week -- one week after the accident
Mrs. Aaron had already hired an attorney to represent her to
go after Kroger.  And even then there was no indication to
Kroger what that was all about.  They didn't know.  I mean,

1    they didn't know it had anything at all to do with the drain
2    at that point, and I would submit to you that it wasn't until
3    Mrs. Aaron went in there a month or two later and saw this in
4    the floor in the area and said, "Yeah, that had to have been
5    it."
6          And the point being in all of that is this:  We --
7    no one really knows what caused her to fall because we didn't
8    see it, and it's total speculation that this cement drain was
9    the cause of her fall.  And keep in mind, again, it's the
10   plaintiff's burden to prove that to you.  And if she can't,
11   even if you think it's a 50/50 split, she hasn't met her
12   burden, and I would submit to you that she's failed to prove
13   her case and you have to find in favor of Kroger on that
14   point as well.
15          The final issue that I think is important for you to
16   address in this case is one of contributory negligence.  And
17   on this issue it is our burden, Kroger's burden, to prove to
18   you that the plaintiff failed to use ordinary care for her
19   own safety on the date of the accident.  And it's important,
20   I think, for you to understand what the law is on this point.
21   And, again, we expect Judge Doumar is going to instruct you
22   this way, but basically -- and even though it sounds harsh --
23   even if the plaintiff is one percent contributorily negligent
24   and that negligence was the cause of her fall, she cannot
25   recover against Kroger.

1          A jury instruction tells you that, and, also, if you

2     find that both Kroger and Mrs. Aaron were negligent you don't

3     compare that negligence, the plaintiff cannot recover, and

4     you return a verdict in favor of Kroger.

5          Now, on this issue the testimony of all of the

6     witnesses and the pictures are clear and, to me, undisputed

7     that this cement drain cover was not in any way hidden.  This

8     was a well-lit store; it was easy to see.  The plaintiff told

9     you that she had generalized knowledge of the store.  It was

10    her store.  She had been in there more times than she could

11    count.  She had been in the produce section more times than

12    she could count.  And her testimony makes clear that when she

13    first walked into this area this is her view.

14         So she's coming down here towards the watermelon

15    display, and she parked her cart at the far corner.  You

16    heard Mr. Harris tell you that he measured the shopping cart,

17    and the shopping cart is at least, I think he said, two feet

18    wide.  These blocks are two feet wide -- I mean, excuse me,

19    one foot each.  She had to have pushed that cart and walked

20    directly over that cement drain cover, or awfully near it,

21    when she first went into that area and parked her shopping

22    cart at the back of that -- at the back of that display.

23         Most importantly, I think, is her own testimony that

24    the store was well lit -- you know, even Dr. Harrison said

25    that -- and that, had she been looking, she would have been

1    able to see it and that there was nothing at all preventing

2    her from seeing it.  To me, that is the classic definition of

3    what "open and obvious" is, and the law is clear that if she

4    failed to navigate an open and obvious condition, then she's

5    contributorily negligent and she can't recover.

6          I would again submit to you what would our business

7    and home life be if people are not required to look out for

8    things that they could have seen had they been looking?  I

9    mean, if I were to trip over this cord after I've already

10   walked over it and I can clearly see it, should I again be

11   permitted to come in here and ask for a lot of money?  I

12   mean, come on.  I mean, I would submit no.

13         As I stated to you yesterday, we believe that this

14   is a case about taking responsibility for one's own actions.

15   We think that it is very clear that, using your common sense

16   and your life experiences and all of the objective evidence

17   put before you, that this is not a dangerous condition under

18   Virginia law and that the plaintiff is unable to prove her

19   burden that this is what caused her to fall, and that she was

20   contributorily negligent and that you should return a verdict

21   in favor of Kroger.

22         Thank you very much.  We appreciate it.

23         THE COURT:  Mr. Wilson, you have three minutes left.

24         MR. WILSON:  Yep.

25         Four points:  He brought up the expert.  Had we not

1   brought in an expert to measure that, you heard from the

2   three people who said it was totally flat.  Every single one

3   of them, in all these years, totally flat.  Had we not

4   brought that man in they wouldn't have now said, "Oh, maybe

5   it's an eighth of an inch."  That's what he came in to do.

6        I am glad to hear Mr. Skaff agree that the medical

7   issues aren't in dispute.  He suggested, "Well, she's just

8   getting old."  This is a store that offers a senior discount,

9   and in litigation now they want to discount seniors.

10       He talked about be "open and obvious."  Which is it,

11  Kroger?  Is this a condition that she should have seen was a

12  danger; that they themselves for how many years in the store

13  never saw it to be a danger but now they're saying she should

14  have recognized something that they didn't see?  "Open and

15  obvious" means she sees the danger.  You don't see that

16  deviation.  You don't see the texture.  It's something you

17  feel.  The "open and obvious" is nothing but a smoke screen.

18       Now, he wants to -- Mr. Skaff tried to downplay the

19  destruction of the tapes, and after -- after -- he starts

20  saying all these other possible causes, all these other

21  possible causes.  Well, guess what?  He gets to argue that

22  now.  This is the equivalent of a knock on the door and

23  running and flushing something down the toilet, and that is

24  simply not something that should be permitted.  So,

25  therefore, you get to take that inference and decide that to

1    the extent there are gaps that he's contending -- I don't

2    think there are, but to the extent they are that's because

3    the witnesses they've taken out of the courtroom.

4          And, lastly, on the "open and obvious" Mr. Skaff

5    said if he tripped over something that he can clearly see

6    would he be allowed to come in and sue.  But here nobody said

7    Mrs. Aaron could clearly see that there was a danger.  She

8    could see a circle.  She didn't trip over it because it was a

9    circle.  She could see it was a different color.  She didn't

10   trip over it because it was a different color.  It was things

11   that could not be visibly perceived.  It was only by feel.

12          Folks, thank you very much.

13         THE COURT:  All right.  Ladies and gentlemen, your

14   lunch is here, and I don't want to interfere with your lunch.

15   It will take me approximately 25 minutes to read these

16   instructions.  Would you rather go eat your lunch and come

17   back -- you'd rather have the instructions?  All right.

18         Now that you've heard all of the evidence and the

19   arguments of the lawyers in this case, we've got -- I wish we

20   never had the age of the Internet with all of these fancy

21   things.

22         It's my duty to tell you what the law is.  It's your

23   duty as jurors to follow the law as I shall state it to you.

24   Now, you don't have to take notes.  I'm going to give you

25   these instructions, so you won't have to worry about taking

1   the notes.  I have to read them, however; it's required.

2          It's your duty as jurors to follow the law as I

3   shall state it to you and to apply that law to the facts as

4   you find them from the evidence in the case.  What the

5   lawyers may say in their arguments is not necessarily

6   evidence.  It may be their view of the evidence.  You heard

7   the evidence.  You heard the witnesses testify.  It's you who

8   will determine what they said or didn't say.  I want to

9   emphasize that.

10          You're not to single out any one of my instructions

11  as stating the law but must consider them as a whole.

12  Neither are you to be concerned with the wisdom of any rule

13  of law I may state to you.  Regardless of any opinion you may

14  have as to what the law is or ought to be, it would be a

15  violation of your sworn duty to base a verdict upon any view

16  of the law other than that given in the instructions of this

17  Court, just as it would also be a violation of your sworn

18  duty as judges of the facts to base a verdict upon anything

19  other than the evidence in the case.

20          In deciding the facts of this case you must not be

21  swayed by sympathy for any party nor bias or prejudice or

22  favor as to any party.  Our system of law does not permit

23  jurors to be governed by prejudice, sympathy, bias, guesswork

24  or speculation.  You're expected to carefully and impartially

25  consider all the evidence in the case, follow the law as

1    stated by the Court, and reach a just verdict regardless of

2    the consequences.  It's your duty to determine the facts, and

3    in so doing you must consider only the evidence that I've

4    admitted in the case.

5         It is your own recollection and interpretation of

6    the evidence that controls in this case.  The evidence in

7    this case consists of the sworn testimony of witnesses,

8    regardless of who may have called them, and all of the

9    exhibits received in evidence, regardless of who may have

10   produced them, and all of the facts which have been admitted

11   or stipulated.

12        I think there was one exhibit that I may have

13   introduced, which was the exhibit concerning the place of the

14   so-called one-quarter-inch or one-eighth-inch defect.

15        THE CLERK:  This one?

16        THE COURT:  Yes.  You can consider that also.  You

17   can consider all the evidence, regardless of who produced it.

18        Statements and arguments of counsel are not evidence

19   in the case unless made as an admission or stipulation of a

20   fact.  When the attorneys on both sides stipulate or agree as

21   to the existence of a fact, however, you must, unless

22   otherwise instructed, accept the stipulation as evidence and

23   regard the fact as proved.

24        It's the duty of the lawyer on each side of the case

25   to object when the other side offers testimony or other

1  evidence which the lawyer believes is not properly

2  admissible.  You should not draw any conclusions or be

3  prejudiced against a lawyer or the party he represents

4  because of the making of an objection.

5          Any evidence as to which an objection was sustained

6  by the Court and any evidence ordered stricken by the Court

7  must be entirely disregarded.  Anything you may have seen or

8  heard outside the courtroom is generally not evidence.

9  However, you have seen the scene, and I just don't want to --

10  I'm going to say, "except for what you've seen."  I'm sorry.

11  I'll restate that.

12          Anything you may have seen or heard outside the

13  courtroom is generally not evidence and must be entirely

14  disregarded, except for what you have seen.  You've actually

15  viewed the particular premises in question.

16          So while you should consider only the evidence in

17  the case, you're permitted to draw such reasonable inferences

18  from the testimony and exhibits as you feel are justified in

19  the light of your common experience.

20          You, as jurors, are the sole judges of the

21  credibility of the witnesses and the weight their testimony

22  deserves.  You may be guided by the appearance and conduct of

23  the witness or by the manner in which the witness testifies,

24  or by the character of the testimony given, or by evidence to

25  the contrary of the testimony given.

1        You should carefully scrutinize all the testimony

2   given, the circumstances under which each witness has

3   testified and every matter in evidence which tends to show

4   whether a witness is worthy of belief.  Consider each

5   witness's intelligence, motive and state of mind and their

6   demeanor and manner while on the stand.  Consider the

7   witness's ability to observe the matters as to which he or

8   she has testified, and whether he or she impresses you as

9   having an accurate recollection of these matters.  Consider

10  also any relation each witness may bear to either side of the

11  case, the manner in which each witness might be affected by

12  the verdict, and the extent to which, if at all, each witness

13  is either supported or contradicted by other evidence in the

14  case.

15       Inconsistencies or discrepancies in the testimony of

16  a witness or between the testimony of different witnesses may

17  or may not cause the jury to discredit such testimony.  Two

18  or more persons witnessing an incident or a transaction may

19  see or hear it differently, and innocent misrecollection,

20  like failure of recollection, is not an uncommon experience

21  in weighing the effect of a discrepancy.  Always consider

22  whether it pertains to a matter of importance or an

23  unimportant detail and whether the discrepancy results from

24  innocent error or intentional falsehood.

25       In deciding whether you believe or do not believe

1    any witness I suggest you ask yourself a few questions.  Did

2    the person impress you as one who was telling the truth?  Did

3    he or she have any particular reason not to tell the truth?

4    Did he or she have a personal interest in the outcome of the

5    case?  Did the witness seem to have a good memory?  Did the

6    witness have the opportunity and ability to observe

7    accurately the things he or she testified about?  Did he or

8    she appear to understand the questions clearly and answer

9    directly?  Did the witness's testimony differ from the

10    testimony of other witnesses?  After making your own judgment

11    you will give the testimony of each witness such weight, if

12    any, as you may think it deserves.

13          You have no right to disregard arbitrarily the

14    believability of any testimony of any witness.  You may

15    discard or accept, in whole or in part, the testimony of any

16    witness when you consider it in connection with the other

17    evidence in the case.  You are entitled to use your common

18    sense in judging any testimony.  From these things and all

19    other circumstances of the case you may determine which

20    witnesses are more believable and weigh their testimony

21    accordingly.  After making your own judgment you will give

22    the testimony of each witness such weight, if any, as you may

23    think it deserves.

24          In considering the weight to be given to the

25    testimony of an expert witness you should consider the basis

1   for his opinion and the manner by which he arrived at it and

2   the underlying facts and data upon which he relied.  An

3   expert witness is to be judged by the same standard as any

4   other witness.

5        Circumstantial evidence is -- any fact that may be

6   proved by direct evidence may be proved by circumstantial

7   evidence.  That is, you may draw all reasonable and

8   legitimate inferences and deductions from the evidence that

9   you've heard.

10       The plaintiff, Mrs. Aaron, has the burden in this

11  civil action to prove every essential element of her claim by

12  a preponderance of the evidence.  If Mrs. Aaron should fail

13  to establish any essential element of her claim by a

14  preponderance of the evidence you should find for the

15  defendant, the Kroger company, as to that claim.  Mrs. Aaron

16  has made a claim against the Kroger company for personal

17  injury based on negligence.  She must establish this claim by

18  a preponderance of the evidence, which means she must prove

19  that something is more likely so than not so.

20       In other words, a preponderance of the evidence

21  means such evidence, as when considered and compared with the

22  evidence opposed to it, has more convincing force and

23  produces in your mind a belief that what is sought to be

24  proved is more likely true than not true.

25       You may have heard the term "beyond a reasonable

 1    doubt."  That is a stricter standard that applies in criminal

 2    cases.  It does not apply in civil cases such as this.  You

 3    should, therefore, put it out of your minds.

 4          Your verdict must be based on the facts as you find

 5    them and on the law contained in all of these instructions.

 6    The issues in this case are:  One, was Kroger negligent; two,

 7    if Kroger was negligent was its negligence a proximate cause

 8    of the accident?  On these issues the plaintiff has the

 9    burden of proof.  Then, three, was the plaintiff negligent?

10    If so, was her negligence the proximate cause of the

11    accident?  On these issues the defendant has the burden of

12    proof.  And, lastly, if the plaintiff is entitled to recover

13    what is the amount of her damages?  On this issue the

14    plaintiff has the burden of proof.

15          An invitee is one who visits premises lawfully at

16    the express or implied invitation of the occupant.  He or she

17    is one who visits other than for a social purpose.

18          Both the plaintiff and the defendant have a duty to

19    exercise reasonable care in performing the duties defined in

20    these instructions.  Reasonable care is the care that a

21    reasonable person would exercise under the same or similar

22    circumstances.

23          An invitee has a right to assume the premises are

24    reasonably safe.  An occupant of premises such as the Kroger

25    company does not guarantee an invitee's safety; rather, it

1   has the duty to use ordinary care to have the premises in a

2   reasonably safe condition for an invitee's use consistent

3   with the invitation, unless the invitee knows or should have

4   known of an unsafe condition, and to use ordinary care to

5   warn an invitee of any unsafe condition about which the

6   occupant knows or by the use of ordinary care should know,

7   unless the unsafe condition is open and obvious to a person

8   using ordinary care for her own safety.  If an occupant fails

9   to perform either or both of these duties then it is

10  negligent.

11          If you find by a preponderance of the evidence that

12  the condition in question was so slight or ordinary that no

13  careful or prudent person would reasonably anticipate any

14  danger from its existence, then as a matter of law there's no

15  actionable negligence.

16          The word "proximate" as used in these instructions

17  in defining proximate cause is a legal term.  It does not

18  mean approximate, with an A in front.  It is a cause of an

19  accident, injury or damage and one which in natural and

20  continuous sequence produces the accident, injury or damage.

21  It is a cause without which the accident, injury or damage

22  would not have occurred.

23          Contributory negligence is the failure to act as a

24  reasonable person would have acted for her own safety under

25  the circumstances of the case.  When the defendant, the

1  Kroger company, claims contributory negligence as a defense

2  the Kroger company has the burden of proving by a

3  preponderance of the evidence that the plaintiff was

4  negligent and that this negligence was a proximate cause of

5  the plaintiff's injuries.

6         If you find from the greater weight of the evidence

7  that both the plaintiff and the defendant were negligent and

8  their negligence proximately contributed to the accident, you

9  may not compare the negligence of the parties.  Any

10 negligence of the plaintiff which was a proximate cause of

11 the accident will bar the plaintiff from recovery.

12        There may be more than one proximate cause of an

13 injury or damage.  The fact that there was an accident and

14 the plaintiff was injured does not of itself entitle the

15 plaintiff to recover.  If you find that the condition was an

16 open and obvious condition and this should have been avoided

17 by the plaintiff exercising reasonable care for her own

18 safety, then the plaintiff is guilty of contributory

19 negligence.

20        You are permitted but not required to infer that the

21 store's June 3rd, 2010, surveillance videotapes would have

22 been unfavorable to Kroger's theory of the case based on

23 Kroger's destruction of the videotapes after the store

24 manager had received an evidence preservation letter from the

25 attorney.  If you do draw an adverse inference against Kroger

1    from its conduct, then you may consider that inference with

2    the other evidence to decide the question of negligence.

3         You shall find your verdict for the plaintiff if she

4    has proved by the greater weight of the evidence that, one,

5    the defendant was negligent, and that the defendant's

6    negligence was a proximate cause of the plaintiff's accident

7    and damages.

8         You shall find your verdict for the defendant if the

9    plaintiff failed to prove either or both of the two elements

10   above or if you find by the greater weight of the evidence

11   that the plaintiff was contributorily negligent and that her

12   contributory negligence was a proximate cause of the

13   accident.

14        This is really a simple case.  The question is was

15   the accident caused by whatever defect is claimed in the

16   drain.  That's what this case is about.  And the question is

17   whether Kroger knew of this defect and failed to warn the

18   defendant of the defect or failed to take proper action to

19   rid itself of the defect.

20        The question, really, you're going to have to

21   decide -- and these are my comments -- is the fact that you

22   have to determine if this defect caused Mrs. Aaron to fall.

23   And that is the real test in this case, to determine that.

24   The question is was the defect negligent, and, if so, did

25   this defect, whatever it was -- because I'm having -- well, I

1   have some problems with it, and I'm sure you have.  But you

2   have done something that I haven't done.  I haven't seen the

3   drain.  Each and every one of you have seen the drain.

4   You'll see whether it's defective just as an ordinary person

5   would look at it, you know?

6           Kroger is required to use reasonable care to provide

7   a safe way to walk.  It is not something that is absolute

8   that they have to do, it's what they have to do as a

9   reasonable person.  And although they're not a person, they

10  are tested just as if a person would be tested.

11          And remember, my comments are not the law.  The law

12  is as stated in these instructions.

13          If you find your verdict for the plaintiff, then in

14  determining the damage to which she is entitled you should

15  consider any of the following which you believe by a

16  preponderance of the evidence was caused by the negligence of

17  the defendant, the Kroger company, by and through its

18  employees:

19          One, any bodily injury sustained by the plaintiff

20  and their effect on her health according to their degree and

21  probable duration; any physical pain and mental anguish that

22  the plaintiff suffered in the past and any that she may be

23  reasonably expected to suffer in the future; any associated

24  humiliation or embarrassment; any inconvenience caused in the

25  past and any that probably will be caused in the future; and,

1  lastly, the medical expenses Mrs. Aaron incurred, which

2  amounts have been stipulated in the Plaintiff's Exhibit 25.

3  If you find your verdict for the plaintiff, your

4  verdict shall be for such sum as will fully and fairly

5  compensate the plaintiff for the damages she sustained as a

6  result of Kroger's negligence, if any.

7  Your verdict must represent the considered judgment

8  of each juror.  In other words, your verdict must be

9  unanimous.  Each of you must decide the case for yourself but

10  only after an impartial consideration of all the evidence in

11  the case with your fellow jurors.  It's your duty as jurors

12  to consult with one another and to deliberate with a view to

13  reaching an agreement, if you can do so without violence to

14  your individual judgment.  In the course of your

15  deliberations do not hesitate to re-examine your own views

16  and to change your opinions if convinced it is erroneous, but

17  do not surrender your honest conviction as to the weight or

18  effect of the evidence solely because of the opinions of your

19  fellow jurors or for the mere purpose of returning a verdict.

20  Remember at all times you're not partisans.  You are the

21  judges of the facts.  You represent the public in this case.

22  Upon returning to the jury room you should first

23  select one of your number to act as your foreman or

24  forewoman, who will preside over your deliberations and will

25  be your spokesperson here in court.  Forms of your verdict

have been prepared for your convenience.  You will take the
verdict forms to the jury room, and when you've reached a
unanimous agreement as to your verdict then you will have
your foreman or forewoman fill it in, date and sign the
appropriate form, and then return to the courtroom.

          If during your deliberations you should desire to
communicate with the Court your message or question must be
put in writing and signed by the foreman or forewoman.  And
you will then give the note to Mr. Pierce, who will bring it
to my attention.  He won't read it.  You fold it over, then I
will take it.  And let me tell you what I've got to do.
Because I may be able to answer that question in two seconds.
However, I must give the lawyers an opportunity to have their
input and their expression, and sometimes that takes a long
time.  I just want to tell you.  So if you don't get an
answer that doesn't mean I don't know the answer, it means
that I am giving due process to the parties that they may
have their input and their objections to it.  So you would
know why it's taking so long, I just want you to understand
that.  I don't allow the attorneys to leave the courthouse,
so I get them down here quickly.  I can assure you that.  I
get them here very quickly.

          I will respond to the question as soon as I possibly
can, most likely in writing, or if it's something that
requires more information I'll ask you to return to the

1    courtroom so that I can do so orally.  If you do transmit a

2    message or question to the Court you must not state or

3    specify your numerical division.  Don't tell me, "Somebody

4    wants to do this" or "that" unless it's somebody wants to go

5    to the bathroom.  You just tell Mr. Pierce, "Somebody wants

6    to do this" or "use that and it's crowded, and is there

7    another bathroom" or something of that nature.  We have two

8    bathrooms in the jury room.  Sometimes two or more people may

9    want to use them at the same time, and it creates a problem.

10          And, lastly, don't interpret anything I have said or

11   done during the trial as suggesting to you what I think your

12   verdict should be.  I'm very interested in you arriving at a

13   verdict, but your verdict is exclusively your duty and

14   responsibility.  It's not mine.  I don't pretend in any way

15   to tell you what your verdict should be.

16          And do we have a verdict form there, Ms. Baxter?

17          THE CLERK:  Yes, sir.  It's on the bench.

18          THE COURT:  There it is.  Here's the verdict form,

19   ladies and gentlemen.  It's "In the United States District

20   Court for the Eastern District of Virginia, Norfolk Division,

21   Jury Verdict."  It's got the case number, the person's name,

22   verdict form.  "We, the jury, find for the plaintiff and

23   fix" -- "damages shall be fixed at" -- and you'll fill in the

24   damages if you find for the plaintiff.  "We, the jury, find

25   for the defendant," and that's it.

1          Now, when you say -- the space here for "We, the

2    jury, find for the plaintiff" -- you say, "Yes, we, the jury,

3    find for the plaintiff, and damages shall be fixed at," or,

4    "We, the jury, find for the defendant" -- you can put "Yes"

5    or "No."  You don't have to put "No" if you have found for

6    the plaintiff, but you have to put "No" if you -- I don't

7    know why.  You wouldn't have to put "No" at all.  You can

8    say, "We the jury find for the defendant."  So you have all

9    of this.

10         You'll be getting the exhibits.  The attorneys have

11   an opportunity to correct or make any objections, so don't

12   begin your deliberations until you get this verdict form,

13   these instructions and the exhibits.

14         Everyone please rise while the jury retires.

15         (The jury withdrew from the courtroom.)

16         THE COURT:  All right.  You may be seated.

17         I'll hear from the plaintiff first.  Do you have

18   anything; Mr. Wilson, other than your prior objections?

19         MR. WILSON:  I -- my prior objections.  I want to

20   add a further objection to some of the comments you made to

21   the jury as you were instructing them in which you said you

22   might have had --

23         THE COURT:  What comment?

24         MR. WILSON:  When you said, "I have serious doubts

25   about the case, as you might as well," and you then -- so I

1    just want to put it on the record.

2            THE COURT:  Did I say that?  Uh-oh.  Well, I do have

3    serious doubts, but I don't decide the case.

4            MR. WILSON:  Yes.

5            MR. SKAFF:  I have nothing to add.  My prior --

6            THE COURT:  Your prior objections you adopt.

7            MR. SKAFF:  Yes, sir.

8            THE COURT:  Well, you may be right, Mr. Wilson.  I

9    wish I hadn't said that.  But I do have serious doubts about

10   the case, Mr. Wilson.

11           MR. WILSON:  Your Honor, that's why I asked for a

12   jury trial.

13           THE COURT:  All right.  We'll recess until we have

14   something.

15           All right.  Carry the exhibits in to the jury room.

16           Yes, sir, Mr. Skaff.

17           MR. SKAFF:  Can I ask you a quick question?

18           You mentioned that we couldn't leave the courthouse.

19   I need to get out of my room.  Is it possible that I could

20   run and get my stuff out of my room real quick?

21           THE COURT:  Yes.  They'll eat their lunch, so you go

22   run.

23           MR. SKAFF:  Yes, sir.  Thank you.

24           THE COURT:  Have you got a cell phone back at your

25   room?  I know you didn't bring it with you.

```
 1          MR. SKAFF:  Yes, sir, I do.

 2          THE COURT:  What is that number?  Would you carry it

 3    with you?  What's the number?

 4          MR. SKAFF:  540-353-1512.

 5          THE COURT:  1 what?

 6          MR. SKAFF:  1512.

 7          THE COURT:  I may have to call you.

 8          MR. SKAFF:  Judge, it won't take me very long.  I'm

 9    just two blocks over.  I'll run over there and get my stuff

10    and get it out.

11          THE COURT:  Hustle, then.  What I'm worried about is

12    if they have a question.  Okay?

13          (There was a pause in the proceedings.)

14          (The exhibits were delivered to the jury.)

15          THE COURT:  All right.  We'll recess until we have a

16    verdict.

17          (A recess was taken pending the jury's verdict.)

18          THE COURT:  The question that the jury has is an

19    interesting question.

20          "What was Ms. Aaron's exact testimony regarding

21    'falling immediately when I turned the corner' or words to

22    that effect?"

23          The only thing I can suggest is that the court

24    reporter read back whatever that testimony was.  Anybody have

25    any suggestion?
```

1          MR. WILSON:  I mean, I don't -- I don't think I can

2     paraphrase it, so, I mean, that would be the only thing -- if

3     that's what they're asking for, that would be the only way I

4     would know how to communicate it.

5          MR. SKAFF:  Your Honor, I guess I have some concerns

6     about that, given the fact that, you know, aren't they to

7     just consider what they've already heard and go from there?

8          THE COURT:  I'm going to allow it to be read back,

9     Mr. Skaff.  I think I'm just going to allow it.

10          Heidi, can you find it in her testimony?

11          THE COURT REPORTER:  Yes, sir.

12          MR. SKAFF:  If you would just note our objection.

13          The other point of that is she testified about that

14     several times.  I know she even testified to it in response

15     to some of Your Honor's questions.

16          THE COURT:  Well, she may have testified two or

17     three times, and then I'll just have -- I don't know what she

18     testified.  I can't remember the exact testimony.  But she

19     did say, "I turned the corner" or something to that effect.

20          See what you can find on it, Heidi.

21          THE COURT REPORTER:  Yes, sir, Judge.

22          THE COURT:  It may be more than once that she talks

23     about falling immediately.  Let's take a check on it.  I wish

24     I had total recall.

25          (There was a pause in the proceedings.)

1          THE COURT:  All right.  We'll bring in the jury.
2    Where did Mr. Wilson go?
3          MR. SKAFF:  He's trying to get Mrs. Aaron.
4          THE COURT:  We don't need Mrs. Aaron.
5          Everybody please rise.
6          (The jury entered the courtroom.)
7          THE COURT:  This won't take but a minute.  We've got
8    the exact words.  You may be seated.
9          The question is, "What was Ms. Aaron's exact
10   testimony regarding 'falling immediately when I turned the
11   corner' or words to that effect."
12         Would you read that portion, please, Ms. Jeffreys.
13         (The excerpt of the testimony was read by the court
14   reporter as follows:)
15   Q.  "And what course did you take to return to your shopping
16   cart?
17   A.  "I was right here in the center, and I took that corner
18   to turn here to go to the shopping cart.
19   Q.  "Okay.  And where was it that you fell?
20   A.  "Almost immediately after I had turned the corner."
21         THE COURT:  That's enough.  Stop.
22         Does that answer your question?
23         All right.  Everyone please rise while the jury
24   retires.
25         (The jury withdrew from the courtroom.)

 1          THE COURT:  We'll recess until we have another

 2    question or something, okay?

 3          (A recess was taken pending the jury's verdict.)

 4          THE COURT:  Okay.  The jury has another question.

 5    This is an interesting question.

 6          It says, "Exhibit P 3D, the pallet guard, is much

 7    closer to the drain than in Exhibit P 1.  Exhibit P 3D also

 8    has a date of 6-3-10.  Was P 3D the more accurate of the two

 9    pictures?  Do we know the date of Exhibit P 1?"

10          MR. SKAFF:  Your Honor, I don't -- there was no

11    testimony about any of that issue.  The only issue -- and the

12    pictures with the date on them are -- they were never

13    discussed.

14          THE COURT:  Nobody testified as to the dates of the

15    pictures.

16          MR. SKAFF:  That's right.

17          THE COURT:  Isn't that true, Mr. --

18          MR. WILSON:  Yeah.  The testimony -- every one of us

19    asked, "Does P 1 show the conditions as of the date of the

20    accident," and all the witnesses were saying, "Yes."  That's

21    what they used.  P 3D -- they were using a different type of

22    camera.

23          THE COURT:  Would somebody tell me what the pallet

24    guard is they're talking about?

25          MR. SKAFF:  The black board.

```
 1          MR. WILSON:  The testimony has been in the case that
 2    P 1 -- nobody has discussed P 3, so P 1 is more accurate of
 3    the two.
 4          THE COURT:  I can't say which is more accurate.  I'm
 5    just not going to say, because then I'll be testifying.  I
 6    can't do that.  I can do it if you agree on it.
 7          MR. SKAFF:  Well, I think -- I think, given the
 8    testimony, that we'd have to say that P 1 accurately depicted
 9    the area on the date of the fall.
10          MR. WILSON:  I think that was unanimous by the
11    witnesses.
12          THE COURT:  So what do you want me to say, then?  Do
13    you want me to say that P 1 is much closer to the drain than
14    Exhibit...
15          (There was a pause in the proceedings.)
16          THE COURT:  In that case, I'll just say, "P 1 is the
17    one that the testimony is more accurate."
18          MR. SKAFF:  I think that's the safest thing, Your
19    Honor, is to say that Exhibit P 1 is --
20          THE COURT:  Do you agree with that?
21          MR. WILSON:  Absolutely.
22          THE COURT:  All right.  Bring in the -- I'll just
23    answer the question.
24          The second question is, "Do we know the date of
25    Exhibit P 1?"
```

         1          MR. SKAFF:  There's no testimony on it, Your Honor.

         2          MR. WILSON:  No testimony.

         3          THE COURT:  Well, they saw it.  Why are they asking?

         4          "P 1, counsel agree, is the most accurate."

         5          MR. SKAFF:  I think we have to be careful, Your

         6   Honor.  I think, according to the testimony, that accurately

         7   depicted -- just say, "P 1 accurately depicted the scene on

         8   the date of the accident."

         9          MR. WILSON:  I agree with that description.

        10          THE COURT:  How do you spell scene, S-C-E-N-E?  I

        11   remember somebody telling me once if they judged me on

        12   spelling I would have failed in law school.

        13          ...at the scene...

        14          Who is the foreman?  We already saw who the foreman

        15   is.

        16          THE CLERK:  The foreman is Roy Spargur.

        17          THE COURT:  Here's what I've said:

        18          "P 1, counsel agree, is the most accurate picture of

        19   the scene, according to the testimony."

        20          Is that satisfactory?

        21          MR. WILSON:  Based on the testimony, P 1 --

        22          THE COURT:  "P 1, counsel agree, is the most

        23   accurate picture of the scene, according to the testimony."

        24          MR. SKAFF:  Here's what I would suggest, Your Honor:

        25          I would just say, "According to the testimony in the

1  case, P 1 accurately depicted the scene on the date of the

2  accident."

3          THE COURT:  I'm not going to send this back with the

4  prior answer in there.

5          Okay.  Now what's the agreed statement?

6          MR. SKAFF:  "According to the testimony" --

7          THE COURT:  "P 1" --

8          MR. SKAFF:  -- "P 1 accurately depicted the scene on

9  the date of the accident."

10          THE COURT:  Okay.  You-all look at this answer that

11  we're going to send back to the jury.  Look at it and see if

12  you agree with it -- you don't have to agree with it; see if

13  it's correct.

14          If you have trouble reading my writing, tell me.  If

15  you do, I --

16          MR. WILSON:  There might be a misspelling, but I'm

17  not going to be the one to point it out.

18          MR. SKAFF:  That's fine.

19          THE COURT:  Is it all right?

20          MR. WILSON:  It's fine.

21          THE COURT:  All right.  You can take it back in.

22  Here, let me fold it.  I don't want the question taken back.

23  It's been written all over by me.

24          File this.

25          THE CLERK:  Yes, sir.

```
1              THE COURT:  Take this back, Bob, if you would.
2    Thank you.
3              THE CSO:  Yes, sir.
4              THE COURT:  Okay.  We'll recess until we have
5    another question or a verdict.
6              (A recess was taken pending the jury's verdict.)
7              THE COURT:  Okay.  Everyone please stand.  Bring in
8    the jury.
9              (The jury entered the courtroom.)
10             THE COURT:  You may be seated.  Mr. Spargur, has the
11   jury arrived at a verdict?
12             THE FOREMAN:  We have, Your Honor.
13             THE COURT:  Would you hand it to Mr. Pierce.
14             (There was a pause in the proceedings.)
15             THE CLERK:  Members of the jury, harken unto your
16   verdict:
17             In Civil Action No. 2:10cv606, Plaintiff Margaret M.
18   Aaron v. Kroger Limited Partnership I.  We, the jury, find
19   for the defendant.
20             Signed:  Roy Spargur.  Dated 1-26-2012.
21             Members of the jury, is this your verdict, so say
22   you all?
23             (All members of the jury indicated in the
24   affirmative.)
25             THE CLERK:  Thank you.
```

THE COURT:  All right, ladies and gentlemen.  I thank you very much.  It's always difficult to arrive at conclusions in these cases, and oftentimes it gives you some consternation.  However, Mrs. Aaron is a nice lady, as the defendant said, but it's just unfortunate.  The store does not have to be an insurer of the safety of the people who use it.  We just have to accept certain responsibilities.

And I appreciate your verdict, and I appreciate your service.  What I did notice -- it's been a long time since I've ever seen someone quote exactly what someone said in a question that was put back to the jury, you know, that was testified to.  I couldn't get over the exact quote that came in about turning the corner.  I have to mention that, because in 30 years no jury has ever done that, and I just had to tell you that.

Everyone please rise while the jury retires.

(The jury withdrew from the courtroom.)

THE COURT:  You may be seated.

Are you going to file a motion, Mr. Wilson?

MR. WILSON:  I think I need to consider grounds for a mistrial based on some of the comments that were made in the presence of the jury after the instructions.

THE COURT:  Well, you can't very well do it now because it's too late.  You have to move for the mistrial when the error is committed.  However, I'll allow you to file

 1   a memorandum, if you desire.

 2           MR. WILSON:  Yeah.  Or I'll just appeal it, one of

 3   the two, Judge.

 4           THE COURT:  All right.  Anything else?

 5           MR. SKAFF:  No, Your Honor.

 6           THE COURT:  Okay.  You've got ten days to file your

 7   motion, Mr. Wilson.

 8           MR. WILSON:  I will.  And I'll consider it

 9   thoughtfully before we do so.

10           THE COURT:  All right.

11           (The hearing adjourned at 3:26 p.m.)

12

13

14

15

16                          CERTIFICATION

17

18           I certify that the foregoing is a correct transcript

19   from the record of proceedings in the above-entitled matter.

20

21                             s/s

22                        Heidi L. Jeffreys

23

24                        April 16, 2012

25                            Date


                Heidi L. Jeffreys, Official Court Reporter